## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

RAMY SHAKER, TRACY
KNIERIM, LISA BARTA, and
CHERYL WELLNITZ, individually
and on behalf of a class of similarly
situated individuals,

        Plaintiff,

v.

CHAMPION PETFOODS USA, INC.
and CHAMPION PETFOODS LP,

        Defendants.

Case No. 2:18-cv-13603-LJM-DRG

Honorable Laurie J. Michelson

**SECOND AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMAND**

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

1

## **INTRODUCTION**

1.      Plaintiffs Ramy Shaker, Tracy Knierim, Cheryl Wellnitz, and Lisa Barta (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendants Champion Petfoods USA, Inc. and Champion Petfoods LP ("Defendants"), for their negligent, reckless, and/or intentional marketing practices of using misleading packaging claims and omissions to misrepresent the quality and characteristics of their dog food diets and ingredients.

2.      Defendants intentionally labeled their dog food to include packaging claims that targeted consumers who were willing to pay premium prices based on Defendants' representations and warranties that their dog food contained fresh, local, or regionally sourced ingredients. Among other things, these packaging claims included that the food is "Biologically Appropriate™," contains "Fresh Regional Ingredients," and is "[n]atural[]."

3.      However, during at least 2014 through the present, Defendants' packaging claims were misleading due to the negligent, reckless, and/or intentional use of non-conforming ingredients and contaminants, as alleged herein. Defendants' packaging failed to disclose the use of ingredients and presence of contaminants that are material to a reasonable consumer's purchasing decision. As a result, Defendants' misleading packaging claims and failure to warn injured

2

consumers, such as Plaintiffs, who reasonably relied upon the misleading packaging

claims when purchasing Defendants' premium priced dog food.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over all causes of action asserted herein

under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter

in controversy exceeds the sum or value of $5,000,000 exclusive  of interest and

costs, as asserted by Defendants in their removal of this case from state court,

and all members of the Class reside in Michigan, which is a state other than the

state(s) in which Defendants are citizens and the state in which this case filed,

and therefore any discretionary exceptions to jurisdiction do not apply.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because

Plaintiffs reside and suffered injury as a result of Defendants' acts in this District,

many of the acts and transactions giving rise to this action occurred in this

District, Defendants conduct substantial business in this District, Defendants

have intentionally availed themselves of the laws and markets of this district, and

Defendants are subject to persona jurisdiction in this District.

## PARTIES

### A.     Plaintiffs

6.     Plaintiff Ramy Shaker ("Plaintiff Shaker") is, and at all times

relevant hereto has been, a citizen of the County of Wayne, state of Michigan.

Plaintiff Shaker purchased the following Alleged Premium Dog Foods: Acana

Singles Duck and Pear Formula Dry Dog Food and Acana Singles Mackerel and Greens Formula Dry Dog Food. Plaintiff Shaker purchased approximately sixteen bags twice a year starting approximately in May 2008 to March 2018. Plaintiff Shaker generally purchased the Alleged Premium Dog Foods from a Specialty Pet Supplies in Plymouth, Michigan.

7.     Plaintiff Tracy Knierim ("Plaintiff Knierim") is, and at all times relevant hereto has been, a citizen of the state of Michigan. Between June 2014 and March 2018, Plaintiff Knierim purchased Orijen Regional Red Dry Dog Food, buying one bag approximately every week. Plaintiff Knierim generally purchased the Alleged Premium Dog Foods from Pet Supply Plus, Store #2, in Woodhaven, Michigan.

8.     Cheryl Wellnitz ("Plaintiff Wellnitz") is, and at all times relevant hereto has been, a citizen of the state of Michigan. Between June 2013 and September 2016, Plaintiff Wellnitz purchased Acana Wild Prairie Dry Dog Food, Orijen Large Breed Dry Dog Food, Orijen Large Breed Puppy Dry Dog Food, and Acana Heritage Dry Dog Food on a regular basis. Plaintiff Wellnitz generally purchased the Alleged Premium Dog Foods from Louie's Pet Baestro in Auburn, Michigan.

9.     Lisa Barta ("Plaintiff Barta") is, and at all times relevant hereto has been, a citizen of the state of Michigan. Plaintiff Barta purchased approximately

4

130 bags of Orijen Senior Dry Dog Food and approximately 14 bags of Acana Meadowland Dry Dog Food between October 2010 and June 2018, making purchases approximately every three weeks. Prior to that, in 2009 and 2010, Plaintiff Barta purchased approximately 20 bags of Acana Wild Prairie Dry Dog Food. Plaintiff Barta generally purchased the Alleged Premium Dog Foods at Feed Rite Pet Supply in Lincoln Park, Michigan.

10.     Prior to purchase, Plaintiffs all saw and relied upon Defendants' packaging when making their decision to buy Defendants' dog food.

11.     Defendants' dog food packaging and labeling included the following misleading packaging claims, among others, "Biologically Appropriate™," "Fresh [Ingredients]," "Regional Ingredients," and that it would "Nourish as Nature Intended," and "Deliver[] Nutrients Naturally."

12.     Among other things, Plaintiffs were unaware that Defendants' dog food was not sufficiently monitored for heavy metals or BISPHENOL A ("BPA"); Defendants' dog food was at risk of containing heavy metals or BPA; Defendants' dog food contained a material amount of non-fresh ingredients, such as regrinds; Defendants' dog food contained a material amount of non-regional ingredients; and that Defendants' dog food was at risk of being adulterated by pentobarbital.

13.    Plaintiffs, like other reasonable consumers, reasonably relied on Defendants' misleading packaging and labeling when deciding to purchase Defendants' dog food at a premium price.

14.    As the result of Defendants' wrongful conduct, as alleged herein, Defendants injured Plaintiffs when Plaintiffs were misled to pay premium prices for Defendants' misleadingly-packaged dog food, because the dog food did not deliver what was promised. Plaintiffs would not have purchased the dog food, or paid the premium prices, if they had not been deceived by Defendants' misleading packaging claims and omissions.

15.    Plaintiffs and the members of the Class would not have purchased Defendants' dog food at all, let alone at Defendants' premium prices, had Defendants not used these Misleading Packaging Claims or had Defendants properly disclosed the risk and inclusion of contaminants and ingredients that did not conform to the packaging.

16.    If Plaintiffs or the members of the proposed Classes were to encounter Defendants' dog foods in the future, they could not rely on the truthfulness of the packaging unless Defendants' packaging and labeling corrected their misleading packaging claims and omissions.

**B.**    **Defendants**

17.    Defendant Champion Petfoods USA Inc. ("Champion USA") is incorporated in Delaware. Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, KY 42206. Since that time, all Acana and Orijen dog foods sold in the United States are manufactured, sourced, and sold by Champion USA.

18.    Defendant Champion Petfoods LP ("Champion Canada") is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6. Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA. Prior to March 2016, all Acana and Orijen dog foods sold in the United States were manufactured, sourced and sold by Champion Canada.

19.    Defendants formulated, developed, manufactured, labeled, distributed, marketed, advertise, and sold Orijen and Acana (hereafter "Alleged Premium Dog Food") throughout the United States, including in this district, during the Class Period.

20.    The packaging for the Alleged Premium Dog Food that Plaintiffs relied upon when making their purchases, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents

through the packaging and labeling of the Alleged Premium Dog Food that contained the misrepresentations and omissions alleged herein.

21.     Defendants intended for consumers, such as Plaintiffs, to rely on the statements on the packaging and labeling when deciding to purchase the Alleged Premium Dog Food. As a result of Defendants' misrepresentations and omissions, reasonable consumers, including the Plaintiffs and the Classes, were misled into purchasing the Alleged Premium Dog Food at premium prices.

22.     Defendants own, manufacture, and distribute the Alleged Premium Dog Food and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging for the Alleged Premium Dog Food.

23.     Defendants are responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the Alleged Premium Dog Food and ingredients. Based on this, Defendants knew there were material omissions concerning the true quality and nature of the Alleged Premium Dog Food and its ingredients that did not conform to the packaging claims.

## FACTUAL ALLEGATIONS

I.     **EVOLUTION OF DEFENDANTS' PACKAGING CLAIMS**

A.     **Original Packaging Claims Were Plain and Generic**

24.     Founded in the 1970s, Defendants entered the dog food industry by selling a traditional, dry dog food kibble and used plain and minimal claims on their packaging.

25.     In the 1990s, Defendants launched their Acana brand, which made packaging claims such as "premium" and "high quality" on its packaging. The following is an example of Defendants' original Acana packaging:

*Old Acana Packaging:*



**B.**     **Introduction of Misleading Packaging Claims**

26.     Defendants were—and continue to be—aware that some consumers perceive their dogs as members of the family. Defendants referred to these consumers as "Pet Lovers" and targeted Pet Lovers as potential consumers for their dog food.

27.     Defendants believed and continue to believe that consumers, including Pet Lovers, would be willing to pay a price premium for dog foods that advertised, represented, and used fresh, locally or regionally sourced ingredients.

28.     In 2006, Defendants launched their new dog food brand, Orijen. Before launching Orijen, Defendants developed new packaging claims and labels for Orijen's packaging that aligned with their belief that consumers were willing to pay a price premium for dog foods that used fresh, locally or regionally sourced ingredients. Defendants designed their new packaging claims to target and appeal to such consumers.

29.     Defendants' new packaging claims for their Orijen brand included the representation that Orijen was a Biologically Appropriate™ dog food. Biologically Appropriate™ was a marketing concept that Defendants intended to represent that Orijen diets contained large amounts of fresh meat and fish ingredients, which Defendants advertised were purchased from local or regional farmers, ranchers, and fisheries.

30.     Defendants included these packaging claims on their labels to emphasize and induce consumers to purchase Orijen diets based on their represented use of ingredients that were fresh, natural, and nourishing.

31.     After Orijen's launch, Defendants saw that they could sell the Alleged Premium Dog Food at premium prices because they represented that it was Biologically Appropriate and used fresh, locally or regionally sourced ingredients. Defendants eventually conformed Acana's packaging claims to be substantially similar to those advertised on Orijen.

