# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

RAMY SHAKER *et al.*, individually
and on behalf of a class of similarly
situated individuals,

Case No. 18-cv-13603

Honorable Laurie J. Michelson

Plaintiffs,

v.

CHAMPION PETFOODS USA INC.
and CHAMPION PETFOODS LP,

Defendants.

---

GREENBERG TRAURIG P.A.
David A. Coulson
Jared R. Kessler
Robert S. Galbo
Elisa H. Baca
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Tel: (305) 579-0754
Email: coulsond@gtlaw.com
kesslerj@gtlaw.com
galbor@gtlaw.com
bacae@gtlaw.com

LAW OFFICES OF JOHN J. O'SHEA PLC
John J. O'Shea (P52009)
18000 Mack Avenue
Grosse Pointe, Michigan 48230
Tel: (313) 884-2265
Email: oshealaw@att.net
***Attorneys for Defendants***

---

# DEFENDANTS' BRIEF IN SUPPORT OF THEIR RESPONSE IN
# OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.    Whether Plaintiffs have met their burden of establishing, through evidence, all of the requirements for class certification under Fed. R. Civ. P. 23(b)(3), when the putative class members saw numerous versions of numerous packages, with varying information providing context for the statements Plaintiffs challenge as deceptive, and where Plaintiffs' theory of damages does not fit their liability theory and is incomplete, unreliable and produces absurd results?

Defendants state: NO.

II.   Should, in the alternative, an issues class be certified pursuant to Fed. R. Civ. P. 23(c)(4), even though any issues class will still entail a bag-by-bag, diet-by-diet inquiry concerning the statements made on each challenged packaging and will not materially advance the litigation?

Defendants state: NO.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

**Page(s)**

**Cases**

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013).........................................................................................11, 29

*In re Am. Med. Sys., Inc.,*
    75 F.3d 1069, 1078 (6th Cir. 1996) ...................................................................12

*In re OnStar Cont. Litig.,*
    278 F.R.D. 352 (E.D. Mich. 2011) .....................................................3, 13, 22, 23

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Michigan,*
    654 F.3d 618, 630 (6th Cir. 2011) ......................................................................12

*Reitman v. Champion Petfoods USA, Inc.,*
    No. 18-cv-1736, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019)...........1, 2, 21, 29

*Reitman v. Champion Petfoods USA, Inc.,*
    830 F. App'x 880 (9th Cir. 2020) ...........................................................2, 23, 30

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,*
    863 F.3d 460 (6th Cir. 2017) .................................................................11, 12, 13

**Other Authorities**

Fed. R. Civ. P. 23 ......................................................................................7, 12, 29

# **TABLE OF CONTENTS**

                                                                         **Page**

I.    INTRODUCTION ....................................................................................1

II.   FACTUAL BACKGROUND.....................................................................3

      A.    The Evolution of Champion Petfoods......................................3

      B.    Champion's Wide Variety of Diets and Packaging ..............5

      C.    Heavy Metals, BPA, and Pentobarbital...................................6

      D.    Facts Specific to Plaintiffs and the History of this Lawsuit..........9

III.  LEGAL STANDARD FOR RULE 23 ........................................................11

IV.   THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED..................12

      A.    Plaintiffs' Claims Are Riddled with Individualized Issues................12

            1.    Plaintiffs' classes raise individualized issues as to the critical elements of (1) whether Champion made misleading statements and (2) whether Plaintiffs relied on them.......................................................................................14

                  a.    Because the statements on Champion bags varied by brand, diet, kitchen, and time, Plaintiffs cannot show uniform, material misrepresentations or establish reliance............................................................15

            2.    The contents *inside* each Champion bag must be compared to the statements on the *outside* of the bag to assess falsity ...................................................................23

                  a.    Issues as to "fresh" require diet-by-diet and lot-by-lot analysis .............................................................24

                  b.    "Regional" also requires individualized analysis..........26

                  c.    Issues as to heavy metals, BPA, and pentobarbital also create individualized issues....................................26

            3.    Plaintiffs cannot prove damages on a class-wide basis ...........29

      B.    Plaintiffs Fail to Carry Their Burden Under Rule 23(c)(4) ...............29

V.    CONCLUSION..........................................................................................30

## I.    INTRODUCTION

In their Motion for Class Certification, ECF No. 61 (the "Motion"), Plaintiffs attempt to certify "miniclasses" corresponding to only six Champion diets, effectively abandoning claims based on numerous other diets they and putative class members purchased.  *C.f.* Second Am. Compl., ECF No. 25, at 55-56 & n.7-13. Plaintiffs' tactical retreat is an attempt to avoid the predominance of individual issues that led to the denial of certification in the initial class action brought by consumers, including one of the Plaintiffs here (Shaker), on analogous allegations challenging statements on Champion's packaging describing its premium dog food as "Biologically Appropriate" and made with "fresh" and "regional" ingredients. *See Reitman v. Champion Petfoods USA, Inc.*, No. 18-cv-1736, 2019 WL 7169792, at *1 (C.D. Cal. Oct. 30, 2019), *aff'd*, 830 F. App'x 880 (9th Cir. 2020).

Plaintiffs' splintering in this latest iteration of the same meritless lawsuit does not paper over the individual issues that still predominate.  As in *Reitman*, the Motion is premised on the theory that Champion made a "fixed set" of "uniform" material misrepresentations and omissions on its packaging. Mot. at 1.  That theory cannot be squared with the evidence.   As shown below, while the words "Biologically Appropriate" and "Fresh Regional Ingredients" may appear on every package, (1) variations in package labeling among Champion's many diets and within diets over time furnished Plaintiffs with differing statements that provided

important context as to the meaning of those terms, and (2) the contents of the packages varied for each diet and within diets over time, such that "one must first look on the outside of the packaging to determine how ingredients are described, and then compare those descriptions to the ingredients inside the bag to determine whether there was a misrepresentation." *Reitman*, 2019 WL 7169792, at *10 (quotation omitted).  For just these reasons, the court held in *Reitman* that "though certain phrases may be found on every package, each package's labeling provides additional context that will require individualized analysis across Class members that predominate over any common questions." *Id.*

This remains true, notwithstanding Plaintiffs' attempt to pare their case down to truncated "miniclasses" based on particular diets produced at Champion's Kentucky DogStar kitchen from June 2016 onward and dropping diets produced at its NorthStar kitchen in Canada.  ECF No. 52.  Simply dropping claims about other diets does not erase the different statements Plaintiffs read on *those* bags from their memories, nor address the overarching fact that the varying packaging and ingredients within each diet render diet-based classes unamenable to common proof.