32.     Defendants' packaging claims on the Alleged Premium Dog Food packaging were expanded to include that they were "Trusted Everywhere," and used "Ingredients We Love [From] People We Trust" to represent to consumers that they could trust Defendants to manufacture and sell Alleged Premium Dog Food that conformed to their packaging labels and claims, as well as to advertise and represent that they loved their ingredients and would be accountable for their ingredients and ingredient suppliers.

33.     Defendants expanded their packaging claims and began representing that their dog food was **B**iologically **A**ppropriate™ and was made from **F**resh **R**egional **I**ngredients. Biologically Appropriate™ is a trademarked advertising concept that Defendants intended to communicate to consumers that they manufactured their Alleged Premium Dog Food to mirror a dog's natural diet.

11

34. Through their Biologically Appropriate™ packaging claim, Defendants promised and represented to consumers that the Alleged Premium Dog Food contained large amounts of natural and nutritious meat and fish ingredients.

35. Defendants' packaging claim of "Fresh Regional Ingredients" promised and represented to consumers that Defendants used a material amount of fresh ingredients that they sourced locally or regionally, in the Alleged Premium Dog Food.

36. In an effort to further support their premium prices, Defendants used additional misrepresentations, including "Nourish as Nature Intended" and "Delivering Nutrients Naturally" (together "the natural claims").

37. Defendants' natural claims represented and guaranteed to consumers that the Alleged Premium Dog Food contained only natural, nourishing ingredients, in alignment with Defendants' Biologically Appropriate™ packaging claim.

38. Defendants' meat and fish inclusion claims advertised that their Alleged Premium Dog Food contained specific inclusion ratios of meat and fish ingredients as a means to support their representations that the Alleged Premium Dog Food contained "Fresh Regional Ingredients" that were Biologically Appropriate™ for dogs to consume.

39. Defendants used Featured Farmer advertisements on their packaging, which displayed large photographs of local, family owned farmers and ranchers, to

leverage their purported use of fresh, local, and regional ingredients, in accordance with their Fresh Regional Ingredients packaging claim.

40.     Defendants could and did charge premium prices for the Alleged Premium Dog Food based on their packaging claims on their labels and packaging. These packaging claims included the following: Biologically Appropriate™, "Fresh Regional Ingredients," and the natural claims.[1]

41.     Defendants admitted that their BAFRINO packaging claims (their abbreviation for Biologically Appropriate, Fresh, Regional and Never Outsourced) were the driving force that increased the sale of the Alleged Premium Dog Food and secured their status as a leader and innovator in the premium dog food market.

42.     Defendants also added the packaging claims of "Nourish as Nature Intended" and "Delivering Nutrients Naturally" to the Premium Priced Dog Food packaging. Defendants added these "natural" packaging claims to communicate to consumers that the Premium Priced Dog Food and the ingredients used in the Premium Priced Dog Food were natural and nutritious.

43.     Defendants were further aided in selling the Alleged Premium Dog Food at premium prices and maintaining their status in the premium dog food market by using the following misrepresentations: "Trusted Everywhere,"

---

[1] Hereafter referred to collectively as "Misleading Packaging claims."

"Ingredients We Love [From] People We Trust," MeatMath; Biologically Appropriate Ratios of Premium Meat Ingredients; and Feature Farmer.

44.    These statements reinforced Defendants' Misleading Packaging claims and conveyed to consumers that the Alleged Premium Dog Foods emphasized the use of large amounts of fresh, regional, and Biologically Appropriate ingredients that were natural and nourishing.

45.    Defendants charged one of the highest, if not the highest, price premiums in the market for their dog foods.

46.    Defendants' average retail price for their Orijen diets was approximately $9 per kilogram ($4 per pound) and $7 per kilogram ($3 per pound) for Acana diets.

47.    The average price point for premium dry dog food is approximately at $4 per kilogram ($2 per pound). On average, the Alleged Premium Dog Food had a premium price point of $7 per kilogram ($3 per pound) – almost double the average price that consumers paid for other premium priced dog foods.

48.    Defendants knew or should have known that the Premium Priced Dog Food was one of the most expensive dog foods sold in retail markets.

49.    The following is a representative example of the old Acana packaging compared to the Alleged Premium Dog Food packaging (Acana Singles Lamb and Apple):

*Old Acana Packaging:*



*New Acana Packaging:*



50.    Photographs of the following Alleged Premium Dog Food packaging can be found in Exhibit 1:

(a) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish;

(b) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird;

(c) Acana Regionals Meadowland with Free-Run Kentucky Poultry, Freshwater Fish, and Nest-Laid Eggs;

(d) Acana Regionals Wild Atlantic with Wild-Caught New England Fish & Fresh Kentucky Greens;

(e) Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs;

(f) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel;

(g) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake;

(h) Acana Singles Duck and Pear;

(i) Acana Singles Lamb and Apple;

(j) Acana Heritage Free-Run Poultry;

(k) Acana Heritage Freshwater Fish;

(l) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish;

(m) Orijen Tundra with Goat, Venison, Mutton, Bison, Arctic Char, Rabbit;

16

(n) Orijen Grain Free Puppy with Chicken, Turkey, Wild-Caught Fish, Eggs;

(o) Acana Singles Mackerel and Greens;

(p) Acana Singles Pork and Squash;

(q) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and

(r) Acana Heritage Meats.

## II.   MISLEADING PACKAGING CLAIMS AND OMISSIONS

### A.   Biologically Appropriate™

51.   The following images are some representative examples of Defendants' Biologically Appropriate™ packaging claims with regard to the Alleged Premium Dog Food respectively:

*As Represented on Orijen Regional Red:*



*As Represented on Acana Singles Lamb & Apple:*



**B.    "Fresh Regional Ingredients"**

52.    The following images are some examples of Defendants' "Fresh Regional Ingredient" packaging claim with regard to the Alleged Premium Dog Food respectively:

*As Represented on Orijen Six Fish:*



18

*As Represented on Acana Singles Duck and Pear*:



## C.   Natural Claims

53.   The following images are some examples of Defendants' natural packaging claim with regard to the Alleged Premium Dog Food respectively:



*As Represented on Acana Singles Lamb and Apple:*

DELIVERING NUTRIENTS NATURALLY.

19

### E.    Omissions

54.    As discussed above, Defendants' packaging also misleadingly omitted the presence of heavy metals, BPA, and the inclusion of non-fresh ingredients, non-regional ingredients, and pentobarbital. Defendants intentionally omitted these ingredients and contaminants in order to induce and mislead reasonable consumers to purchase Defendants' dog food at premium prices.

## III.   WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING

### A.    Heavy Metals

55.    Defendants' Alleged Premium Dog Food had a risk of containing heavy metals due to Defendants' failure to monitor for their presence in their ingredients and finished products. Defendants were aware of this risk and failed to disclose it to Plaintiffs and the Classes.

56.    Heavy metals include mercury, lead, arsenic, and cadmium. Exposure of animals to these toxins can cause serious illness.

57.    Arsenic is an odorless and tasteless element that does not degrade or disappear. Arsenic occurs in the environment and can be found in rocks, soil, water, air, plants, and animals.  Inorganic arsenic is highly toxic and a known cause of human cancers.  The association between inorganic arsenic and cancer is well documented. Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug

Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA).

58.    Lead is a carcinogen and developmental toxin known to cause health problems. Lead, unlike many other poisons, builds up in the body over time as the person is exposed to and ingests it, resulting in a cumulative exposure which can, over time, become toxic and seriously injurious to health. The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. § 165.110(b)(4)(iii)(A).

59.    Mercury is a known toxin which can damage the cardiovascular system, nervous system, kidneys, and digestive tract in dogs.  The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals. Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state level.

60.    Cadmium has been observed to cause anemia, liver disease, and nerve and brain damage in animals eating or drinking it.  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a

probable human carcinogen.  It has been specifically noted that "Kidney and bone effects have [] been observed in laboratory animals ingesting cadmium.

61.    Defendants knew that properly and sufficiently monitoring for heavy metals in their ingredients and Alleged Premium Dog Food was not only important but critical.  Defendants recently aspired to the goal of having "no…heavy metals" in their Alleged Premium Dog Food products as a key differentiator of their "Fresh Regional Ingredients" packaging claim.

62.    Defendants knew that monitoring heavy metals was likewise important to their pet loving consumers.

63.    Finally, Defendants knew or should have known that they could control the levels of heavy metals in the Alleged Premium Dog Food by properly monitoring their ingredients for heavy metals and adjusting any formulation or diet to reduce ingredients that contained higher levels of heavy metals.

64.    Through the Alleged Premium Dog Food's packaging, including their "Biologically Appropriate" and "Fresh Regional Ingredients" claims, among other claims on their dog food packaging, Defendants attempted to convey to their consumers that Defendants could be trusted to properly and sufficiently test for heavy metals in the Alleged Premium Dog Food.

65.    However, Defendants also knew that they were not properly and sufficiently testing for heavy metals in the Alleged Premium Dog Food.

Defendants knew that their failure to properly and sufficiently test for heavy metals in the Alleged Premium Dog Food continued throughout the Class Period.

66.     Defendants' packaging claims were misleading due to their failure to properly and sufficiently monitor for the presence of heavy metals in their Alleged Premium Dog Food.[2]

67.     Defendants' packaging was also misleading due to their failure to disclose the risk of heavy metals being present in the Alleged Premium Dog Food.

68.     Defendants knew or should have known that consumers paid premium prices and expected Defendants to regularly test for heavy metals and sufficiently monitor the presence of heavy metals in the Alleged Premium Dog Food and ingredients.

69.     At all times during the Class Period, Defendants did not consistently monitor or test for heavy metals in the Alleged Premium Dog Food and ingredients.

70.     Defendants' internal policies called for regular heavy metal testing for their Alleged Premium Dog Food, with fish-based diets, such as Acana Regionals Wild Atlantic, scheduled for heavy metal testing more often. Defendants also scheduled various ingredients for heavy metal testing.

---

[2] See Exhibit 2 for Plaintiffs' own heavy metal testing that confirmed the presence of heavy metals in all Acana and Orijen diets tested.