Indeed, the *Reitman* court already rejected the fallback subclass approach Plaintiffs employ here, finding that it "would be futile because the analysis would still require bag-by-bag determinations that would predominate over common questions to the class." *Reitman*, 2019 WL 7169792, at *10; *see also Reitman*, 830

2

F. App'x at 881 (similar).  This conclusion applies with even more force here, because Plaintiffs' claim under the Michigan Consumer Protection Act ("MCPA") is governed by an individual, transaction-based reliance standard, rather than the "reasonable consumer" standard at issue in *Reitman*.  *See, e.g.*, *In re OnStar Cont. Litig.*, 278 F.R.D. 352, 378 (E.D. Mich. 2011) ("[I]t would be impossible for this Court to apply a reasonable consumer standard as to reliance class-wide because the putative class members received different disclosures, from different sources, at different times, and the disclosures changed over time.").

Certification is independently unwarranted because Plaintiffs' class damages model does not track their theory of liability, and Plaintiffs' secondary arguments for certification via Rule 23(b)(2) injunctive relief or Rule 23(c)(4) "issues classes" are equally unavailing.  The Court should deny Plaintiffs' Motion in its entirety.

## II.   FACTUAL BACKGROUND

### A.   The Evolution of Champion Petfoods

Reinhard Muhlenfeld founded Champion in 1979 as a feed mill in Alberta, Canada.  Decl. of Chinedu Ogbonna ("**Ex. A**") ¶ 8.  When Champion began producing its own dog food in 1985 under the brand ACANA, it was similar to traditional dog foods.  *Id.* ¶ 9.  But in 2005, Reinhard's son Peter set out to develop dog foods tailored to the way canines, and their wolf ancestors, evolved to eat in the wild.  *Id.* ¶ 11; Dep. of Peter Muhlenfeld Vol. 1 ("**Ex. B**") at 24:1-12; *Id.* Vol. 2

3

("**Ex. C**") at 138:13-139:17. The result was the brand ORIJEN. Ex. C at 136:17-20. Unlike traditional dog food, which relies on grains, potatoes, or other fillers, with synthetic supplements to provide nutrition, ORIJEN consists primarily of animal-based proteins to mirror how a dog attains nutrition in nature (albeit within the limitations of dry kibble). *Id.* at 138:13-17; Dep. of Jeff Johnston Vol. 1 ("**Ex. D**") at 47:15-48:6. Champion transitioned this Biologically Appropriate approach to ACANA diets, continually developing new diets over time. Ex. C at 136:17-23.

Champion also broke the pet food mold in two other ways. First, it obtained as many ingredients as possible from suppliers who were located relatively close to Champion's manufacturing facilities (called "kitchens"). Ex. A ¶ 12. Second, most of Champion's diets included a significant amount of fresh ingredients (preserved through no more than refrigeration) and later also utilized raw (fresh frozen) ingredients, while the typical dog food had **no** fresh or raw ingredients. *Id.* ¶¶ 14-15. Even with minimal advertising and no consumer research until 2017, Champion's diets became sought after by consumers ("Pet Lovers"). Ex. B at 181:5-6, 182:5-9, 183:4-11, 186:20-23; Ex. C at 106:2-16, 125:5-8, 128:13-15, 195:23-196:1, 219:23-220:5. Yet Champion never outsourced production of its finished pet food. Ex. A ¶ 16. Three basic values—Biologically Appropriate, Fresh Regional Ingredients, and Never Outsourced—came together as "BAFRINO," which forms Champion's mission and explains how it differs from traditional dog food. *Id.* ¶ 17.

Around 1990, Champion built its NorthStar kitchen in Alberta, Canada.  Ex. A ¶ 10. In January 2016, Champion opened its DogStar kitchen in Kentucky and throughout 2016 and 2017 transitioned the manufacturing of nearly all of its dog food diets sold in the U.S. to DogStar, resulting in American consumers purchasing diets made at NorthStar until that inventory was exhausted.  Decl. of Christopher Milam ("**Ex. E**") ¶ 8.  As a result, Michigan consumers, including Plaintiffs, purchased diets from both kitchens during 2016 and into 2017.  *Id.* ¶ 9.

## B.    Champion's Wide Variety of Diets and Packaging[1]

ACANA is comprised of three distinct families (Singles, Heritage, and Regionals).  Ex. A ¶ 28.  Within each family, there are many diets.  During the putative class period, Champion sold approximately 20 different ACANA diets and 17 different ORIJEN diets in the United States, each with its own unique formula and ingredient profile.  *Id.* ¶¶ 28-29.  Within the same brand or brand family, the type and amount of ingredients vary, even amongst formulas that use similar animal proteins.  Ex. E ¶¶ 12-14.  The formulas for each of Champion's diets have changed within the class period and continue to change.  *Id.* ¶¶ 14-18.

The statements on each diet's packaging reflect the diverse characteristics of that specific diet.  Ex. A ¶¶ 30-31.  The labeling on the front and back emphasize the philosophy of the diet, certain specific ingredients for that diet, and, especially with

---

[1] *See* Mot. Ex. 2-3, 5-7, ECF Nos. 64-3 through 64-8, for at-issue packaging.

ACANA, the source of key ingredients. Ex. A ¶ 39; Ex. E ¶¶ 15, 16, 22, 53, 54 (images); Mot. Ex. 2-3, 5-7. On the back of every package is an ingredient panel listing the ingredients in descending order by weight. Ex. A ¶ 40; Mot. Ex. 2-3, 5-7. The back of Champion's bags include a prominent panel indicating the weight, in pounds, of key fresh, raw, dried, dehydrated, or oil ingredients used to make the particular diet, in comparison to the total weight of the dog food bag. Ex. A ¶ 41; Ex. E ¶¶ 15, 16, 22 (images); Mot. Ex. 2-3, 5-7. This is referred to as "Meat Math." Ex. A ¶ 41; Ex. E ¶¶ 21-22.

Just as the formulas for Champion's diets have changed over time, so have the statements on its packaging. Ex. A ¶¶ 32-33. Most diets sold to U.S. consumers had at least two distinct packages between July 1, 2016 and 2019. *Id.* ¶ 38. The way Champion executes the "Biologically Appropriate" philosophy varies by diet and is explained to consumers through multiple statements on the bags that changed over time. *Id.* ¶ 32. "Fresh" and "regional" are descriptions that spotlight certain ingredients, depending on the diet and, within diets, on changing ingredients and their sourcing over time; it is undisputed that Champion's packaging at issue has never claimed that *all* or *100%* of its ingredients were fresh or regional. *Id.* ¶¶ 33-34; Ex. B at 197:18-25; Ex. D at 49:18-19; Ex. E ¶¶ 20, 49; Mot. Ex. 2-3, 5-7.