71.     Defendants knew or should have known that consumers reasonably expected them to test for and monitor the presence of heavy metals in the Alleged Premium Dog Food and ingredients in accordance with their own testing schedule.

72.     Defendants failed to meet their own testing schedule for the Alleged Premium Dog Food and ingredients. Defendants knew or should have known that they did not conduct all of their scheduled heavy metal tests for the Alleged Premium Dog Food or ingredients during the Class Period.

73.     Defendants internally acknowledged that they did not follow their internal heavy metal testing schedules during the Class Period.

74.     Defendants obfuscated and concealed their testing data, frequency, and standards for heavy metals from consumers by refusing to provide consumers with heavy metal test results and heavy metal testing frequency for the Alleged Premium Dog Food.

75.     Contrary to consumer expectations, Defendants assessed the presence of heavy metals in the Alleged Premium Dog Food based on an outdated, bare minimum standard of adulteration.  Defendants knew or should have known that consumers trusted and expected Defendants to hold themselves to a higher standard for heavy metals.

76.     Defendants knew or should have known that the standards for heavy metal levels in human foods have become increasingly stringent in recent years.

77.     Defendants knew or should have known that the Alleged Premium Dog Food contained unmonitored heavy metal levels that were inconsistent with their packaging claims.

78.     Among other things, Defendants' packaging claim of "Trusted Everywhere" was misleading based on Defendants' failure to test for heavy metals, which resulted in the unmonitored presence of heavy metals in the Alleged Premium Dog Food.

79.     Defendants misleadingly failed to prevent the Alleged Premium Dog Food from containing heavy metal levels that exceeded those found in fresh, Biologically Appropriate™ ingredients.

80.     Defendants tested their fresh, Biologically Appropriate™ ingredients, such as de-boned chicken, mutton meat and organs, beef meat and organs, pork meat, and deboned turkey, and found that many of those ingredients did not contain detectable amounts of heavy metals.

81.     Defendants also tested some of their dried and frozen ingredients and found that many of these exceeded the adulteration standard for heavy metal presence.

82.     Defendants knew or should have known that consumers expected them to ensure that the Alleged Premium Dog Food was monitored and tested for heavy metals to ensure compliance with their packaging claims.

83.    Defendants knew, yet failed to disclose, its lack of regular testing and knowledge of the risk or presence of heavy metals in the Alleged Premium Dog Food and its ingredients.

**B.    BPA**

84.    Defendants misleadingly failed to prevent the Alleged Premium Dog Food from containing BPA levels that exceeded those found in fresh, Biologically Appropriate™ ingredients.

85.    Defendants' Alleged Premium Dog Food had a risk of containing BPA due to Defendants' failure to monitor for its presence in their ingredients, packaging, and finished products. Defendants were aware of this risk and failed to disclose it to Plaintiffs and the Classes.

86.    BPA is an industrial chemical that is not naturally occurring and "is an endocrine disruptor." BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems. The dangers of BPA in human food are recognized by the FDA, along with various states.  For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally added BPA.

87.    Defendants knew that properly and sufficiently monitoring for BPA in their ingredients and Alleged Premium Dog Food was not only important but

critical. Defendants required the supplier of their packaging bags to certify that the packaging was BPA-free given the natural representations on the Alleged Premium Dog Food, yet they did not require ingredient suppliers to make a similar certification.

88. Defendants knew or should have known that they could control the levels of BPA in the Alleged Premium Dog Food by properly monitoring their ingredients and finished products for BPA.

89. Through the Alleged Premium Dog Food's packaging, including their "Biologically Appropriate," "Fresh Regional Ingredients," and natural claims, among other claims on their dog food packaging, Defendants attempted to convey to their consumers that Defendants could be trusted to properly and sufficiently test for BPA in the Alleged Premium Dog Food.

90. Defendants' packaging claims were misleading due to their failure to properly and sufficiently monitor for the presence of BPA in their Alleged Premium Dog Food.[3]

91. Defendants' packaging was also misleading due to their failure to disclose the risk of BPA being present in the Alleged Premium Dog Food.

---

[3] See Exhibit 2 for Plaintiffs' own BPA testing that confirmed the presence of BPA in all Acana and Orijen diets tested.

92.     Defendants knew or should have known that consumers paid premium prices and expected Defendants to regularly test for BPA and sufficiently monitor the presence of BPA in the Alleged Premium Dog Food, ingredients, and packaging.

93.     At all times during the Class Period, Defendants did not consistently monitor or test for BPA in the Alleged Premium Dog Food and ingredients.

94.     Defendants knew or should have known that the standards for BPA in human foods have become increasingly stringent in recent years.

95.     Among other things, Defendants' natural claims on their packaging were misleading based on Defendants' failure to test for, or disclose the risk of, BPA, which resulted in the unmonitored presence of BPA in the Alleged Premium Dog Food.

96.     Defendants knew, yet failed to disclose, its lack of regular testing and knowledge of the risk or presence of BPA in the Alleged Premium Dog Food and its ingredients.

## C.     Non-Fresh Ingredients

97.     At all times during the Class Period, Defendants knew or should have known that their packaging claims were misleading to consumers due to Defendants' use of regrinds and other non-fresh ingredients, including expired and refresh ingredients.

98.     Regrinds is a low quality, non-fresh, and overcooked ingredient that was commonly used in the Alleged Premium Dog Food. The Alleged Premium Dog Food routinely incorporated large amounts of non-fresh regrind ingredients.

99.     Defendants made regrind ingredients from already cooked dog and cat food that had failed nutritional testing, water activity/product temperature testing, and/or microbiological testing. Defendants also made regrinds from finished dog and cat food that was too old to sell.

100.    Defendants had a common practice of routinely using regrind ingredients throughout the Class Period. Defendants routinely used regrinds as a major ingredient in the Alleged Premium Dog Food.

101.    Defendants had flowcharts that tracked the various dog and cat food diets regrinds that they used as an ingredient in each dog food diet. Defendants used cat food as a regrind ingredient in the Alleged Premium Dog Food.

102.    Defendants also used regrinds that were nutritionally deficient, nutritionally dangerous, and contaminated with salmonella. As discussed below, in 2018, Defendants also utilized pentobarbital contaminated regrinds in their "Red Meat" dog food diets.

103.    Defendants used millions of pounds of regrinds each year during the Class Period.

104.   In fact, Defendants' nickname for their regrind inventory at one of their production facilities was "Regrind Mountain." Defendants often used substantial amounts of regrinds as a major ingredient in the Alleged Premium Dog Food. For example, some production lots of Orijen contained up to 5-6% regrinds, while some Acana production lots contained up to 15-16% regrinds.

105.   Defendants did not disclose their use of regrinds as an ingredient on the Alleged Premium Dog Food ingredient panels or anywhere on their packaging.

106.   By using regrinds in their manufacturing process, Defendants used ingredients that they cooked twice – first in the production that resulted in out-of-specification dog food and second as a reused ingredient.

107.   As a double cooked ingredient, Defendants knew or should have known that regrinds were not fresh.

108.   Defendants knew or should have known that their use of regrinds contradicted their packaging claims.  For instance, Defendants took active steps to try to hide their use of regrinds during consumer, retailer, and distributor visits to their kitchens.

109.   Consistent with Defendants' use of non-fresh regrind ingredients, Defendants also used expired and refreshed ingredients in the Alleged Premium Dog Food. Defendants' monitoring and evaluation of ingredients was insufficient

to prevent the use of non-fresh, expired ingredients in the Alleged Premium Dog Food.

110.   Defendants routinely permitted the use of expired ingredients in the Alleged Premium Dog Foods. Furthermore, Defendants returned ingredients that they did not need to their ingredient suppliers, who then froze these ingredients. When Defendants requested these ingredients back, their suppliers would then thaw and send these "refreshed" ingredients back to Defendants. Expired and refreshed ingredients were not fresh, which Defendants knew.

111.   Defendants purchase a material amount of frozen or previously frozen fish ingredients from a New England based fishery ("Fish Supplier").  Fish Supplier blended and ground frozen blocks of fish until thawed and unfrozen, which it then shipped to Defendants in an unfrozen, blended state.

112.   Defendants then used a material amount of this previously frozen fish blend as the primary fish ingredient in their fish-based dog food diets. Defendants did not disclose anywhere on their packaging that the fish from Fish Supplier was frozen or previously frozen. Defendants knew or should have known that freezing an ingredient disqualified them from representing that said ingredient is "fresh."

113.   Furthermore, Defendants knew or should have known that advertising frozen ingredients as "fresh or raw" was confusing to consumers, who would not understand that "raw" means "frozen" or "previously frozen."

31

114.   Defendants do not define that "raw" means "frozen" anywhere on their packaging.

115.   Defendants then used a material amount of this previously frozen fish blend as the primary fish ingredient in their fish-based dog food diets. Defendants did not disclose anywhere on their packaging that the fish from Fish Supplier was frozen or previously frozen.

116.   Defendants knew or should have known that freezing an ingredient disqualified them from representing that said ingredient is "fresh."

117.   Defendants did not disclose their use of expired, refresh, or frozen ingredients in the Alleged Premium Dog Food on the ingredient panels or anywhere on their packaging.

118.   Defendants knew or should have known that their use of regrind, expired, and refresh ingredients failed to substantiate their packaging claims. Regrind, expired, and refresh ingredients are not "Fresh" or "Biologically Appropriate™."

119.   Defendants knew or should have known that reasonable consumers trusted Defendants not to use regrind, expired, frozen or refresh ingredients in the Alleged Premium Dog Food. Moreover, reasonable consumers, including Plaintiffs, would have expected Defendants to disclose the use of regrinds, expired, frozen or refresh ingredients.

32

**D.     Non-Regional Ingredients**

120.   At all times during the Class Period, Defendants knew or should have known that their packaging claims were misleading because Defendants sourced many ingredients from non-local and non-regional ingredient suppliers, including international ingredient suppliers.

121.   Defendants' packaging claims for the Alleged Premium Dog Food emphasized and represented that Defendants focused on the use of fresh, regional ingredients that were locally grown near their kitchens.