### C. Heavy Metals, BPA, and Pentobarbital

Nearly all foods contain some level of naturally-occurring heavy metals, such

as arsenic, cadmium, lead, and mercury, because they are ubiquitous in the environment and, therefore, exist in the ingredients used to make the foods, such as mercury in fresh fish. *See* Expert Report of Dr. Robert H. Poppenga ("**Ex. F**") at 4-8. Heavy metals are commonly found in all dog foods, even though they are not added to the foods by the dog food maker. *Id.* at 8-20; Dep. of Sean Callan Vol. 1 ("**Ex. G**") at 53:12-16; 54:16-55:3. Beginning in 2008, Champion conducted third-party testing to confirm that any heavy metals in its dog foods were far below levels of concern for dogs according to the National Research Council (NRC) and the Food and Drug Administration (FDA)'s Maximum Tolerable Limits ("MTLs"). Ex. D at 102:9-14, 144:1-3. All testing, conducted both before and after this litigation commenced, demonstrate the levels of heavy metals in Champion's diets are below both the MTLs and the European Union regulatory standards, and thus safe to consume. *Id.*; Ex. F at 8, 12-14, 25-27, 40-41.[2]

BPA is a chemical associated with plastic that, like heavy metals, has become ubiquitous in the environment. Ex. F at 28-29. It is undisputed that Champion

---

[2] Plaintiffs misleadingly quote from and rely on an early 2018 internal draft strategic plan from the marketing department that brain-stormed about trying to have "no … heavy metals" in future ACANA Regionals and Singles diets. Mot. at 8 (citing Ex. 8). But that statement and exhibit are taken out of context and do not assist Plaintiffs in meeting their burden under Rule 23. First, such a representation was never made to any class members. Second, this aspirational idea was not pursued by Champion because it is scientifically impossible. Ex. D at 191:16-193:13; 202:9-16. And third, the level of heavy metals has nothing to do with whether ingredients are fresh or regional.

makes no representations about BPA on its packaging and does not add BPA to its diets as an ingredient.  ECF No. 64 ("SUMF") at ¶ 64; Mot. Ex. 2-3, 5-7. The SAC alleges that trace levels of BPA were detected by Plaintiffs' Ellipse lab using a 30 ppb level of quantification ("LOQ") in some, but not all, of the Champion diets tested.  ECF No. 25-3; Ex. G at 105:9-20. But another lab employed by Plaintiffs, ExperTox, detected **no** BPA in 38 samples of Champion dog food.  *See* Dep. of Dr. Pusillo Vol. 1 ("**Ex. H**") at 19:15-17, 21:11-18; 43:2-5, 124:9-13; Dep. of Dr. Pusillo Vol. 2 ("**Ex. I**") at 111:16-112:1.  Similarly, Champion's post-litigation testing showed nearly all diets (based on one sample per diet) had no detectable BPA even with a sensitive 5 ppb LOQ.  Ex. F at 30-31. Even the small levels detected by Ellipse in some samples pose no possible danger to a dog's health, (*id.* at 32, 41), and Plaintiffs have no expert who opines to the contrary.  Ex. I at 112:5-13.

The Motion also heavily relies on the "risk of pentobarbital" contamination in Champion's dog food.  Mot. at 9-11.  Since 2016, Champion's DogStar Kitchen has purchased beef tallow (fat) from five different suppliers, one of them being JBS/MOPAC ("JBS").  Ex. E ¶ 64.  Beef tallow is a minor ingredient in Champion's beef-based diets, including Regional Red, which is used in a spray coating on finished kibble for flavor.  *Id.* ¶¶ 59, 61.  On or around May 7, 2018, Champion learned that two lots of beef tallow (from the JBS rendering facility located in Pennsylvania) delivered in late March 2018 had tested positive for small amounts of

pentobarbital.  *See* Letter from Pa. Dept. of Ag. ("**Ex. J**").  Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, Champion quarantined or retrieved from distributors approximately 1.6 million pounds; only about 100,000 pounds had been sold by distributors to retailers, with only a small (but unknowable) subset of them making it to Michigan retailer shelves.  Dep. of Jim Wagner ("**Ex. K**") at 46:11-16, 47:10-24, 129:10-25, 131:11-18, 133:9-12; Dep. of Erik Flakstad ("**Ex. L**") at 72:20-21; 80:9-15; 113:16-114:9.  Based on (i) test results of representative composite samples of the kibble by Texas A&M's Veterinary Medical Diagnostic Lab ("TVMDL") indicating a "Non-Detect" reading of pentobarbital ("**Ex. M**"), (ii) the opinion of a private consultant, and (iii) the FDA's approval with a "No Action" letter, Champion determined that consumption of the kibble posed no danger to dogs and it was unnecessary to recall the food. Ex. J at 33:5-34:12, 47:10-24, 48:12-17, 52:20-24, 53:20-54:12, 84:14-23, 98:10-20, 152:10-153:9.

### D. Facts Specific to Plaintiffs and the History of this Lawsuit

Plaintiff Shaker initiated these claims in April 2018 in *Reitman*, but his claims were dismissed for lack of personal jurisdiction in October 2018.  *See Reitman*, 2018 WL 4945645, at *6.  He then filed this action on October 19, 2018 and later added Plaintiffs Knierim, Wellnitz, and Barta in the SAC on March 20, 2020.  ECF No. 25.

All four Plaintiffs purchased Champion dog food made at both NorthStar and DogStar, including the diets on which they seek to certify classes and other diets.

*See* SAC ¶¶ 6-9; **Ex. N** ("Shaker Rog.") at Nos. 3, 7; **Ex. O** ("Shaker Dep.") Ex. 4 (purchased ACANA Duck and Pear[3] from April 2010 to April 2017); **Ex. P** ("Barta Rog.") at Nos. 3, 5, 6, 7; **Ex. Q** ("Barta Dep.") at 36:16-37:4 (began purchasing diet not at issue by Sept. 2009; purchased ACANA Meadowlands from February 2016 to August 2016 and ORIJEN Senior from Sept. 2016 to June 2018); **Ex. R** ("Knierim Rogs.") at Nos. 3, 6, 7; **Ex. S** ("Knierim Dep.") at 49:11-14, 50:5-7; 52:12-15, Ex. 3 at p.1 (purchased ORIJEN Regional Red from June 2014 to March 2018); **Ex. T** ("Wellnitz Dep.") at 42:8-15, 45:2-46:2, Ex. 2 (began purchasing diets not at issue in June 2013; purchased ACANA Free Range Poultry from 2016 to Sept. 2018).