122.   Defendants purchased and used the following foreign ingredients and imported the following non-regional ingredients for the Alleged Premium Dog Food: spray dried sardines from Peru, spray dried mackerels from Morocco, herring oil and herring meal from Denmark, salmon oil from Chile, duck meal and pork meal from the European Union, palatants and vitamins from China, turmeric from India, and large amounts of lamb, cattle, goat, and mutton ingredients from New Zealand and Australian.

123.   Defendants knew or should have known that sourcing ingredients from high-risk locations, such as China and India, did not align with Defendants' "Fresh and Regional Ingredients" packaging claim. Defendants nonetheless purchased palatants and vitamins from China and turmeric from India.

124.   While Defendants referenced New Zealand lamb once on their Acana packaging, Defendants advertised Kentucky lamb seven times, often in larger and bolded text, and associated with photographs of Kentucky lamb.

125.   During the Class Period, Defendants manufactured the Alleged Premium Dog Food using imported salmon oil, herring meal, herring oil, spray dried mackerel, and spray dried sardines. Defendants purchased a material amount of these ingredients from international ingredient suppliers.

126.   Ingredients sourced from greater than 100 miles from Defendants were neither regional nor local to Defendants.

127.   During the Class Period, Defendants sourced a majority of their ingredients from non-regional ingredient suppliers. For example, in 2017, Defendants sourced about 70% of their ingredients outside of Kentucky, with 25% sourced internationally.

128.   Defendants represented to consumers that they focused on local and regional ingredients in the Alleged Premium Dog Food. Yet, Defendants sourced a majority of their pork meat and beef from outside of Kentucky in 2017. Defendants also sourced a majority of their goat, lamb, and mutton from international ingredient suppliers in 2017.

129.   Defendants did not disclose that many ingredients came from international ingredient suppliers on their Orijen packaging.

34

130. Defendants' "Fresh Regional Ingredients" packaging claim was misleading, in part, because Defendants regularly used non-regional ingredients from North Africa, South America, Europe, New Zealand, and Australia. Defendants purchased the majority of some of their meat ingredients, such as lamb, from international suppliers. Furthermore, the Alleged Premium Dog Food contained only a minority of ingredients that were actually regional or local.

131. Defendants' use of undisclosed imported meat ingredients was also deceiving to consumers because these imported ingredients were frozen, and thus, was misleading based on their "Fresh Regional Ingredients" packaging claim.

132. Defendants used images and information about "Featured Farmers" on the packaging of the Alleged Premium Dog Food to support its "Regional" misrepresentation. Defendants' packaging claims advertised their Featured Farmers through large photographs on the back of the Alleged Premium Dog Food packaging. Defendants' packaging imagery and packaging claims portrayed Featured Farmers as local, family-owned farmers, ranchers, and fisheries.

133. Defendants' packaging claims also described that Featured Farmers were their 'trusted supplier' of various local or regional ingredients.

134. Defendants did not source a material amount of their advertised local or regional ingredients from their Featured Farmers.

135.   For instance, Defendants' Orijen Regional Red packaging advertised that a small, family owned local farm ("Beef Featured Farmer")[4] was their "trusted supplier" of "fresh local beef." Defendants used their Featured Farmers imagery and packaging claims to represent to consumers that their Beef Featured Farmer, a small farmer in their local community, supplied Defendants with a material amount of the beef used in Orijen Regional Red. Defendants did not disclose any other beef supplier on their Orijen Regional Red packaging.

136.   Defendants knew or should have known that they did not purchase a material amount of their beef used in Orijen Regional Red manufactured at DogStar from Beef Featured Farmer during the Class Period.

137.   For instance, in 2016, Defendants purchased a very small minority of their beef from Beef Featured Farmer in 2016 and 2017.

138.   Similarly, Defendants advertised that a small, family owned local farm ("Lamb Featured Farmer") was their "trusted supplier" of "fresh grass-fed Suffolk lamb" located in Russellville, Kentucky. However, Defendants purchased a very small minority of their lamb from Lamb Featured Farmer. Instead, Defendants purchased the majority of their lamb internationally from New Zealand.

---

[4] Hereafter, references to third party ingredient suppliers will describe the suppliers by general descriptors, and not identify the parties by name.

139.   Defendants knew or should have known that consumers expected that Defendants' "Featured Farmers" supplied most, if not all of their advertised ingredients. For instance, Defendants purchase almost all of their saltwater fish from a New England based fishery ("Fish Supplier"). This Fish Supplier is not local or regional to Defendants' DogStar Kitchen in Kentucky.

### E.   Misleading Meat Math

140.   At all times during the Class Period, Defendants knew or should have known that their packaging claims that the Alleged Premium Dog Food is "Biologically Appropriate" and that it uses "Fresh Regional Ingredients" were misleading because Defendants did not use the advertised amounts of meat and fish ingredients[5] when manufacturing the Alleged Premium Dog Food.

141.   Defendants' packaging included packaging claims and labels that represented that Defendants used specific amounts of meat and fish ingredients in the Alleged Premium Dog Food to reinforce their packaging claims of Biologically Appropriate and Fresh Regional Ingredients. Defendants referred to these representations as MeatMath for Orijen and Biologically Appropriate Ratios for Acana.

---

[5] Meat and fish ingredients are defined as any dried, raw, fresh, or liquid ingredient derived from any animal or fish.

142.   During the earlier years of the Class Period, Defendants' MeatMath packaging claims represented that their Orijen diets used 75% or 80% meat and fish ingredients. During the later years of the Class Period, Defendants' packaging represented that Orijen contained 85% meat and fish ingredients.

143.   Defendants' Acana products advertised various amounts of Biologically Appropriate Ratios of meat and fish ingredients, with Acana products' packaging representing that those products contained either 50%, 60%, or 70% meat and fish ingredients.

144.   However, Defendants' MeatMath and Biologically Appropriate Ratio claims were inaccurate. Defendants' recipes revealed that the Alleged Premium Dog Food have consistently used materially less than the advertised amount of meat and fish ingredients during the Class Period.

145.   Defendants' Biologically Appropriate and Fresh Regional Ingredients packaging claims were misleading because Defendants misrepresented the amount of fresh, regional, and Biologically Appropriate™ meat and fish ingredients they used in the Alleged Premium Dog Food.

**F.     Pentobarbital**

146.   Defendants knew or should have known that their packaging claims for their Red Meat diets[6] were misleading to consumers because Defendants failed to

---

[6] The Red Meat Diets consist of Orijen Regional Red, Acana Heritage Meats, and

38

monitor and test their ingredients and dog food for the presence of pentobarbital and/or the material risk of containing pentobarbital.

### 1. *Pentobarbital was a well-known risk*

147.   Pentobarbital is a Class II controlled substance. There is no safe or set level for pentobarbital in dog food.  If pentobarbital is present in dog food, the dog food is adulterated.

148.   The ingestion of pentobarbital by a dog can lead to adverse health issues, including: tyalism (salivation); emesis (vomiting); stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.); hyporexia (decreased appetite); lethargy/depression; neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements); ataxia (difficulty walking); collapse; coma; and death.

149.   According to the FDA, dog food manufacturers, such as Defendants, were responsible for taking appropriate and responsible steps to ensure that their dog food and ingredients did not contain pentobarbital, such as verifying the safety and source of their ingredients and raw materials.

150.   Defendants knew or should have known that rendered ingredients, including beef tallow, had a material risk of containing pentobarbital.

---

Acana Appalachian Ranch.

151.   Defendants considered beef tallow to be a high-risk ingredient. Defendants' internal policies generally required annual audits for high-risk ingredient suppliers.

152.   Defendants were on notice as to the material risk of pentobarbital because they knew that other dog food companies experienced problems and recalls because they used ingredients that were adulterated with pentobarbital.

153.   In 2017, a dog food company recalled its products once it found out that its dog food was adulterated with pentobarbital after using pentobarbital adulterated beef ingredients. In light of this news, Defendants internally questioned whether they could be confident that their ingredients did not contain pentobarbital.

154.   In 2018, another dog food company recalled its dog food after it became adulterated with pentobarbital from rendered ingredients. Concerned by this recall, Defendants' employees requested that they ask their rendered ingredient suppliers to verify that there were adequate controls in place to exclude euthanized animals from their rendered ingredients. Defendants' employees also urged that they needed to test for pentobarbital.  Neither occurred.

155.   Beef tallow is a rendered ingredient that is not fresh, but rather liquid ingredient that should be derived from the fat of slaughtered cows.

156.   Defendants purchased their beef tallow to third party suppliers.  For example, Defendants purchased hundreds of thousands of pounds of beef tallow

from a large rendered ingredient supplier ("Tallow Supplier") from August 2016 to

May 2018.

### 2.    *Failure to Monitor*

157.   Defendants used beef tallow (fat) in their Red Meat diets. The following

is an example of Defendants' ingredient panel for Orijen Regional Red:

**INGREDIENTS**

Deboned beef, deboned lamb, deboned mutton, green beef tripe, lamb liver, whole blue catfish, beef liver, deboned pork, whole atlantic mackerel, beef kidney, dehydrated beef, dehydrated whole egg, dehydrated pork, dehydrated beef liver, dehydrated lamb, whole green peas, whole navy beans, red lentils, beef heart, pork liver, pork kidney, deboned goat, chickpeas, green lentils, ground lamb bone, pinto beans, alfalfa, natural pork flavor, beef fat, beef cartilage, pork cartilage, green lamb tripe, herring oil, dried kelp, whole pumpkin, whole butternut squash, kale, spinach, mustard greens, collard greens, turnip greens, whole carrots, apples, pears, freeze-dried beef liver, freeze-dried beef tripe, freeze-dried lamb liver, freeze-dried lamb tripe, pumpkin seeds, sunflower seeds, zinc proteinate, mixed tocopherols (preservative), chicory root, turmeric, sarsaparilla root, althea root, rosehips, juniper berries, dried lactobacillus acidophilus fermentation product, dried bifidobacterium animalis fermentation product, dried lactobacillus casei fermentation product.