Plaintiffs conducted their own online research before purchasing Champion dog food, including reading different statements on Champion's website.  Shaker Dep. at 19:15-25; Barta Dep. at 25:20-26:21, 32:23-33:8; Knierim Dep. at 38:21-39:2, 42:8-43:2.  Moreover, Each Plaintiff read and relied on the packages and ingredient panels before purchasing, including statements that appeared on NorthStar packaging that did not appear on DogStar packaging.  Shaker Dep. 31:1-

---

[3] In a Stipulated Order Dismissing Without Prejudice Certain Dog Food Diets at Issue, Plaintiffs did not include ACANA Wild Mackerel as one of the remaining diets at issue.  *See* ECF No. 52 ¶ 13.  Moreover, Shaker testified that neither he nor the store from which he purchased his dog food (Specialty Pet Supplies in Plymouth, MI) had receipts evidencing that he ever purchased the mackerel diet and that he is not "100 percent positive" he ever bought it.  Shaker Dep. at 53:10-25, 71:19-24.  Thus, the Wild Mackerel class should be struck or otherwise not certified pursuant to the Stipulated Order and because it lacks a class representative.

13, 58:1-5, 62:5-18, 63:2-23, 66:20-67:9, 77:17-23, 86:21-89:7 (duck being sourced from Ontario, Canada); Barta Dep. at 55:22-56:4, 57:18-20, 58:23-59:18 (NorthStar packaging said ingredients from "sunny Alberta" were "never frozen"), 62:12-63:1, 63:23-25, 67:4-19, 69:21-70:1, 70:23-71:4, 83:19-25; Knierim Dep. at 68:2-24 ("made in Canada"), 84:14-17, 92:21-93:2; Wellnitz Dep. at 27:2-11, 63:3-12 ("made in Canada."), 36:23-37:4, 38:12-19, 65:13-18, 67:2-13, 68:12-14, 70:7-21, 72:14-22, 79:8-10. Indeed, both Barta and Wellnitz testified that they did not go back and read the statements on the bags made at DogStar after Champion switched kitchens from NorthStar.  Barta Dep. at 78:22-79:15 ("[W]hen they switched to Kentucky, I didn't go and read the bag."); Wellnitz Dep. at 74:4-75:10 ("I didn't look to see if something had changed."), 83:2-7 ("I didn't see the made in our USA Kentucky kitchen, again, probably a mistake on my part, assuming it was all made in Canada.").  And, Shaker testified after a certain point, "there was no need to read [the bags] every time I bought the bags." Shaker Dep. 82:15-83:20.

    None of the Plaintiffs allege, nor is there any evidence, that their dogs were harmed or malnourished by consuming Champion's dog food.  Ex. F at 38-41.

## III.   LEGAL STANDARD FOR RULE 23

    A class may only be certified if it satisfies the prerequisites of Federal Rule of Civil Procedure 23.  *E.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466

(6th Cir. 2017). This requires a "rigorous analysis" which may frequently entail "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078 (6th Cir. 1996). "Given the huge amount of judicial resources expended by class actions, particular care in their issuance is required." *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011).

Plaintiffs bear the burden of "affirmatively demonstrating" by a preponderance of the evidence that Rule 23's requirements are met and that certification is appropriate. *Wal-Mart*, 564 U.S. at 350; *Sandusky Wellness Ctr.*, 863 F.3d at 466. "Mere repetition of the language of Rule 23(a) is not sufficient." *In re Am. Med. Sys.*, 75 F.3d at 1079 (citation and quotation omitted). "[O]rdinarily the determination should be predicated on more information than the pleadings will provide," requiring "evidence on the maintainability of the class action." *Id.*

## IV. THE PROPOSED CLASSES SHOULD NOT BE CERTIFIED

### A. Plaintiffs' Claims Are Riddled with Individualized Issues

For a class to be certified under Rule 23(b)(3), Plaintiff must show (1) that questions of law or fact that are common to all of the class members "predominate over any questions affecting only individual members"; and (2) that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[S]ubdivision (b)(3) contains the more

stringent requirement that common issues 'predominate' over individual issues." *In re American Medical Sys.*, 75 F.3d at 1084; *see also Cahoo v. Fast Enterprises LLC*, No. 17-cv-10657, 2020 WL 7624613, at *16 (E.D. Mich. Dec. 22, 2020) ("The test is 'more demanding' than the commonality determination.").

"A proposed class generally will fail the predominance test when 'the legal or factual questions that qualify each class member's case as a genuine controversy,' are not 'subject to generalized proof, and thus applicable to the class as a whole.'" *Cahoo*, 2020 WL 7624613, at *15 (quoting *Sandusky Wellness Ctr.*, 863 F.3d at 468). Similarly, "where many individual inquiries are necessary, a class action is not a superior form of adjudication." *Id.* (quotation omitted). "The analysis 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

Under the MCPA, a plaintiffs must prove "1) that the defendant made a material misrepresentation that was false; 2) the defendant knowingly made the false representation with the intent that the plaintiff would act upon it; 3) that the plaintiff acted in reliance upon it; and 4) resulting damages." *In re OnStar Cont. Litig.*, 278 F.R.D. at 376. "A material fact for purposes of the MCPA is 'one that is important to the transaction or affects the consumer's decision to enter into the transaction.'" *Id.* (quoting *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 283 (1999)). "[T]he MCPA prohibits making an omission that tends to mislead or deceive any consumer,

but only if the omitted fact could not be reasonably known by *that consumer*. Thus, the issue is not whether the omission is misleading to a reasonable consumer but whether the consumer could reasonably be expected to discover the omission at issue." *Id.* (emphasis added; alteration omitted).