158.   Defendants failed to properly monitor, audit, and/or maintain a trusted

relationship with Tallow Supplier regarding the material risk of pentobarbital

adulteration in their beef tallow.

159.   Defendants never tested the beef tallow they used from Tallow Supplier

to confirm that pentobarbital and/or euthanized animal carcasses were excluded.

160.   Defendants knew or should have known that Tallow Supplier's practice

of handling raw materials from condemned animal carcasses that were not fit for

slaughter increased the likelihood that Tallow Supplier's beef tallow contained undesirable raw materials, including pentobarbital.

161.   Defendants did not follow their policy of annually auditing high-risk ingredient suppliers. Defendants did not conduct any audits for Tallow Supplier in 2016 or 2017, even though Defendants considered Tallow Supplier to be a high-risk ingredient supplier.

162.   Despite the news of recent pentobarbital recalls, Defendants did not require any additional quality control safeguards to confirm, test, or verify that Tallow Supplier was effectively preventing Defendants' beef tallow from becoming adulterated with pentobarbital. As mentioned above, Defendants instead ignored internal requests to do so.

163.   When Defendants finally audited Tallow Supplier in early 2018, Defendants observed that other raw materials and products were spilled and built up on the floors and equipment. Defendants' observations indicated that Tallow Supplier's segregation protocol was ineffective.

164.   Defendants did not request any corrective action from Tallow Supplier. Defendants acknowledged that follow-up corrective actions after Quality Assurance audits was one of their weaknesses.

### 3.   *Failure to Disclose or Recall Pentobarbital Adulterated Red Meat Diets*

165.   On May 7, 2018, government agencies notified Defendants that beef tallow shipped by Tallow Supplier to Defendants' DogStar kitchen had tested positive for pentobarbital.

166.   Defendants produced over 1.7 million pounds of finished kibble that used pentobarbital adulterated tallow as an ingredient.

167.   Defendants also used over 10,000 pounds of regrinds that contained pentobarbital as an ingredient in the Alleged Premium Dog Food.

168.   Defendants estimated that the Red Meat diets that used the adulterated beef tallow as an ingredient contained pentobarbital at levels of up to 3.4 ppb.

169.   Defendants knew or should have known that the FDA did not tolerate any amount of pentobarbital in dog food. The FDA has zero tolerance for any pentobarbital in dog food.

170.   Despite estimating that pentobarbital was present in their Red Meat diets, Defendants did not recall Red Meat diets that were already in retail markets.

171.   While Defendants retrieved much of their dog food, Defendants allowed over 100,000 pounds to remain in retail stores despite knowing that it contained some level of pentobarbital. Defendants also sold dog food that used over 10,000 pounds of pentobarbital contaminated regrinds as an ingredient.

172. Defendants never disclosed to consumers that they purchased Red Meat diets in retail stores that contained some level of pentobarbital or pentobarbital contaminated regrinds.

173. Defendants refused to offer any refund to consumers who purchased the Red Meat diets that contained pentobarbital.

174. In November 2018, Defendants filed a lawsuit against Tallow Supplier for damages from the pentobarbital incident in 2018.

175. Defendants sued Tallow Supplier for contaminating their finished kibble to pentobarbital. Defendants argued that Tallow Supplier was liable because they failed to immediately disclose to Defendants that their beef tallow contained pentobarbital.

176. In their complaint, Defendants admitted that the FDA considers any amount of pentobarbital to constitute adulteration under Federal law.

177. Defendants know that Tallow Supplier should have disclosed the presence of pentobarbital in their beef tallow. At the same time, Defendants also assert that they did not need to disclose the presence of pentobarbital in the Alleged Premium Dog Food to consumers.

### 4. *Material Risk of Pentobarbital Ignored for Years*

178. After the pentobarbital incident in May 2018, Defendants knew or should have known that Tallow Supplier's manufacturing process and quality

44

assurance practices failed to effectively screen and prevent their beef tallow and dog food from containing pentobarbital.

179. Tallow Supplier conducted additional testing on their own and found that their beef tallow tested positive for pentobarbital in November 2017, January 2018, and February 2018. During this same time period, Defendants purchased approximately 282,000 pounds of beef tallow from Tallow Supplier.

180. Defendants have not taken any steps to test, verify, or confirm that these earlier shipments of beef tallow from Tallow Supplier did not contain any pentobarbital.

181. Defendants have also not tested any of the Alleged Premium Dog Food they manufactured from November 2017 to February 2018 that used Tallow Supplier's beef tallow as an ingredient to determine to whether the Alleged Premium Dog Food contained pentobarbital.

### 5. *Undisclosed Pentobarbital Risk was Misleading*

182. Defendants "Biologically Appropriate" natural packaging claims were misleading based on the presence of pentobarbital in the Alleged Premium Dog Food. Consumers could not have known or suspected that the Alleged Premium Dog Food had a risk of containing pentobarbital.

183. Pentobarbital is a dangerous, unnatural poison that is not Biologically Appropriate. Defendants' Alleged Premium Dog Food was contaminated with

pentobarbital only because Defendants used beef tallow, a non-fresh ingredient that did not conform to their "Fresh Regional Ingredient" representations.

## IV.   DEFENDANTS' PACKAGING CLAIMS MISLED AND DECEIVED CONSUMERS

184.   Defendants' packaging claims, representations, and omissions were misleading to consumers because Alleged Premium Dog Food contained and/or had a material risk of containing non-conforming ingredients and contaminants.

185.   The following generally summarizes the misleading packaging claims that Defendants negligently, recklessly, or intentionally used to mislead and deceive reasonable consumers:

| Misleading Packaging Claims | Acana | Orijen |
|---|:---:|:---:|
| *Biologically Appropriate*[TM] | ✔ | ✔ |
| *"Fresh Regional Ingredients"* | ✔ | ✔ |
| *"Nourish as Nature Intended"* | | ✔ |
| *"Deliver[] Nutrients Naturally"* | ✔ | |

186.   Reasonable consumers, like Plaintiffs, paid Defendants a price premium for the Alleged Premium Dog Food because the consumers relied on the accuracy of Defendants' misleading packaging claims.

46

187.   Reasonable consumers, like Plaintiffs and other Class members, considered the above packaging claims to be material to their decision to purchase Defendants' Alleged Premium Dog Food.

188.   Defendants knew or should have known, yet failed to disclose, that the Alleged Premium Dog Food contained and/or had a material risk of containing ingredients and contaminants that were non-conforming to these packaging claims.

189.   Defendants also knew or should have known that consumers would consider these non-conformances with their packaging claims to be a material consideration when purchasing Defendants' Alleged Premium Dog Food.

190.   A reasonable consumer would not have paid Defendants' price premium had they known that the Alleged Premium Dog Food contained and/or had a material risk of containing these non-conforming ingredients and contaminants.

191.   Furthermore, many reasonable consumers would have refused to purchase the Alleged Premium Dog Food entirely if they had known that Defendants used non-conforming ingredients and failed to monitor, test, and screen for the presence of unnatural and non-nourishing contaminants.

192.   As a result of these false or misleading statements and omissions, consumers, like Plaintiffs, suffered substantial financial losses by overpaying

premium prices for the Alleged Premium Dog Food that did not conform to their packaging claims.

## V.   DEFENDANTS' MISLEADING PACKAGING CLAIMS AND FAILURE TO WARN VIOLATED MICHIGAN LAWS

193.   Michigan laws were designed to ensure that a company's packaging claims and representations about its products were truthful and accurate.

194.   Defendants violated Michigan laws by negligently, recklessly, and/or intentionally misrepresenting that the Alleged Premium Dog Food conformed to the following packaging claims:

> (a)  Biologically Appropriate™;
>
> (d) Fresh Regional Ingredients;
>
> (c)  Nourish as Nature Intended; and
>
> (d)  Delivering Nutrients Naturally

195.   Defendants also owed consumers a legal duty to disclose that the Alleged Premium Dog Food contained and/or had a material risk of containing pentobarbital, regrinds, refreshed ingredients, expired ingredients, regrinds that contained pentobarbital, non-regional ingredients, heavy metals, BPA, and/or other ingredients and contaminants that did not conform to Defendants' packaging claims.

196.   Defendants' marketing and advertising campaign on its packaging was sufficiently lengthy in duration, and widespread in dissemination, that it would be

unrealistic to require Plaintiffs to plead reliance upon each advertised misrepresentation.

197.   Defendants' deceptive packaging practices implicated the public as consumers because Defendants directed their misrepresentations at the market generally.

198.   Defendants engaged in this long-term advertising campaign to convince potential customers that they should pay Defendants a price premium for the Alleged Premium Dog Food  because consumers could trust that Defendants used ingredients that conformed to all of their packaging claims and effectively prevented the inclusion of non-nutritious and unnatural contaminants and ingredients through regular monitoring, testing, and screening.

## VI.   CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE

199.   Plaintiffs reasonably relied upon Defendants' misleading packaging claims and representations alleged herein when Plaintiffs made their decision to purchase the Alleged Premium Dog Food.

200.   Any reasonable consumer would consider the packaging and labeling of a dog food product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase said dog food.

201.   Consumers reasonably relied upon Defendants' misleading packaging claims as objective statements that communicated, represented, and advertised that the Alleged Premium Dog Food had specific product characteristics.

202.   Furthermore, Defendants advertised their assurances that they were "Trusted Everywhere" and used "Ingredients We Love [From] People We Trust" on their packaging to communicate to consumers that Defendants were accountable for their ingredient suppliers, and that the Alleged Premium Dog Food was manufactured to exceed consumer expectations as well as in a manner that substantiated all of their packaging claims.

203.   Plaintiffs, along with other reasonable consumers, reasonably interpreted and relied upon Defendants' misleading packaging claim of Biologically Appropriate™ to mean that the Alleged Premium Dog Food did not contain biologically inappropriate, unnatural, or non-nutritious ingredients and contaminants.

204.   Plaintiffs' reliance and interpretation that the Alleged Premium Dog Food did not contain a material amount of non-fresh and non-regional ingredients based on Defendants' marketing of "Fresh Regional Ingredients," was also reasonable because Defendants packaging repeatedly advertised and emphasized this marketing claim.