Here, because "the MCPA claims asserted by [Plaintiffs'] proposed . . . class[es] raise numerous individualized issues that predominate over any common issues," class treatment is not the superior method of litigating those claims. *Id.*

> **1.** **Plaintiffs' classes raise individualized issues as to the critical elements of (1) whether Champion made misleading statements and (2) whether Plaintiffs relied on them**

Plaintiffs' efforts to splinter their case into six mini-classes of purchasers of specific DogStar diets merely multiply the individual fact issues. *First*, Plaintiffs and putative class members were exposed to different statements at different times in different contexts on a variety of bags and through their own individual research, precluding a finding of predominance or superiority. *Second*, the contents of the diets Plaintiffs purchased also changed over time, raising additional individual issues as to Plaintiffs' theory of falsity by misrepresentation or omission, *i.e.*, that supposedly "nonconforming" substances in the different diets—such as frozen ingredients, nonregional ingredients, regrinds, heavy metals, BPA, and pentobarbital—did not match up to representations on the packaging or should have been disclosed on the packaging. *See* Mot. at 3-11.

a.   **Because the statements on Champion bags varied by brand, diet, kitchen, and time, Plaintiffs cannot show uniform, material misrepresentations or establish reliance**

Plaintiffs attempt to meet their burden of establishing predominance and superiority by alleging that all putative class members were exposed to "fixed" or "uniform" statements on Champion's packaging.  Mot. at 1, 2, 3, 14, 19.  Plaintiffs focus on three groups of statements: "Biologically Appropriate," "Fresh Regional Ingredients," and "Delivering Nutrients Naturally"/"Nourish as Nature Intended." *See id.* at 1-2.  But these statements do not stand alone. They derive their diet-specific meaning from other statements on the respective bags. Just from 2016 through October 2018 alone,[4] Champion sold 20 different ACANA diets and 17 different ORIJEN diets in the United States, and the statements displayed on each of the bags varied to reflect the unique strengths and benefits of each diet.  Ex. A ¶¶ 28, 29, 36. As the "Tracking Chart" Plaintiffs attached as Exhibit 1 to the Motion illustrates, these statements varied by brand, diet, and date of production.  Mot. Ex. 1.  A rigorous analysis of the actual labels to which consumers were exposed and the

---

[4] The time period covered by the purported mini-classes definitions in the Motion is June 1, 2016 to the present.  Plaintiff Shaker first joined the initial lawsuit against Champion in California on April 19, 2018.  *See Reitman*, No. 2:18-cv-01736 (ECF No. 39).  Thus, the latest that Plaintiffs could claim to be misled by any alleged false or misleading statements is April 19, 2018 (or October 19, 2018, when this action was filed before the Court), and the Rule 23(b)(3) class period thus would end no later than that date even Plaintiffs' proposed classes were viable, which they are not.

numerous variations and contexts given to their terms reveals numerous bag-by-bag inquiries, which is incapable of being determined by collective evidence applicable to any class of purchasers.

**Biologically Appropriate.**  The expression "Biologically Appropriate" is not self-defining.  Rather, the expression acquires meaning from the qualifying language and the surrounding explanations on the packaging that provide critical context for what "Biologically Appropriate" means with respect to a given diet at a given time.  Such explanatory language differs from bag to bag, even within the same diets at issue, as the packages evolved over time.  *Compare* Mot. Ex. 2 at 2, *with id.* at 3 (reflecting different descriptions of the term on the front and back of the 2016 and 2018 ACANA Free-Run Poultry bags); Mot. Ex. 5 at 2, *with id.* at 3 (same, with front of 2016 and 2018 ACANA Duck & Pear bags); Mot. Ex. 6 at 2, *with* Mot. Ex. 6 at 3 (same, with back of 2016 and 2018 ORIJEN Regional Red bags).  Plaintiffs ignore the varying statements that lend meaning to "Biologically Appropriate" and do not challenge their accuracy.

**Fresh and Regional**.  The statements about "fresh" ingredients also varied significantly throughout and before the class period, even within each diet at issue. Most diets' formulas changed over time, which is reflected on the front of the bags, in the ingredient panels on the back, and in the prominent "Meat Math" section of the bags, which breaks down the approximate amount, in pounds, of each key

ingredient, and whether they were added as fresh, raw, dried, freeze-dried, dehydrated, or as oils into the formula.  Ex. E ¶¶ 14-18 (images, explaining key ingredient changes seen on 2016 and 2018 Meadowland and Free-Run Poultry bags).

For example, even though Plaintiffs have dropped their claims involving dog food made at Champion's NorthStar kitchen, some Plaintiffs relied on statements from NorthStar bags to define their understanding of "fresh" that never appeared on DogStar bags, such as that ingredients were "never frozen."  *See, e.g.*, Barta Dep. at 59:3-11; *see also id.* at 34:20-22 ("Q. Is that something that was important to you when you were purchasing the food? A. I thought.  I believe fresh food is better than, you know, if . . . they have to freeze it."); *id.* at 72:11-15.  Plainly, consumers such as Barta who purchased dog food from NorthStar prior to the class period will have different, individualized understandings of "fresh" than other consumers.

Even within the class period, the statements on each package regarding the amounts of fresh, raw, freeze-dried, oil, or dehydrated ingredients changed over time for each diet, which would be critical to consumers' understanding of the "fresh" statements at issue.  *Compare* Mot. Ex. 5 at 2, *with id.* at 3 (different formulations of "freeze dried," "DRIED," "Dehydrated," and "OIL" ingredients referenced on the front the 2016 and 2018 ACANA Duck and Pear bags and on the back of the bags in the Meat Math section); *compare* Mot. Ex. 6 at 2, *with id.* at 3 (same, between the Meat Math sections on the back of the 2016 and 2018 ORIJEN Regional Red bags).

Plaintiffs testified that these prominently-displayed and varying references to "oils," "dehydrated," and "freeze dried" ingredients made it clear to them that not all of the ingredients in Champion dog food were advertised as being fresh.  Knierim Dep. at 73:17-25 ("Q. Do you think dried ingredients are fresh? . . . A. . . . I guess it wouldn't be fresh."); *see also* Shaker Dep. 58:1-6. Class-members' understanding of what the "fresh" representation means and their unique perceptions of whether the inclusion of ingredients in "frozen," "dehydrated," and "oil" forms rendered that representation misleading are impacted by these varying statements on the packaging, and thus their understandings inherently differ.  *See, e.g.*, Shaker Dep. at 90:12-21 ("Q. And did it bother you at all that dried ingredients were used? A. I didn't have one feeling or another at the time."); Wellnitz Dep. at 99:6-10 ("Q. Would you have had any issue with the inclusion of a freeze-dried ingredient such as chicken liver? A. I would not.").

The statements about "regional" ingredients also varied extensively across countries, kitchens, and time, even within the same diets.  Again, although Plaintiffs have limited their claims to diets made in Champion's DogStar kitchen beginning in 2016, several named Plaintiffs testified that their understanding of "regional" was formed when they began purchasing the diets before the class period when the packaging stated that it was "Made in Canada."  *See, e.g.*, Knierim Dep. at 68:2-24, 89:2-92:24; Wellnitz Dep. at 65:13-18, 67:2-13.  At least one Plaintiff did not even

realize that Champion began producing the diets in Kentucky during the class period, assuming that "regional" continued to refer to Canada. Wellnitz Dep. at 79:8-17; 83:2-7.