205.   Plaintiffs' reliance and interpretation that the Alleged Premium Dog Food contained a material amount of "Fresh Regional Ingredients" was also reasonable because Defendants' packaging repeatedly advertised and emphasized this marketing claim.

206.   Plaintiffs' reliance and interpretation that the Alleged Premium Dog Food did not contain, or have a risk of containing, non-natural ingredients including BPA and pentobarbital was reasonable due to the Alleged Premium Dog Food packaging emphasizing that the food was natural using the packaging claims "Nourish as Nature Intended" and "Delivering Nutrients Naturally."

207.   As discussed above, Defendants foresaw Plaintiffs' reliance on their misleading packaging claims. Defendants designed their packaging claims to target and induce reasonable consumers, like Plaintiffs, to pay premium prices for the Alleged Premium Dog Food based on Defendants' misleading packaging claims.

## VII.   DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY

208.   Defendants had exclusive knowledge of the contents and formula of the Alleged Premium Dog Food and ingredients, including whether any of the Alleged Premium Dog Food contained and/or had a risk of containing non-conforming ingredients and contaminants.

209.   Defendants also had exclusive knowledge of their suppliers, including where the ingredients were sourced, how the ingredients arrived, whether the

51

ingredients were frozen, the quality of received ingredients, their own internal heavy metal, BPA, and pentobarbital testing protocol, and whether any of the supplied ingredients contained and/or had a material risk of containing heavy metals, BPA, and/or pentobarbital.

210.   Furthermore, consumers, like Plaintiffs, had no means to ascertain that Defendants were not using the amount of meat and fish ingredients advertised on the packaging and that Defendants did not use a material amount of the advertised ingredient from their Featured Farmers. Defendants had exclusive knowledge as to the details of the Alleged Premium Dog Food formulas and ingredient supply chains.

211.   Defendants also had exclusive knowledge as to their use of millions of pounds of regrinds as an ingredient in the Alleged Premium Dog Food.

## VIII. DEFENDANTS ACTED INTENTIONALLY TO MISLEAD CONSUMERS

212.   Defendants acted intentionally to hide the true quality and contents of the Alleged Premium Dog Food. Defendants willingly misrepresented and failed to disclose to consumers that these foods contained and/or had a material risk of containing heavy metals and BPA; a material amount of non-fresh ingredients, including regrinds; a material amount of non-regional ingredients; and (for the Red Meat Diets) a material risk of containing pentobarbital.

213. Defendants did so despite knowing that the presence and/or material risk of the presence of these non-conforming ingredients in the Alleged Premium Dog Food was material to a reasonable consumer. Defendants knew that consumers trusted and relied on Defendants to ensure that the Alleged Premium Dog Food did not contain any ingredients and contaminants that did not conform to their packaging claims and representations.

## IX. NOTICE OF BREACHES OF EXPRESS AND IMPLIED WARRANTIES

214. Defendants had sufficient notice of their breaches of express and implied warranties. Defendants have, and had, exclusive knowledge of the contents of the Alleged Premium Dog Food. Defendants also had exclusive knowledge regarding their suppliers, including whether any ingredients contained and/or were at a material risk of containing heavy metals, BPA and/or pentobarbital.

215. Defendants also had sufficient notice that the Alleged Premium Dog Food had unmonitored levels of heavy metals.

216. Defendants had sufficient notice that their ingredients were not "Biologically Appropriate," "Fresh" and "Regional," as represented.

217. Defendants also had sufficient notice because Defendants Plaintiffs filed their lawsuit within a reasonable amount of time of discovering that Defendants were in breach of their express and implied warranties.

218.   Moreover, Defendants were on notice of Plaintiffs' claims because Defendants were named and / or are currently named in other lawsuits predicated on the same set of factual circumstances underlying this action.

## X.   BENEFICIARIES OF DEFENDANTS' EXPRESS AND IMPLIED WARRANTIES

219.   Defendants knew that consumers, such as Plaintiffs and the members of the proposed Classes, would be the end purchasers of the Alleged Premium Dog Food. Defendants knew that they were targeting and directly marketing to these consumers through their packaging claims and representations.

220.   Defendants intended that consumers, such as Plaintiffs and the members of the proposed Classes, would consider and rely on their packaging claims and representations when deciding whether to purchase the Alleged Premium Dog Food.

221.   Defendants knew that consumers, such as Plaintiffs and the members of the proposed Classes, as the end purchasers of the Alleged Premium Dog Food, were the beneficiaries of Defendants' express and implied warranties. Defendants knew and expected that consumers would be injured if Defendants' express and implied warranties were breached.

## CLASS ACTION ALLEGATIONS

222.   Plaintiffs bring this action individually and on behalf of the following

Classes pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil

Procedure:

> Class #1 ("Main Class," represented by Plaintiffs): All persons who reside in the State of Michigan who, from July 1, 2014 to the present, purchased Orijen or Acana dog[7] food products in the State of Michigan for household or business use, and not resale.
>
> Subclass #1 ("Orijen Class" represented by Plaintiff Knierim, Plaintiff Wellnitz and Plaintiff Barta): All persons who reside in the State of Michigan who, from July 1, 2014 to the present, purchased Orijen[8] dog food products in the State of Michigan for household or business use, and not resale.

---

[7] Specifically, Plaintiffs in the Main Class represent consumers that purchased (1) Acana Regionals Grasslands with Grass-Fed Kentucky Lamb, Freshwater Trout & Game Bird; (2) Acana Regionals Meadowland with Free-Run Poultry, Freshwater Fish, and Nest-Laid Eggs; (3) Acana Regionals Wild Atlantic with Wild-Caught New England Fish & Fresh Kentucky Greens; (4) Orijen Original with Fresh Free-Run Chicken and Turkey, Wild-Caught Fish and Nest-Laid Eggs; (5) Orijen Six Fish with New England Mackerel, Herring, Flounder, Redfish, Monkfish and Silver Hake; (6) Acana Singles Duck and Pear; (7) Acana Singles Lamb and Apple; (8) Acana Heritage Free-Run Poultry;  (9) Acana Heritage Freshwater Fish; (10) Orijen Six Fish Wild-Caught Regional Saltwater and Freshwater Fish; (11) Orijen Tundra Goat, Venison, Mutton, Bison, Arctic Char, Rabbit; (12) Orijen Grain Free Puppy with Chicken, Turkey, Wild-Caught Fish, Eggs; (13) Acana Singles Mackerel and Greens; (14) Acana Singles Pork and Squash; (15) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish; (16) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; (17) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and (18) Acana Heritage Meats.
[8] The Orijen Class represents (1) Orijen Original; (2) Orijen Six Fish; (3) Orijen Tundra; (4) Orijen Grain Free Puppy; and (5) Orijen Regional Red.

Subclass #2 ("Acana Singles Class," represented by Plaintiff Shaker): All persons who reside in the State of Michigan who, from July 1, 2014 to the present, purchased Acana Singles[9] dog food products in the State of Michigan for household or business use, and not resale.

Subclass #3 ("Acana Regionals Class," represented by Plaintiffs Wellnitz and Plaintiff Barta): All persons who reside in the State of Michigan who, from July 1, 2014 to the present, purchased Acana Regionals[10] dog food products in the State of Michigan for household or business use, and not resale.

Subclass #4 ("Acana Heritage Class," represented by Plaintiff Wellnitz): All persons who reside in the State of Michigan who, from July 1, 2014 to the present, purchased Acana Heritage[11] dog food products in the State of Michigan for household or business use, and not resale.

Subclass #5 ("Red Meat Class," represented by Plaintiff Knierim and Plaintiff Wellnitz): All persons who reside in the State of Michigan who, from August 2016 to the Present, purchased a "Red Meat" diet[12] that used beef tallow in the State of Michigan for household or business use, and not resale.[13]

---

[9] The Acana Singles Class represents consumers that purchased (1) Acana Singles Duck and Pear; (2) Acana Singles Lamb and Apple; and (3) Acana Singles Pork and Squash.

[10] The Acana Regionals Class represents consumers that purchased (1) Acana Regionals Wild Atlantic; (2) Acana Regionals Meadowland; (3) Acana Regionals Appalachian Ranch; and (4) Acana Regionals Grassland.

[11] The Acana Heritage Class represents consumers that purchased (1) Acana Heritage Free-Run Poultry; (2) Acana Heritage Freshwater Fish Formula; and (3) Acana Heritage Meats.

[12] The Red Meat Class represents consumers that purchased (1) Acana Regionals Appalachian Ranch with Ranch-Raised Red Meats & Freshwater Catfish; (2) Orijen Regional Red with Angus Beef, Wild Boar, Boer Goat, Romney Lamb, Yorkshire Pork & Wild Mackerel; (3) Orijen Regional Red Angus Beef, Ranch Raised Lamb, Wild Boar, Pork, Bison Dry Dog Food; and (4) Acana Heritage Meats.

[13] The Main Class and Subclasses are collectively referred to as the "Classes"

223.   Excluded from the Classes are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

224.   This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

225.   The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Class members in a single action will provide substantial benefits to the parties and Court.

226.   Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

    (a)   whether Defendants owed a duty of care to Plaintiffs and the Classes;

    (b)   whether Defendants knew or should have known that the Alleged Premium Dog Food contained and/or had a material risk of containing heavy metals, BPA and (for the Red Meat Diets) pentobarbital;   a material amount of non-fresh

57

ingredients, including regrinds and pentobarbital; a material amount of non-regional ingredients; and/or any other ingredients or contaminants that did not conform to the packaging claims;

(c) whether Defendants failed to test the Alleged Premium Dog Food and ingredients for the presence of heavy metals, BPA, pentobarbital, and/or unnatural or other contaminants that did not conform to the packaging claims;

(d) whether Defendants failed to disclose that the Alleged Premium Dog Food contained, or had a risk of containing, heavy metals, BPA, pentobarbital, and/or unnatural or other contaminants that did not conform to the packaging claims;

(e) whether Defendants failed to disclose that the Alleged Premium Dog Food contained, or had a risk of containing, non-regional and non-fresh ingredients that did not conform to the packaging claims;

(f) whether Defendants wrongfully represented that the Alleged Premium Dog Food conformed to the following packaging claims: Biologically Appropriate™; and "Fresh Regional

Ingredients"; "Nourish as Nature Intended"; and "Delivering Nutrients Naturally."