Even on diets made only at DogStar, the statements about "regional" ingredients on the packaging varied materially within diets over time, including which ingredients were "regional" and what "region" they came from.  Ex. A ¶ 33; Ex. E ¶¶ 52-54 (images, explaining sourcing and supplier changes seen on 2016 and 2018 Free-Run Poultry and Meadowland bags).  For example, the front of the 2016 ACANA Duck and Pear bag states "***Kentucky's Fertile Farms and Orchards***[:] Our Source of Inspiration and Fresh Regional Ingredients," whereas the front of the 2018 bag contains the significantly different statement "***America's Vast and Fertile Lands***[:] Our Source of Inspiration and Fresh Regional Ingredients."  Mot. Ex. 5 at 2-3 (emphases added).  Moreover, statements on the packaging regarding the city or county where some key ingredients were sourced changed over time within diets. Ex. E ¶¶ 52-54; *compare* Mot. Ex. 2 at 2, *with id.* at 3 (reflecting key ingredients as coming from different cities and states on the front of the 2016 ACANA Free Run Poultry as compared to the 2018 bag). Some bags also changed the photograph of their featured supplier, which identified the farm, city, and state from which at least some of a featured ingredient was sourced.  *Compare* Mot. Ex. 2 at 2, *with id.* at 3; Mot. Ex. 3 at 2, *with id.* at 3.

These varying sourcing statements influenced consumers' respective perceptions of the term "regional."   Plaintiffs acknowledged that Champion's packaging "does not say 100 percent regional ingredients," Shaker Dep. at 58:18-20; Wellnitz Dep. at 83:9-15, that they reviewed Champion packaging expressly listing ingredients as being sourced from as far apart as New England to New Zealand, Shaker Dep. at 20:24-21:11, 72:6-9, and that they all had different conceptions of what regional meant.   *See, e.g.*, Shaker Dep. at 61:17-18 ("regional to me, it meant United States and part of Canada."); Wellnitz Dep. at 79:8-10 ("Q. And when it says regional, you stated that regional to you means it was made in Canada? A. Yes."); Knierim Dep. at 69:11-14 ("regional to me would be made in the US or made regionally, you know, in Kentucky, maybe."); Barta Dep. at 56:25-57:2 ("Regional is that they got their food from somewhere that was close to where they were manufacturing the food.").   The term is thus, by definition, relative to person, time, and place, and inherently unamenable to class certification.

***Delivering Nutrients Naturally/Nourish as Nature Intended.***   Plaintiffs similarly ignore the variation in and context surrounding the statements "Delivering Nutrients Naturally" and "Nourish as Nature Intended."   Plaintiffs include these phrases in their discussion of purportedly "uniform" claims, Mot. at 1-2, but do not include these terms on their "Tracking Chart" attached as Exhibit 1 to the Motion. For good reason: they do not appear on many of the packages at issue.   "Nourish as

20

Nature Intended" does not appear on the ACANA Free-Run Poultry, ACANA Meadowlands, or ACANA Duck & Pear bags.  Mot. Ex. 2, 3, 5.  As for "Delivering Nutrients Naturally," the ORIJEN Senior Class and Regional Red Class bags do not include that statement at all, Mot. Ex. 6-7, and it appears on the bags of other diets in different variations and contexts over time.  *See* Mot. Ex. 2, 3, 5.  Moreover, where each of these statements appear, they are tied to the specific ingredients in each diet, which, as noted above, also changed over time.  *Id.*  In mischaracterizing these representations as "fixed" and "uniform," Plaintiffs once again ignore the different statements at issue, their changes over time within diets, and the surrounding context, all of which demand individualized inquiries.

Plaintiffs' proposed mini-classes fail Rule 23(b)(3)'s predominance and superiority tests for all of these reasons.  *See Reitman*, 2019 WL 7169792, at *10 ("each package's labeling provides additional context that will require individualized analysis across Class members that predominate over any common questions.").  The varied statements that appeared on the bags of the diets sought to be certified cannot simply be clumped together in a pretense of collective evidence, because class members would have been exposed to a numerous different statements and contexts across the DogStar bags at issue, on prior NorthStar bags that are not at issue, or when conducting individualized online research.

Under just these circumstances, courts in this district and across the country

have declined to certify a proposed class, including on claims brought under the

MCPA.  *See, e.g.*, *In re OnStar Cont. Litig.*, 278 F.R.D. at 378.  In *In re Onstar*,

buyers of automobiles equipped with Onstar telematics alleging misrepresentations

in the disclosures they received were unable to satisfy Rule 23(b)(3) because they

"were provided different documents with different forms of disclosure, . . . in many

instances performed their own individual investigations prior to the[ir] purchase[s]"

and, "further compounding the issue, the disclosure information changed over the 4

½ year class period."  *Id.*  The court held that under those circumstances, "it would

be impossible for this Court to apply a reasonable consumer standard as to reliance

class-wide because the putative class members received different disclosures, from

different sources, at different times, and the disclosures changed over time."  *Id.*  The

Sixth Circuit denied the plaintiff's Rule 23(f) petition, relying on the district court's

finding that the plaintiff's received different disclosures over time, finding that:

> *Class litigation of consumer-protection claims is generally not*
> *appropriate when the defendant made different representations to*
> *different plaintiffs and the defendant's liability will hinge in large part*
> *on the accuracy of the particular representation each plaintiff received.*

*In re Onstar Cont. Litig.*, No. 7-md-1867 (Appellate Case No. 12-101), Dkt. No. 28-

1, at 2 (6th Cir. Mar. 16, 2012) (not reported, attached as "**Ex. U**") (emphasis added).

*See also In Re Tropicana Orange Juice Mktg. and Sales Prac. Litig.,* No. 2:11-

07382, 2019 WL 2521958, at *10 (D.N.J. June 18, 2019) (such labelling "variations

are the poster child for lack of predominance").[5]

Here, as in the foregoing cases, and as the Ninth Circuit has already held on analogous claims in *Reitman*, there has been no "uniform" misrepresentation or omission that could affect all putative class members the same way.  830 F. App'x at 881.  The finder of fact will be required to perform an individualized inquiry into each of the bags purchased by each mini-class member over time to determine what combination of statements appeared on each consumer's packaging to then asses (1) whether that combination was misleading or omitted material information and (2) whether each consumer relied on that combination in making their purchases of Champion dog food.  *In re OnStar Cont. Litig.*, 278 F.R.D. at 376 ("the issue is not whether the omission is misleading to a reasonable consumer"). Plaintiffs have failed to meet their burden to establish predominance and superiority for this reason alone.