(g)     whether Defendants wrongfully represented and continue to represent that the Alleged Premium Dog Food was natural, nutritious, and of a superior quality;

(h)     whether Defendants wrongfully represented that the manufacturing of the Alleged Premium Dog Food was subjected to rigorous quality assurances and standards;

(i)     whether Defendants' representations in their warranties packaging and/or labeling are false, deceptive, and misleading;

(j)     whether those representations are likely to deceive a reasonable consumer;

(k)     whether a reasonable consumer would consider that the Alleged Premium Dog Food containing and/or having a material risk of containing the following ingredients or contaminants to be a material fact in purchasing dog food: heavy metals, BPA, a material amount of non-fresh ingredients, including regrinds, a material amount of non-regional ingredients, pentobarbital, and/or any other ingredients and contaminants that did not conform to the labels, packaging, advertising, and statements;

(l)  whether Defendants had knowledge that the representations on the packaging of the Alleged Premium Dog Food were false, deceptive, and misleading;

(m)  whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(n)  whether Defendants' representations and descriptions on the packaging of the Alleged Premium Dog Food was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(o)  whether Defendants violated Michigan law;

(p)  whether Defendants engaged in unfair trade practices;

(q)  whether Defendants engaged in false advertising;

(r)  whether Defendants breached their express warranties;

(s)  whether Defendants breached their implied warranties;

(t)  whether Defendants made fraudulent misrepresentations;

(u)  whether Defendants made fraudulent omissions;

(v)  whether Defendants unjustly enriched themselves at consumers' expense;

(w)  whether Defendants' conduct was negligent per se;

(x)　　whether Defendants had a duty to disclose the material omissions concerning the quality and nature of the Alleged Premium Dog Food and its ingredients;

(y)　　whether Plaintiffs and the members of the Classes are entitled to actual, statutory, and treble damages; and

(z)　　whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

227.　Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

228.　Plaintiffs' claims are typical of those of the members of the Classes because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

229.　Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

230.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

231.   Questions of law and fact common to the Classes predominate over any questions affecting only individual members of a Class.

232.   As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*, Against Defendants on Behalf of Plaintiffs and Members of the Classes**

233.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

234.   Defendants falsely represented to Plaintiffs and the Classes that their Alleged Premium Dog Foods:

    (a) Are Biologically Appropriate;

    (b) Contain Fresh Regional Ingredients;

    (c) "Nourish as Nature Intended"; and

    (d) "Deliver[] Nutrients Naturally."

235. Defendants made these deceptive statements and misrepresentations on the packaging of the Alleged Premium Dog Food in the conduct of trade or commerce as manufacturers and sellers of the Alleged Premium Dog Foods.

236. Defendants knew or should have known that the Alleged Premium Dog Foods did not have the quality and ingredients described above because they contained, and/or had a material risk of containing, heavy metals, BPA, a material amount of non-fresh ingredients including regrinds, a material amount of non-regional ingredients, pentobarbital, and/or any other ingredients or contaminants that do not conform to the packaging claims.

237. Defendants' pattern of knowing misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Classes with respect to the Alleged Premium Dog Foods' quality, ingredients, and suitability for consumption by dogs.

238. Defendants intended that Plaintiffs and the Classes would rely on Defendants' misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the Alleged Premium Dog Foods' quality, ingredients, and suitability for consumption by dogs.

239.   Defendants' conduct and omissions described herein occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

240.   The facts concealed or not disclosed by Defendants were material facts in that Plaintiffs and any reasonable consumer would have considered them in deciding whether to purchase the Alleged Premium Dog Foods.  Had Plaintiffs known the Alleged Premium Dog Foods did not have the quality and ingredients advertised by Defendants, they would not have purchased the Alleged Premium Dog Foods.

241.   Defendants' unlawful conduct is continuing, with no indication that Defendants intend to cease this fraudulent course of conduct.

242.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they purchased the Alleged Premium Dog Food that was worth less than the price they paid.

243.   Plaintiffs and the members of the Classes would not have purchased the Alleged Premium Dog Food at all had they known of the presence of these non-conforming ingredients, contaminants, and/or unnatural or other ingredients.

244.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder.

## COUNT II

### Breach of Express Warranty against Defendants on Behalf of Plaintiffs and Members of the Classes

245.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

246.    Defendants marketed and sold the Alleged Premium Dog Food into the stream of commerce with the intent that the Alleged Premium Dog Food would be purchased by Plaintiffs and the members of the Classes.

247.    Defendants expressly warranted, advertised, and represented to Plaintiffs and the Classes using the following misleading packaging claims for the Alleged Premium Dog Food:

> (a) Biologically Appropriate;
>
> (b) Fresh Regional Ingredients;
>
> (c) "Nourish as Nature Intended"; and
>
> (d) "Delivering Nutrients Naturally."

248.    Defendants made these express warranties for the Alleged Premium Dog Food in writing through their labels, representations, and advertisements on the Alleged Premium Dog Food's packaging. These express warranties became part of the basis of the bargain Plaintiffs and the member of the Classes entered into upon purchasing the Alleged Premium Dog Food.

249.   Defendants made these advertisements, warranties, and representations in connection with the sale of the Alleged Premium Dog Food to Plaintiffs and the Classes. Plaintiffs and members of the Classes relied on Defendants' advertisements, warranties, and representations regarding the Alleged Premium Dog Food in deciding whether to purchase Defendants' products.

250.   Defendants' Alleged Premium Dog Food did not conform to Defendants' advertisements, warranties and representations in that they contained and/or had a material risk of containing:

(a) heavy metals;

(b) BPA;

(c) a material amount of non-fresh ingredients, including regrinds;

(d) a material amount of non-regional ingredients;

(e) pentobarbital; and/or

(f) any other ingredients or contaminants that do not conform to packaging claims.

251.   Defendants were on notice of this breach because they were aware that the Alleged Premium Dog Food contained and/or had a material risk of containing the above non-conforming contaminants and ingredients.

252.   Defendants had notice, in part, due to their limited testing for heavy metals and BPA and their knowledge that the Alleged Premium Dog Food diets

used beef tallow that contained and/or had a material risk of containing pentobarbital.

253.   Defendants also had notice, in part, because they knowingly used a material amount of non-regional ingredients, and used a material amount of non-fresh ingredients, such as regrinds, and used less than the advertised amount of meat and fish ingredients.

254.   Defendants also had sufficient notice because Plaintiffs filed their lawsuit within a reasonable amount of time of discovering that Defendants were in breach of their expressed and implied warranties.

255.   Privity exists because Defendants expressly warranted to Plaintiffs and the members of the Classes that they manufactured the Alleged Premium Dog Food in accordance to all of their packaging claims above so that the Alleged Premium Dog Food did not contain any ingredients and/or contaminants that were non-conforming to these packaging claims.

256.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they purchased the Alleged Premium Dog Food that was worth less than the price they paid.

257.   Plaintiffs and the members of the Classes would not have purchased the Alleged Premium Dog Food at all had they known of the presence of these non-conforming ingredients, contaminants, and/or unnatural or other ingredients.

258.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT III

### Breach of Implied Warranty of Merchantability on Behalf of the Plaintiffs and Members of the Classes

259.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

260.   Defendants are merchants engaging in the sale of goods to Plaintiffs and the Classes.

261.   There was a sale of goods from Defendants to Plaintiffs and the members of the Classes.

262.   At all times mentioned herein, Defendants manufactured or supplied the Alleged Premium Dog Food, and prior to the time the Alleged Premium Dog Food was purchased by Plaintiffs and the members of the Classes, Defendants impliedly warranted to them that the Alleged Premium Dog Food was of merchantable quality, fit for their ordinary use (consumption by dogs), and conformed to the promises and affirmations of fact made on the Alleged Premium Dog Food packaging, such as:

(a)  Biologically Appropriate;

68

      (b)  Fresh Regional Ingredients;

      (c)  "Nourish as Nature Intended"; and

      (d)  "Delivering Nutrients Naturally."

263.  Plaintiffs and the members of the Classes relied on Defendants' promises and affirmations of fact when they purchased the Alleged Premium Dog Food.

264.  The Alleged Premium Dog Food was not fit for their ordinary use, consumption by dogs, and did not conform to Defendants' affirmations of fact and promises as they contained and/or had a material risk of containing:

      (a)  heavy metals;

      (b)  BPA;

      (c)  a material amount of non-fresh ingredients, including regrinds;

      (d)  a material amount of non-regional ingredients;

      (e)  pentobarbital; and/or

      (f)  any other ingredients or contaminants that do not conform to packaging claims.

265.  Defendants breached the implied warranties by selling the Alleged Premium Dog Food that failed to conform to the promises or affirmations of fact made on the packaging as each product contained and/or had a material risk of containing the above non-conforming ingredients and contaminants.

266.   Defendants were on notice of this breach as they were aware that the Alleged Premium Dog Food contained and/or had a material risk of containing the above non-conforming contaminants and ingredients.

267.   Defendants had notice, in part, due to their limited testing for heavy metals and BPA and their knowledge that the Alleged Premium Dog Food diets used beef tallow that contained and/or had a material risk of containing pentobarbital.

268.   Defendants also had notice, in part, because they knowingly used a material amount of non-regional ingredients, and used a material amount of non-fresh ingredients, such as regrinds, and used less than the advertised amount of meat and fish ingredients.

269.   Defendants also had sufficient notice because Plaintiffs filed their lawsuit within a reasonable amount of time of discovering that Defendants were in breach of their expressed and implied warranties.

270.   Privity exists because Defendants impliedly warranted to Plaintiffs and the members of the Classes that they manufactured the Alleged Premium Dog Food in accordance to all of their packaging claims above so that the Alleged Premium Dog Food did not contain any ingredients and/or contaminants that were non-conforming to these packaging claims.

271.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the Classes have suffered actual damages in that they purchased the Alleged Premium Dog Food that was worth less than the price they paid.