### 2. The contents *inside* each Champion bag must be compared to the statements on the *outside* of the bag to assess falsity

The foregoing statements not only present individualized inquiries as to their

---

[5] *See also Converse v. Ameritech Corp.*, 179 F.R.D. 533, 538 (W.D. Mich. 1997) ("individual questions predominate over common questions" where "representations were made to the putative class in a variety of ways and from a variety of sources"); *Oom v. Michaels Companies Inc.*, No. 16-cv-257, 2017 WL 3048540, at *7 (W.D. Mich. July 19, 2017) (similar, where "the Court would have to engage in a highly-individualized inquiry" and "[e]ach claim would depend on a specific, case-by-case analysis"); *Montgomery v. Kraft Foods Glob., Inc.*, No. 12-cv-00149, 2014 WL 1875022, at *4 (W.D. Mich. May 9, 2014) (similar, based on the plaintiffs' failure to "demonstrate the materiality of any alleged misrepresentation using common evidence").

context, but also as to the specific *contents* and ingredients in each package on which they appeared.  Plaintiffs' omission-based theory is that the presence of purported "nonconforming" substances in some ingredients or samples of Champion dog food—such as frozen ingredients, nonregional ingredients, regrinds, heavy metals, BPA, or pentobarbital—should have been disclosed or rendered Champion's "Biologically Appropriate" and "Fresh and Regional" statements false.  Mot. at 3-11.  This theory demands scrutiny not only of the formulation of each diet as it changed over time, but of each individual lot or bag of food, as Plaintiffs concede that the substances they complain of were present only in "some" ingredients or samples of Champions' dog food, and not in others.  *Id.*

### a. Issues as to "fresh" require diet-by-diet and lot-by-lot analysis

An ingredient that was "fresh" for one particular diet is not necessarily fresh (or described as such) in another diet.  Ex. E ¶¶ 23-27.  As noted above, Champion has never advertised that it uses 100% fresh ingredients, Ex. A ¶ 34; Ex. B at 197:18-25; Ex. D at 49:18-19, and many Champion packages explain that particular ingredients are "fresh or raw" and/or were "dried," "dehydrated," "freeze-dried," or in the form of "oil."  Ex. E ¶¶ 15, 16, 22 (images).  Whether an ingredient was fresh (preserved by no more than refrigeration) necessitates not only a diet-by-diet analysis, but—depending on the time of the year, seasonality, or size of the catch or harvest—a lot-by-lot analysis of the contents of each diet purchased by each class

24

member.  Ex. E ¶¶ 28-37.  This cannot be established by collective evidence applicable to the entire putative mini-classes.

Similarly, Plaintiffs speculate that Champion uses "significant volume of regrinds . . . and expired ingredients."  Mot. at 3.  Not only does the record not support that allegation, it is self-defeating.  What Plaintiffs call "expired" ingredients are merely ingredients that exceeded a best-used-by-date from the supplier.  Ex. E ¶ 44.  Champion employs quality control procedures to make sure it is safe to do so, *id.* ¶¶ 45, 47, and the use of such ingredients is not "routine," Mot. at 5—it is infrequent and almost always involves dried ingredients, not fresh or raw ingredients.  Ex. E ¶ 46.  Regardless, whether ingredients that went into certain batches of certain diets were past their best-used-by-date is an inherently individualized, lot by lot analysis.

As to "regrinds," this is a term Champion coined for the practice of reworking product that may have been unused or rejected from a prior production run into a new production run; often this includes misshapen or unformed kibble. Ex. E ¶ 38. Regrinds of finished kibble typically do not displace fresh or raw, but only dried ingredients.  *Id.* ¶¶ 40, 42.  Critically, determining whether regrinds were used is yet another lot-by-lot inquiry, given that many production runs would have no regrinds of any type, *id.* ¶ 40, as the testimony relied on by Plaintiffs confirms. Mot. Ex. 19 at 73:13-15.  Champion also created a policy specifying that only certain diets can

accept regrinds from certain other diets (they have to have identical or very similar formulas) and only in small percentages so that the guaranteed analysis and the ingredient panel is not materially altered.  Ex. E ¶¶ 40-41; Mot. Ex. 20 at 126:1-18. Although Plaintiffs point to a few instances where the amount of regrinds in a lot exceeded Champion's internal policy, this was a rare event rather than a "common practice" as Plaintiffs assert, Mot. at 6, and whether or not this occurred would likewise require a lot-by-lot analysis.  Mot. Ex. 20 at 126:19-25 (explaining this occurs "[f]rom time to time" with "exceptions").  In short, episodic production realities with no demonstrated impact on nutritional value of the foods do not create a common issue, much less one that "predominates" in the face of such a variety of issues within each mini-class.

### b.    "Regional" also requires individualized analysis

Similarly, the description of "regional" or "regionally sourced" varies among diets and even within a diet, Ex. E ¶ 48, in part because, as explained above, "regional" is an inherently relative term that all Plaintiffs understood to mean different things based on their individual research, when they started buying Champion dog food, from what kitchen, what diets they bought, and the sourcing of the different ingredients in those diets, which changed over time.  *Supra* at 11, 20.

### c.    Issues as to heavy metals, BPA, and pentobarbital also create individualized issues

As noted above, Champion does not make any representations about heavy

metals on its packaging or add heavy metals to its dog food.  Ex. A ¶ 34; SUMF ¶

50.  Rather, heavy metals are ubiquitous elements that are naturally occurring in the

ingredients Champion uses. Ex. F at 4-7.  The levels at which they are present in

Champion's finished dog food are at levels that are not harmful for dogs to consume,

(Ex. F at 4-7, 40-41), and necessarily vary by diet and by lot depending on the

various ingredients and types of ingredients used and the heavy metals that naturally

occur in those ingredients.  *See id.* at 11; Mot. Ex. 30 at 24, 26, 31-35.[6]

Plaintiffs' scaremongering invocation of BPA is equally unhelpful.  As with

metals, Champion does not use BPA as an ingredient or otherwise add it to the dog

food, and makes no claim that its diets are "BPA free." SUMF ¶ 64.  It is undisputed

that BPA is ubiquitous in the environment, Ex. F at 28-29, and Plaintiffs have not

provided a BPA expert, or identified the source of BPA that has been detected in

very low amounts in some samples of Champion dog food such that the potential for