272.   Plaintiffs and the members of the Classes would not have purchased the Alleged Premium Dog Food at all had they known of the presence these non-conforming ingredients, contaminants and/or unnatural or other ingredients.

273.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their implied warranties and resulting breach.

## **COUNT IV**

### **Fraudulent Misrepresentation against Defendants on Behalf of the Plaintiffs and Members of the Classes**

274.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

275.   Defendants falsely represented to Plaintiffs and the Classes regarding the Alleged Premium Dog Food with the following misleading packaging claims:

(a) Biologically Appropriate;

(b) Fresh Regional Ingredients;

(c) "Nourish as Nature Intended"; and

(d) "Delivering Nutrients Naturally."

71

276.   Defendants intentionally and knowingly made these misrepresentations to induce Plaintiffs and the member of the Classes to purchase the Alleged Premium Dog Food.

277.   Plaintiff and the Classes were ignorant of the falsity of the representations made by Defendants about the Alleged Premium Dog Foods.

278.   Defendants knew that their representations about the Alleged Premium Dog Food were false because the Alleged Premium Dog Food contained and/or had a material risk of containing the following non-conforming contaminants and ingredients:

(a) heavy metals;

(b) BPA;

(c) a material amount of non-fresh ingredients, including regrinds;

(d) a material amount of non-regional ingredients;

(e) pentobarbital; and/or

(f) any other ingredients or contaminants that do not conform to packaging claims, advertising, and statements.

279.   Defendants allowed their packaging claims to intentionally mislead consumers, such as Plaintiffs and the members of the Classes.

280.   Plaintiffs and the members of the Classes did in fact rely on these misrepresentations and purchased the Alleged Premium Dog Food to their

72

detriment. Given the deceptive manner in which Defendants advertised, represented, and otherwise marketed the Alleged Premium Dog Food on their packaging, reliance by the Plaintiffs and the members of the Classes on Defendants' misrepresentations was justifiable.

281.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the Classes suffered actual damages in that they purchased the Alleged Premium Dog Food that was worth less than the price they paid.

282.   Plaintiffs and the Classes would not have purchased the Alleged Premium Dog Food at all had they known of the presence of non-conforming contaminants and ingredients.

283.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT V

### Fraudulent Concealment or Nondisclosure Against Defendants on Behalf of the Plaintiffs and Members of the Classes

284.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

285.   Defendants fraudulently concealed material facts that they had a legal duty to disclose to Plaintiffs and the members of the Classes regarding the Alleged Premium Dog Food. These material facts known by Defendants were:

73

    (a)  Risk of heavy metals;

    (b)  Risk of BPA;

    (c)  Risk of pentobarbital;

    (d)  Risk of the use of regrinds with pentobarbital;

    (e)  Use of Regrinds;

    (f)  Use of nondisclosed non-regional ingredients;

    (g)  Use of other non-fresh ingredients (including refreshed or expired) that do not conform to the label.

286.  Defendants intentionally and knowingly omitted this information to induce Plaintiffs and the members of the Classes to purchase the Alleged Premium Dog Food.

287.  Defendants knew that the concealment or nondisclosure of these facts concerning the quality of the Alleged Premium Dog Food was material to consumers because they contradicted the representations on the packaging that Defendants admit drives their sales.

288.  Defendants were under a duty to disclose to Plaintiffs and members of the Classes the true quality, characteristics, ingredients, and suitability for consumption of the Alleged Premium Dog Foods because: (1) Defendants were in a superior position to know the true state of facts about their product; (2) Defendants were in a superior position to know the actual ingredients, characteristics, and

suitability of the Alleged Premium Dog Foods; and (3) Defendants knew that Plaintiffs and the Classes could not reasonably have been expected to learn or discover that the Alleged Premium Dog Foods were misrepresented in their packaging prior to purchasing the Alleged Premium Dog Foods.

289.   Defendants had a legal duty to disclose this information because Defendants knew the representations on the Alleged Dog Food's packaging created a false impression unless these omitted material facts were disclosed to the Plaintiffs and the members of the Classes.

290.   Defendants also had a legal duty to disclose this information under Mich. Comp. Laws Ann. § 287.529, which provides that commercial feed is "misbranded and in violation of this act if… Its labeling is false or misleading in any particular."

291.   Michigan adopted this statute to protect public safety and to protect consumers, such as Plaintiffs.

292.   Plaintiffs and the members of the Classes had no knowledge of the true quality of the Alleged Premium Dog Food based on Defendants' fraudulent concealment and nondisclosures and had no ability to discover the omitted information prior to purchasing the Alleged Premium Dog Food. Given the deceptive manner in which Defendants chose to omit or not disclose material

information concerning the quality of the Alleged Premium Dog Food, Plaintiffs and the members of the Classes were injured.

293.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the Classes suffered actual damages in that they purchased the Alleged Premium Dog Food that was worth less than the price they paid.

294.   Plaintiffs and the members of the Classes would not have purchased the Alleged Premium Dog Food at all had they known omitted and nondisclosed information.

295.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## COUNT VI

### Unjust Enrichment Against Defendants on Behalf of the Plaintiffs and Members of the Classes

296.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

297.   Plaintiffs and the members of the Classes, through the purchase of the Alleged Premium Dog Food, have conferred substantial benefits on Defendants. Defendants knowingly and willingly accepted and enjoyed these benefits.

298.   Defendants either knew or should have known that the payments rendered by Plaintiffs and the member of the Classes were given and received with

the expectation that the Alleged Premium Dog Food  would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants' packaging claims. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

299.   Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and the Classes.

300.   Plaintiffs and the Classes are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

301.   Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## <u>COUNT VII</u>

### Negligence Against Defendants Behalf of the Plaintiffs and Members of the Classes

302.   Plaintiffs incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

303.   Defendants' conduct is negligent per se.

304.   Defendants violated their statutory duty under do Mich. Comp. Laws Ann. § 287.534, which provides that the manufacture or distribution of any commercial feed that is adulterated or misbranded is prohibited.

305.   Under Mich. Comp. Laws Ann. § 287.529, "A commercial feed is considered to be misbranded and in violation of this act if any of the following occur: (a) Its labeling is false or misleading in any particular."

306.   Under Mich. Comp. Laws Ann. § 287.528, a commercial feed is adulterated if "[i]t bears or contains any poisonous or deleterious substance that may render the feed injurious to health," if it " is, in whole or in part, the product of a diseased animal or of an animal that has died other than by slaughter, which is unsafe under 21 USC 342(a)(1) or (2)," if it "is inferior or is damaged, and the inferiority or damage has been concealed," if its "composition or quality falls below or differs from that purported or represented on its label."

307.   Michigan adopted these statutes to protect public safety and to protect consumers, such as Plaintiffs and the members of the Classes.

308.   Commercial feed, as defined in the Michigan statute, is "all materials or combination of materials, including feed ingredients, that are distributed or intended for distribution for use as animal feed or for mixing in animal feed." Mich. Comp. Laws Ann. § 287.523.

309.   Defendants falsely represented to Plaintiffs and the members of the Classes regarding the Alleged Premium Dog Food with the following misleading packaging claims:

(a) Biologically Appropriate;

(b) Fresh Regional Ingredients;

(c) "Nourish as Nature Intended"; and

(d) "Delivering Nutrients Naturally."

310.   Defendants failed to exercise due care when they sold their dog food to Plaintiffs and the members of the Classes because Defendants failed to prevent the Alleged Premium Dog Food from containing and/or having a material risk of containing:

(a) heavy metals;

(b) BPA;

(c) a material amount of non-fresh ingredients, including regrinds;

(d) a material amount of non-regional ingredients;

(e) pentobarbital; and/or

(f) any other ingredients or contaminants that do not conform to packaging claims, advertising, and statements.

311.   Defendants' violations of the Michigan feed law was a substantial factor in the harm suffered by Plaintiffs and the Classes, including purchasing a product with *de minimis* value.

312.   Due to Defendants' negligence, Plaintiffs and the Classes have been damaged in an amount to be proved at trial or, alternatively, seek rescission and disgorgement under this Count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Alleged Premium Dog Food until the non-conforming ingredients, contaminants, and/or unnatural or other ingredients, such as heavy metals, BPA, non-fresh ingredients, including regrinds, non-regional ingredients, and/or pentobarbital, are removed or full disclosure of the presence of such appear on all labels, packaging, and advertising;

C.    An order enjoining Defendants from selling the Alleged Premium Dog Food in any manner suggesting or implying that they conform to their misleading packaging claims of Biologically Appropriate; "Fresh Regional Ingredients," "Nourish as Nature Intended," and "Delivering Nutrients Naturally."

D.    An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.    An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Michigan law, plus pre- and post- judgment interest thereon;

G.    An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.     An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I.     An order requiring Defendants to pay treble damages on any count so allowable;

J.     An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiffs and the Classes; and

K.     An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 20, 2020                     Respectfully submitted,

*/s/ E. Powell Miller*
E. POWELL MILLER (P39487)
SHARON S. ALMONRODE (P33938)
DENNIS A. LIENHARDT (P81118)
WILLIAM KALAS (P82113)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

**LOCKRIDGE GRINDAL NAUEN**
**P.L.L.P.**
ROBERT K. SHELQUIST

REBECCA A. PETERSON (241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

**ROBBINS ARROYO LLP**
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
kseely@robbinsarroyo.com
smckany@robbinsarroyo.com

**GUSTAFSON GLUEK, PLLC**
DANIEL E. GUSTAFSON
KARLA M. GLUEK
RAINA C. BORRELLI
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

**CUNEO GILBERT & LADUCA, LLP**
CHARLES LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
kvandyck@cuneolaw.com
charles@cuneolaw.com

**LITE DEPALMA GREENBERG, LLC**
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com
scruzhodge@litedepalma.com

**WEXLER WALLACE, LLP**
KENNETH WEXLER
MICHELLE PERKOVIC
55 West Monroe St., Ste. 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimilie: (312) 346-0022
kaw@wexlerwallace.com
mp@wexlerwallace.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2020 I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. POWELL MILLER (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