BPA in any given diet, at any given time, will necessarily vary. Ex. H at 15:11-12;

15:14-16; 15:22-25; Ex. I at 112:5-13. Plaintiffs' own lab tests—in which BPA was

present in some samples tested by one lab in amounts that are not close to being

harmful to a dog, but absent from another 38 samples tested by a different lab—

---

[6] Plaintiffs harp on internal emails from many years ago about Champion wanting to do more testing for heavy metals, Mot. at 7-9, but ignore that Champion in fact *did* test for heavy metals and by the start of the class period in June 2016 had conducted abundant heavy metal testing of its products.  Ex. F at 3, 11-15, 40-41.  Since the litigation started, extensive additional testing has occurred. *See, e.g.*, *id.* at 25-27.

confirm that whether BPA is even present in Champion's food requires a lot-by-lot analysis. *Supra* at 8. Champion's own testing showed no detectable BPA in 20 out of 24 samples, and out of the 6 diets at issue, only one diet, ACANA Free-Run Poultry, had a sample with detectable BPA.  Ex. F at 30-31.

Finally, Plaintiffs' pentobarbital allegations raise even more obvious individual inquiries.  Plaintiffs rely heavily upon Champion's receipt of two lots of beef tallow from JBS/MOPAC on March 26 and 28, 2018, that Champion later learned had tested positive for pentobarbital. Mot. at 9-11; Ex. I.  The only bags that could have possibly been affected were Champion's DogStar beef-based diets (called "Red" diets) produced after March 26, 2018.  Ex. E ¶ 68; Ex. I.  Critically, Plaintiffs' Shaker, Barta, and Wellnitz never purchased any beef-based diets.  *See* Mot. at 12; *supra*, at 10.  The only Plaintiff who purchased a beef-based diet was Knierim, who bought ORIJEN Regional Red, but Knierim's receipts prove her last purchase of Champion dog food was on *March 12, 2018*. Ex. S at Ex. 3 p.1. Thus, none of the proposed class representatives purchased a bag that could have possibly contained tallow from the tainted JBS lots, providing yet another reason why class certification is inappropriate.[7]

---

[7] It is unknown if any bags produced with the tainted JBS tallow were even sold at retail in Michigan. Ex. K at 72:20-21; 80:9-15; 113:16-114:9. Moreover, Champion also sourced tallow from four suppliers other than JBS, and Champion stopped purchasing tallow from JBS altogether in May 2018.  Ex. E ¶ 64; Ex. K 23:16-17. Pentobarbital was never found to be in Champion's finished food product at any

### 3.    Plaintiffs cannot prove damages on a class-wide basis

It is axiomatic that a plaintiff must be able to prove damages on a class-wide basis. *Comcast*, 569 U.S. at 34. "[A]t the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "courts must conduct a rigorous analysis to determine whether that is so." *Id.* at 35. "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory" and isolate any respective theory of liability. *Id.* at 38. As set out in detail in Champion's motion to exclude Plaintiffs' damages expert Stefan Boedeker, ECF No. 63, Plaintiffs provide no method for calculating damages on a class-wide basis that tracks their theory of liability and is inadmissible for other reasons. This is an independent basis on which the Motion should be denied.[8]

### B.    Plaintiffs Fail to Carry Their Burden Under Rule 23(c)(4)

Plaintiffs move in the alternative for issue certification under Rule 23(c)(4),

---

levels, *see* Ex. M, but for Rule 23 purposes, the individual inquiries required to determine which consumers, if any, purchased one of the relatively few bags affected precludes certification.

[8] Plaintiffs' request for injunctive certification under Rule 23(b)(2), Mot. at 17-18, is also unavailing for multiple reasons, including that no single injunction could provide relief to any of the classes, Plaintiffs seek primarily monetary relief, and Plaintiffs lack standing as they have all stopped purchasing Champion's dog food. *See, e.g.*, *Reitman*, 2019 WL 7169792, at *14; *Mason v. Granholm*, No. 05-cv-73943, 2007 WL 2541769, at *2 (E.D. Mich. Aug. 31, 2007); *Rouse v. Caruso*, No. 2:06-cv-10961, 2013 WL 5775354, at *6 (E.D. Mich. Oct. 25, 2013).

which enables a district court to certify an issue class "[w]hen appropriate." Mot. at 28-30. While predominance is not required, "Rule 23(c)(4) may not be used to circumvent the predominance requirement of Rule 23(b)(3)." *Snow v. Atofina Chemicals, Inc.*, No. 01-cv-72648, 2006 WL 1008002, at \*9 (E.D. Mich. Mar. 31, 2006). Courts reject "fallback argument[s]" under Rule 23(c)(4) where individual "fact-intensive inquiries" are required. *Cahoo*, 2020 WL 7624613, at \*16-17.

Because of the complexities of the individualized issues identified *supra*, Plaintiffs' issue classes would not materially advance the litigation or make it more manageable, underscoring why issue certification is not appropriate. *See, e.g.*, *Reitman*, 830 F. App'x at 882 ("the numerous individualized issues affecting determinations of liability make Rule 23(c)(4) certification inefficient.").

## V.     CONCLUSION

For all the foregoing reasons, the Motion should be denied in its entirety.

Dated:  July 15, 2021                    Respectfully submitted,

                              */s/ David A. Coulson*
                              David A. Coulson
                              GREENBERG TRAURIG P.A.
                              333 S.E. 2nd Avenue, Suite 4400
                              Miami, FL 33131
                              Tel: (305) 579-0754
                              Email: couldsond@gtlaw.com
                              ***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of July, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and that the foregoing document is being served this day on all counsel of record in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *David A. Coulson*
DAVID A. COULSON

## SERVICE LIST

THE MILLER LAW FIRM, P.C.
DENNIS A. LEINHARDT
E. POWELL MILLER
SHARON S. ALMONRODE
EMILY E. HUGHES
WILLIAM KALAS
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Email: dal@millerlawpc.com
       epm@millerlawpc.com
       ssa@millerlawpc.com
       eeh@millerlawpc.com
       wk@millerlawpc.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
REBECCA A. PETERSON
ROBERT K. SHELQUIST
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Email: rapeterson@locklaw.com
       rkshelquist@locklaw.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
E-mail:
dgustafson@gustafsongluek.com

WEXLER WALLACE LLP
KENNETH A. WEXLER
MICHELLE LUKIC
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Email: kaw@wexlerwallace.com
       mpl@wexlerwallace.com

*Attorneys for Plaintiffs*

31