## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RAMY SHAKER, TRACY KNIERIM, LISA BARTA, and CHERYL WELLNITZ, individually and on behalf of a class of similarly situated individuals,<br><br>　　　　Plaintiffs,<br>v.<br><br>CHAMPION PETFOODS USA, INC. and CHAMPION PETFOODS LP,<br><br>　　　　Defendants. | Case No. 2:18-cv-13603-LJM-DRG<br><br>Honorable Laurie J. Michelson<br><br>Magistrate Judge David R. Grand |

## PLAINTIFFS' REVISED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT

## <u>COUNTER STATEMENT OF ISSUES PRESENTED</u>

1.  Whether the record on the presence of heavy metals and risk of BPA in Defendants' dog food raises a genuine issue of material fact regarding whether Defendants' use of "Biologically Appropriate" is misleading?

    Plaintiffs state: YES.

2.  Whether the record on the risk of pentobarbital contamination in Defendants' dog food raises a genuine issue of material fact regarding whether Defendants' use of "Biologically Appropriate" is misleading?

    Plaintiffs state: YES.

3.  Whether the record on Defendants' undisclosed use of non-fresh ingredients, including regrinds and frozen and expired ingredients, in its dog food raises a genuine issue of material fact regarding whether Defendants' use of "Fresh" is misleading?

    Plaintiffs state: YES.

4.  Whether the record on Defendants' undisclosed use of ingredients sourced from outside the Kentucky region and/or outside the United States raises a genuine issue of material fact regarding whether Defendants' use of "Regional" is misleading?

    Plaintiffs state: YES.

5.  Whether the record on the presence of heavy metals and the risk of BPA and pentobarbital in Defendants' dog food raises a genuine issue of material fact regarding whether Defendants' use of the Natural Claims is misleading?

    Plaintiffs state: YES.

6.  Whether the record on Defendants' failure to disclose the inclusion of heavy metals, BPA, non-fresh, and non-regional ingredients raises a genuine issue of material fact regarding whether the omissions were material to reasonable consumers?

    Plaintiffs state: YES.

7.  Whether the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §445.901, *et seq*., exemption is inapplicable because the marketing and

sale of Defendants' dog food in Michigan is not governed by Michigan's Feed Law, Mich. Comp. Law §287.521, *et seq.,* and not regulated by the Michigan Department of Agriculture?

Plaintiffs state: YES.

8.   Whether the record shows a genuine issue of material fact as to whether Defendants actually submitted any relevant label or packaging to a Michigan regulatory body for approval?

Plaintiffs state: YES.

9.   Whether privity is not required for Plaintiffs' express warranty claims because Plaintiffs were the intended beneficiaries of Defendants' contract with the retailers?

Plaintiffs state: YES.

10.   Whether Defendants received sufficient pre-suit notice of Plaintiffs' express and implied warranty claims?

Plaintiffs state: YES.

11.   Whether the Economic Loss Doctrine is inapplicable?

Plaintiffs state: YES.

## <u>TABLE OF CONTENTS</u>

COUNTER STATEMENT OF ISSUES PRESENTED ............................................... i

TABLE OF AUTHORITIES ................................................................... v

TABLE OF MOST APPROPRIATE AUTHORITIES ........................................... xi

I.     INTRODUCTION ........................................................................ 1

II.    ADDITIONAL STATEMENT OF UNDISPUTED
       MATERIAL FACTS ................................................................... 2

III.   LEGAL STANDARD .................................................................. 25

IV.    ARGUMENT ............................................................................ 25

       A.   A Reasonable Jury Could Find the Packaging Claims Are
            Misleading ...................................................................... 25

            1.   Heavy Metals and a Risk of BPA Renders
                 "Biologically Appropriate" Misleading ........................... 25

            2.   Pentobarbital Makes "Biologically Appropriate"
                 Misleading ............................................................... 28

            3.   A Jury Could Find that the "Fresh" Statement is
                 Misleading ............................................................... 30

            4.   A Jury Could Find the "Regional" Statement is
                 Misleading ............................................................... 34

            5.   A Jury Could Find the Natural Claims are
                 Misleading ............................................................... 37

       B.   Plaintiffs' Expert Opinions Create Issues of Material Fact ...... 39

       C.   Triable Issues Exist as to CPF's Material Omissions .............. 43

       D.   Summary Judgment Is Improper on the MCPA Claims .......... 47

            1.   CPF's Marketing Conduct is Not Exempt from
                 the MCPA ................................................................ 48

            2.   The MCFL is Concerned with Ingredients and
                 Guaranteed Analysis .................................................. 52

            3.   CPF has not Met its Burden to Establish that the
                 MCFL Specifically Authorizes Pet Food
                 Marketing Activities .................................................. 53

            4.   The Actual Submission of any Label Here Raises
                 a Question of Fact for the Jury. .................................... 54

E.      Privity Does Not Preclude the Express Warranty Claim..........55

F.      CPF Had Sufficient Notice of the Warranty Claims ...............56

G.      The Economic Loss Doctrine Does Not Apply .......................58

V.      CONCLUSION .................................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott Labs. v. Gerber Prods. Co., Inc.*,
  979 F. Supp. 569 (W.D. Mich. 1997) ..................................................................40

*Alexander v. Del Monte Corp.*,
  2011 WL 87286 (E.D. Mich. Jan. 11, 2011) ......................................................52

*Am. Auto. Ass'n, Inc. v. Advanced Am. Auto Warranty Servs., Inc.*,
  2009 WL 3837234 (E.D. Mich. Nov. 16, 2009)..................................................49

*Am. Italian Pasta Co. v. New World Pasta Co.*,
  371 F.3d 387 (8th Cir. 2004) ..............................................................................42

*Att'y Gen. v. Diamond Mortg. Co.*,
  414 Mich. 603, 327 N.W.2d 805 (1982).................................................10, 49, 51

*Baker v. Arbor Drugs, Inc.*,
  215 Mich.App. 198, 544 N.W.2d 727 (1996).....................................................49

*Beaty v. Ford Motor Co.*,
  854 Fed.Appx. 845 (9th Cir. Apr. 2, 2021) .......................................................30

*Bell v. Publix Super Mkts., Inc.*,
  982 F.3d 468 (7th Cir. 2020) ...........................................................33, 34, 35, 39

*Brownlow v. McCall Enters., Inc.*,
  315 Mich. App. 103 (2016) ............................................................10, 34, 44, 50

*Campbell v. Whole Foods Mkt. Grp., Inc.*,
  516 F. Supp. 3d 370 (S.D.N.Y. 2021) ................................................................36

*City of Wyoming v. Procter & Gamble Co.*,
  210 F. Supp. 3d 1137 (D. Minn. 2016)...............................................................57

*Colangelo v. Champion Petfoods USA, Inc.*,
  2022 WL 991518 (N.D.N.Y. Mar. 31, 2022) ..........................................2, 36, 43

*Comer v. Roosen Varchetti & Olivier, PLLC*,
  2018 WL 5719793 (E.D. Mich. Nov. 1, 2018)...................................................50

v

*Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*,
  790 Fed.Appx. 775 (6th Cir. 2019) ........................................................59

*Crossing at Eagle Pond, LLC v. Lubrizol Corp.*,
  346 F. Supp. 3d 1048 (E.D. Mich. 2018) ...............................................60

*Cyr v. Ford Motor Co.*,
  2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019) ...............................52

*Detroit Bd. of Educ. v. Celotex Corp.*,
  196 Mich. App. 694, 493 N.W.2d 513 (1992) ........................................59

*Dumont v. Reily Foods Co.*,
  934 F.3d 35 (1st Cir. 2019) ....................................................................36

*Eff v. Slusher*,
  2000 WL 33419371 (Mich. Ct. App. May 19, 2000). ...................*passim*

*Golden Star Wholesale, Inc. v. ZB Importing, Inc.*,
  531 F. Supp. 3d 1231 (E.D. Mich. 2021) ...............................................53

*Hobbs v. Brother Int'l Corp.*,
  2016 WL 7647674 (C.D. Cal. Aug. 31, 2016) .......................................37

*Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*,
  209 Mich. App. 365, 532 N.W.2d 541 (1995) ..................................58, 60

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
  280 F. Supp. 3d 975 (E.D. Mich. 2017) ...........................................57, 58

*In re Nat'l Prescription Opiate Litig.*,
  458 F.Supp.3d 665 (N.D. Ohio 2020) ....................................................50

*Innovation Ventures, LLC v. N2G Distrib., Inc.*,
  779 F. Supp. 2d 671 (E.D. Mich. 2011) .................................................32

*Johnston v. PhD Fitness, LLC*,
  2018 WL 646683 (E.D. Mich. Jan. 31, 2018) ........................................57

*Karam v. Sagemark Consulting, Inc.*,
  383 F.3d 421 (6th Cir. 2004) .................................................................47

*Kyles v. Keefe Commissary Network, LLC*,
  2015 WL 1637466 (E.D. Mich. Apr. 13, 2015) ..................................52

*L & F Prods., a Div. of Sterling Winthrop Inc. v. Procter & Gamble, Co.*,
  45 F.3d 709 (2d Cir. 1995) ...............................................40

*Liss v. Lewiston-Richards, Inc.*,
  478 Mich. 203, 732 N.W.2d 514 (2007)..............................49, 51, 53

*Loreto v. Procter & Gamble Co.*,
  515 Fed.Appx. 576 (6th Cir. 2013)................................10, 37

*MacDonald v. Thomas M. Cooley Law Sch.*,
  724 F.3d 654 (6th Cir. 2013) ...........................................44

*Mantikas v. Kellogg Co.*,
  910 F.3d 633 (2d Cir. 2018) ...........................................36

*Matanky v. Gen. Motors LLC*,
  370 F. Supp. 3d 772 (E.D. Mich. 2019) .......................44, 52

*McNeil-PPC, Inc. v. Pfizer Inc.*,
  351 F. Supp. 2d 226 (S.D.N.Y. 2005) ...............................42

*MEA-NEA Loc. I v. Mount Clemens Cmty. Sch.*,
  2004 WL 2387650 (Mich. Ct. App. Oct. 26, 2004) ...................56

*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883 (7th Cir. 2000) ....................................41, 42

*Murphy v. The Proctor & Gamble Co.*,
  695 F. Supp. 2d 600 (E.D. Mich. 2010) .......................59, 60

*Neibarger v. Universal Coops., Inc.*,
  439 Mich. 512, 486 N.W.2d 612 (1992).............................58

*Price v. Long Realty, Inc.*,
  199 Mich. App. 461, 502 N.W.2d 337 (1993)......................50

*Renfro v. Champion Petfoods USA, Inc.*,
  25 F.4th 1293 (10th Cir. 2022) .....................................27

*Republic Ins. Co. v. Broan Mfg. Co.*,
  960 F. Supp. 1247 (E.D. Mich. 1997) ................................................................60

*Retractable Techs., Inc. v. Becton*,
  2013 U.S. Dist. LEXIS 26996 (E.D. Tex. Feb. 27, 2013).................................42

*River Rouge Sch. Dist. v. Mestek, Inc.*,
  2002 WL 1921466 (Mich. Ct. App. Aug. 20, 2002) ..........................................55

*Rosenbaum v. Toyota Motor Sales, USA, Inc.*,
  2016 WL 9775018 (E.D. Mich. Oct. 21, 2016)..................................................51

*Roseville Plaza Ltd. P'ship v. United States Gypsum Co.*,
  811 F. Supp. 1200 (E.D. Mich. 1992) ................................................................60

*Ruth v. Triumph P'ships*,
  577 F.3d 790 (7th Cir. 2009) ..............................................................................40

*Schechner v. Whirlpool Corp.*,
  237 F.Supp.3d 601 (E.D. Mich. 2017) ...............................................................55

*Smith v. Globe Life Ins. Co.*,
  460 Mich. 446, 597 N.W.2d 28 (1999)...............................................................48

*Song v. Champion Petfoods USA, Inc.*,
  2020 WL 7624861 (D. Minn. Dec. 22, 2020) ....................................................26

*State v. McGuire*,
  2007 WI App 139, 302 Wis.2d 688, 735 N.W.2d 555 ......................................43

*Tolan v. Cotton*,
  572 U.S. 650 (2014)............................................................................................25

*Verisign, Inc. v. XYZ.COM LLC*,
  848 F.3d 292 (4th Cir. 2017) ..............................................................................40

*Weaver v. Champion Petfoods USA, Inc.*,
  3 F.4th 927 (7th Cir. 2021) ..........................................................26, 31, 40, 43

*Willard v. Huntington Ford, Inc.*,
  952 F.3d 795 (6th Cir. 2020) ..............................................................................28

viii

*Wong v. T-Mobile USA, Inc.*,
  2006 WL 2042512 (E.D. Mich. July 20, 2006) ................................10, 48, 49, 51

*Woodger v. Taylor Chevrolet, Inc.*,
  2015 WL 5026176 (E.D. Mich. Aug. 25, 2015) ................................................48

*Wysong Corp. v. APN, Inc.*,
  889 F.3d 267 (6th Cir. 2018) ...............................................................................27

*Zarinebaf v. Champion Petfoods USA Inc.*,
  2022 WL 910638 (N.D. Ill. Mar. 29, 2022) ........................................................2

*Zarinebaf v. Champion Petfoods USA Inc.*,
  2022 WL 980832 (N.D. Ill. Mar. 31, 2022) ...............................................*passim*

*Zeiger v. WellPet LLC*,
  526 F. Supp. 3d 652 (N.D. Cal. 2021) ................................................................38

## STATUTES

Mich. Comp. Law §257.248 .......................................................................................51

Mich. Comp. Law §287.521. ...........................................................................2, 47, 48

Mich. Comp. Law §287.524 .......................................................................................50

Mich. Comp. Law §287.525 .......................................................................................52

Mich. Comp. Law §287.533 ...............................................................................50, 51

Mich. Comp. Law §445.315 .......................................................................................52

Mich. Comp. Laws §445.901 ......................................................................................1

Mich. Comp. Law §445.903 .......................................................43, 44, 45, 46, 47

Mich. Comp. Law §445.904 .......................................................................................48

Mich. Comp. Law §600.1405 .....................................................................................55

## <u>TABLE OF MOST APPROPRIATE AUTHORITIES</u>

*Att'y Gen. v. Diamond Mortg. Co.*,
    414 Mich. 603, 327 N.W.2d 805 (1982)

*Bell v. Publix Super Mkts., Inc.*,
    982 F.3d 468 (7th Cir. 2020)

*Brownlow v. McCall Enters., Inc.*,
    315 Mich. App. 103 (2016)

*Detroit Bd. of Educ. v. Celotex Corp.*,
    196 Mich. App. 694, 705, 493 N.W.2d 513 (1992)

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
    280 F. Supp. 3d 975 (E.D. Mich. 2017)

*Loreto v. Procter & Gamble Co.*,
    515 Fed.Appx. 576, 582 (6th Cir. 2013).

*MEA-NEA Loc. I v. Mount Clemens Cmty. Sch.*,
    2004 WL 2387650 (Mich. Ct. App. Oct. 26, 2004)

*Neibarger v. Universal Coops., Inc.*,
    439 Mich. 512, 523, 486 N.W.2d 612 (1992).

*Wong v. T-Mobile USA, Inc.*,
    2006 WL 2042512 (E.D. Mich. July 20, 2006)

*Zarinebaf v. Champion Petfoods USA Inc.*,
    2022 WL 980832 (N.D. Ill. Mar. 31, 2022)

## I.    INTRODUCTION

Champion Petfoods USA, Inc. and Champion Petfoods LP ("CPF") knows its packaging is valuable real estate that attracts pet parents willing to pay the ultra premium prices it charges. CPF garnered these prices by misleadingly promising "Biologically Appropriate" dog food made with "regional," "fresh," and "natural" ingredients. In reality, the dog food contains and/or is at risk of containing heavy metals, Bisphenol A ("BPA"), pentobarbital, non-fresh ingredients, and non-regional ingredients. CPF's inclusion of these ingredients and toxins form the basis of Plaintiffs' single cohesive theory of liability—CPF's packaging statements misled consumers as to the content and quality of its dog food. Plaintiffs' theory raises triable issues of material fact. Yet, CPF asks that this Court parse the statements in a way not expected of reasonable consumers like Plaintiffs. Even if this Court did so, the motion fails.

CPF hangs its hat on the misplaced argument that because other courts dismissed related cases, this Court should follow suit. CPF does not acknowledge that only two of the cases included the *same* evidence before this Court, including the expert opinions, and one denied summary judgment as to the majority of Plaintiffs' claims. This alone shows that the other cases are not relevant to this Court's analysis. Further, two were decided on a motion to dismiss and the one decided at summary judgment had no consumer surveys before the court.

Meaningfully, *Zarinebaf v. Champion Petfoods USA Inc.,* makes clear Plaintiffs have established a genuine issue of fact for most claims based on the opinions of their experts challenged here, Silverman and Boedeker. No. 18 C 6951, 2022 WL 980832 (N.D. Ill. Mar. 31, 2022) ("*Zarinebaf II*"). *See generally Zarinebaf II*; *Zarinebaf v. Champion Petfoods USA Inc.,* No. 18 C 6951, 2022 WL 910638, at *1 (N.D. Ill. Mar. 29, 2022) ("*Zarinebaf I*").[1] Judge Kendall properly denied summary judgment after a 2-day *Daubert* hearing on Plaintiffs' experts' opinions. *Id*. These expert reports distinguished the record from the related cases cited by CPF. *Id*. at 6-8. Judge Kendall's detailed expert evaluation and the genuine issues of material fact at issue show why CPF's motion here should likewise be denied.[2]

## II.    ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    CPF's packaging promises that its Dog Food is "Biologically Appropriate" and made with "Fresh Regional Ingredients" and "Delivering Nutrients Naturally" or "Nourish as Nature Intended."[3] (*See* **ECF Nos. 110-3 to -7**; **ECF No. 104-10** ██████████████████████████ **ECF No. 110-25, PageID17142:1-3** ("Biologically Appropriate" is "to get as close to the natural diet

---

[1] The unpublished cases cited herein are attached as P.Ex.91.

[2] The court in *Colangelo v. Champion Petfoods USA, Inc.,* No. 6:18-cv-1228, 2022 WL 991518, at *7-27 (N.D.N.Y. Mar. 31, 2022) granted CPF's motion for summary judgment after excluding portions of Boedeker's and Silverman's opinions without the benefit of a *Daubert* hearing.

[3] "Dog Food" refers to Acana (1) Heritage Free-Run Poultry, (2) Singles Duck & Pear; (3) Regionals Meadowland; and Orijen (4) Senior; and (5) Regional Red.

as possible.").)

2.      The packaging states the Dog Food "Deliver[s] Nutrients Naturally" or "Nourish as Nature Intended," promising nutrients in their freshest, most natural and flavorful form," and "authentic fresh ingredients mirror[ing] those Mother Nature provides." (**ECF No. 104-12, PageID13073**; **ECF Nos. 110-3 to -7**.)

3.      Biologically Appropriate has a specific meaning. (**P.Ex.35**, -49 ("The Biologically Appropriate™ concept is simple: mirror the freshness and variety of meats that dogs and cats are evolved to eat.");[4] **ECF No. 104-30**.)

4.      CPF knew advertising "fresh" and "regional" ingredients drove sales. (**ECF No. 104-11, PageID13067** ("Based on feedback in the field and from our expert panels fresh regional ingredients (FRI) are our biggest opportunity…The ability to feature and tell this story is a great asset. More pet lovers are looking [] to see where their ingredients come from. Our ability to source transparently ([] 100 mile diet) and leverage our local smaller suppliers gives us the greatest advantage.").)

5.      "Biologically Appropriate" and "Fresh Regional Ingredients" are CPF's "key differentiators." (**ECF No. 104-9**.)

6.      ███████████████████████████████

---

[4] "P.Ex. __" refers to exhibits to the Index of Exhibits Regarding Plaintiffs' Revised Memorandum of Law in Opposition to Defendants' Revised Motion for Summary Judgment.

███████████ (**ECF No. 104-10**; *see also* **P.Ex.36** (Biologically Appropriate and Fresh Regional Ingredients induce "Pet Lovers" to pay premium prices because they "want the best for their dogs…[,] insist on the freshest and most nourishing ingredients, and hold us to the highest standards.").)

7.     A consumer survey performed by Plaintiffs' expert, Stefan Boedeker, demonstrates that 68-89% of respondents interpret the packaging consistent with Plaintiffs' allegations: (**ECF No. 104-14, PageID13276-82**, Figs. 12-23; **ECF No. 104-13, PageID13098, 13151, 13153-54, 13159, 13162, 13166-67**, ¶¶32(i)-(l), 171-72, 178-79, 188-192, 202-03, 213, 216.)

| EXPECTATIONS SURVEY OF REASONABLE CONSUMERS | Acana Diets | Orijen Diets |
|---|---|---|
| **From the "Biologically Appropriate" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain heavy metals. | 84.3% | 82.8% |
| The dog food shown does not contain BPA (Bisphenol A). | 73.2% | 71.3% |
| The dog food shown does not contain pentobarbital | 68.2% | 69.9% |
| The dog food shown only contains fresh ingredients, unless specifically stated otherwise on the packaging. | 83.9% | 89% |
| **From the "Fresh" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown contains only fresh ingredients unless specifically stated otherwise on the packaging. | 84.7% | 84.2% |
| The dog food shown does not contain any expired ingredients. | 88.4% | 79.4% |
| The dog food shown does not contain any reground dog food (dog food previously manufactured by this manufacturer but that did not meet its specifications for sale). | 76.9% | 78.5% |
| **From the "Regional" statements on the Dog Food, consumers would expect that:** | | |
| The dog food shown does not contain imported ingredients. | 76.9% | 73.7% |
| Each ingredient in the dog food shown is from the region where the food is made unless specifically stated otherwise on the packaging. | 77.3% | 79.4% |
| **From the "Delivering nutrients naturally" statements on the Dog Food, consumers would** | | |

| expect that: | | |
|---|---|---|
| The dog food shown does not contain heavy metals. | 84.7% | n/a |
| The dog food shown does not contain BPA (Bisphenol A). | 74.4% | n/a |
| The dog food shown does not contain pentobarbital | 71.9% | |
| From the "Nourish as Nature Intended" statements on the Dog Food, consumers would expect that: | | |
| The dog food shown does not contain heavy metals. | n/a | 81.9% |
| The dog food shown does not contain BPA (Bisphenol A). | n/a | 73.2% |
| The dog food shown does not contain pentobarbital | n/a | 74.1% |

8.      "Biologically Appropriate," and made with fresh, regional, and natural ingredients are promises repeated on the packaging upwards of 28 times. (*See* **ECF Nos. 110-3 to -7**; **ECF No. 104-10**; **ECF No. 104-2**.)

9.      CPF marketed the Dog Food as "Biologically Appropriate," made with "Fresh Regional Ingredients," "Nourish as Nature Intended," and "Delivering Nutrients Naturally" (the "Packaging Claims"). It failed to disclose that the Dog Food contained heavy metals, and non-fresh and non-regional ingredients and had the risk of including BPA and pentobarbital (the "Omissions"). Plaintiffs relied on the Packaging Claims and Omissions. (*See* **P.Ex.18**, 56:5-20, 57:14-58:9, 62:12-63:12, 67:13-19, 69:21-70:12, 71:21-72:15, 81:18-82:8, 112:7-19; **P.Ex.19**, 38:12-19, 40:3-6, 49:15-23, 66:7-22, 70:11-22, 89:12-15, 108:7-25; **P.Ex.20**, 35:10-18, 55:25-57:21, 63:13-23, 64:23-65:13, 74:10-15, 77:24-79:1, 85:6-16, 88:2-11, 102:22-103:17; **P.Ex.21**, 37:1-16, 61:6-14, 67:2-13, 79:24-80:3, 100:25-101:22.) Plaintiffs were not aware the Dog Food contained the Omissions, and would not have purchased if the Omissions were disclosed. (*See* **P.Ex.18**, 15:11-24, 95:17-22, 112:7-19; **P.Ex.19**, 108:7-25; **P.Ex.20**, 22:19-22, 82:3-13, 102:22-103:17; **P.Ex.21**,

15:23-16:3, 100:25-101:22.)

10.     Reasonable   consumers,   like   Plaintiffs,   expect   "Biologically Appropriate" dog food to not contain heavy metals, BPA, pentobarbital, and only contain fresh ingredients, unless specified otherwise on the packaging. (*See* **P.Ex.18**, 15:11-24, 26:15-21, 34:8-18, 56:5-21 (fresh food "has [not] been sitting around and stale or expired."), 67:20-24, 71:21-72:15 ("fresh is better than frozen or expired or stale ingredients."), 92:12-14, 112:7-19; **P.Ex.19**, 25:9-13, 70:14-22, 73:17-25, 98:1-5, 108:7-25; **P.Ex.20**, 22:19-22, 24:3-13, 82:3-13, 102:22-103:13; **P.Ex.21**, 72:6-13, 100:25-101:22.) Plaintiffs' experts confirm reasonable consumers share these expectations. (*See* **ECF No. 104-13, PageID13098, 13120-24, 13151, 13153-54, 13159, 13166**, ¶¶32(i), 93-102, 171-72, 178-79, 188-92, 216 (Plaintiffs' marketing expert, Bruce A. Silverman, opining a reasonable consumer would find the presence of heavy metals and non-fresh ingredients and the risk of BPA and pentobarbital as inconsistent with Biologically Appropriate); **ECF No. 104-14, PageID13277, 13280**, Figs. 14, 20 (the vast majority of survey respondents understand Biologically Appropriate to mean that the dog food does not contain heavy metals, BPA, pentobarbital, and contains only fresh ingredients unless specifically stated otherwise.).)

11.     Plaintiffs expected the Dog Food to contain only fresh ingredients, unless the packaging disclosed otherwise. (**P.Ex.18**, 26:15-21, 71:21-72:15, 112:11-

12; **P.Ex.19**, 72:14-24, 73:17-25, 108:7-11; **P.Ex.20**, 74:10-15, 82:3-13, 102:22-24; **P.Ex.21**, 72:6-13, 100:25-101:4.) Plaintiffs' experts confirm reasonable consumers share this expectation. (*See* **ECF No. 104-13, PageID13098, 13124-31, 13162, 13166**, ¶¶32(i), 103-121, 202-03, 216 (Silverman opining a reasonable consumer would not expect CPF to use non-fresh ingredients on the "Fresh" statements); **ECF No. 104-14, PageID13276, 13279**, Figs. 12, 18 (the vast majority of survey respondents (84.2% to 84.7%) understood CPF's "Fresh" promise to mean that the Dog Food contains only fresh ingredients unless specifically stated otherwise.).)

12.   Plaintiffs do not understand "raw" to mean frozen. (*See* **P.Ex.18**, 72:13-15 (("fresh is better than frozen or expired or stale ingredients"); **P.Ex.19**, 72:14-24 ("raw" means "freshly caught, freshly killed, freshly picked"); **P.Ex.20**, 74:21-24 (equating "raw" to "sushi," not frozen food); **P.Ex.21**, 80:16-24; **ECF No. 104-13, PageID13127-28**, ¶111 ("[CPF] refers to its frozen or previously frozen ingredients as 'raw.' I do not believe that most consumers would see it that way.").)

13.   Plaintiffs understood CPF's "regional" statements to mean that nearly all, if not all, ingredients used were regional to CPF's Kentucky DogStar kitchen. (*See* **P.Ex.18**, 34:8-18, 56:22-57:2 ("Regional is that they got their food from somewhere close to where they were manufacturing[.]"), 59:19-22; **P.Ex.19**, 66:7-22 ("locally used products" from a "local farm" were important), 81:17-82:19 (believed the Kentucky supplier on the packaging was the sole supplier of beef and

that the suppliers "were all regional and local"), 82:21-83:4, 83:9-15 (an ingredient is not regional if it is not from local businesses); **P.Ex.20**, 14:4-10, 89:15-90:4; **P.Ex.21**, 67:2-13.) Plaintiffs' experts confirm reasonable consumers share this expectation. (*See* **ECF No. 104-13, PageID13098, 13124-31, 13166-67**, ¶¶32(i), 103-121, 213, 216 (Silverman opining a reasonable consumer would not expect CPF to use non-regional ingredients in its Dog Food based on the "Regional" promise); **ECF No. 104-14, PageID13277, 13280**, Figs. 13, 19 ((73.7% to 76.9%) majority of respondents would not expect imported ingredients in the Dog Food and that each ingredient was sourced regionally (77.3% to 79.4%) based on "regional" statements.).) Even CPF considers its "regional" claim to be inconsistent with its use of non-regional ingredients. (**ECF No. 104-26**, 5 ("We have recently considered changing this [regional] definition [] as we have outgrown our ability to source from our local region.").) The packaging omits non-regional ingredients, like turmeric from India. (**ECF No. 104-23** ("[Turmeric] is currently from India.").)

14.    Plaintiffs understood "Delivering Nutrients Naturally" and "Nourish as Nature Intended" (the "Natural Claims") to mean the Dog Food did not contain heavy metals and that there was no risk of the Dog Food containing BPA and pentobarbital. Their experts confirm reasonable consumers share this expectation. (*See* **ECF No. 104-13, PageID13098, 13151, 13153-54, 13159**, ¶¶32(i), 171-172, 178-179, and 188-192 (Silverman opining a reasonable consumer would consider

the presence of heavy metals and the risk of containing BPA and pentobarbital as inconsistent with the Natural claims); **ECF No. 104-14, PageID13281**, Fig. 21 (84.7% would not expect the Dog Food to contain heavy metals, 74.4% would not expect it to contain BPA, and 71.9% would not expect it to contain pentobarbital due to the "Delivering Nutrients Naturally" claim); *id.* **PageID13278**, Fig. 15 (81.9% would not expect the Dog Food to contain heavy metals, 73.2% would not expect it to contain BPA, and 74.1% would not expect it to contain pentobarbital based on the "Nourish as Nature Intended" claim.).)

15.   CPF acknowledged that it does not adequately monitor and test for heavy metals. (**ECF No. 104-36, PageID13391** ("Not only are we negligent if we're not testing for these, we have no way to reassure our customers or ourselves for that matter."); **ECF No. 104-37, PageID13395** ("On the food safety side of things, there are a number of risks that we are running completely blind to that we really need to be looking at doing surveillance on as a company. These include…heavy metals[.]"); **ECF No. 104-38, PageID13397** ("It looks like the [heavy metal] testing schedule hasn't been followed too well, all of the fish diets are supposed to get heavy metals analysis as part of their extra testing."); **P.Ex.37**, -31 (if CPF specifies how infrequently it tests for heavy metals, it would not "come across in a positive light."); **ECF No. 104-30** (White Paper admits heavy metals is in the Dog Food.).)

16.   CPF did not widely publicize or share its heavy metal test results.

(**P.Ex.38**, -47 (Customer Care representatives were instructed to not share heavy metal test results with customers or retailers); **P.Exs.39, 40** (White Paper, which omitted sampling frequency, lot numbers, and specific diets from the test results on heavy metals, shared only on an "as needed basis"); **P.Ex.41**, 151:5-152:5 (CPF does not share heavy metal testing results because consumers would react); **P.Ex.42** (CPF refused to give heavy metal test results); **ECF No. 104-13, PageID13147-51**, ¶¶159-172 (CPF was aware consumers were concerned about heavy metals); **ECF No. 60-9, PageID2846-47** ("consumers may want to solicit information from companies regarding heavy metal contamination before purchase."); **ECF No. 60-10, PageID2868** ("[t]he trace-element data [of heavy metals] generated in this study have shown there might be a cause of concern for owners who feed their pet[.]"); **ECF No. 60-11, PageID2872** ("information [] on the label should be helpful for the owner").)

17.    CPF's employees believe that its ingredients and its Dog Food do not contain any heavy metals. (*See* **ECF No. 104-32, PageID13375:22-23** (not aware of heavy metals in CPF foods); **P.Ex.41**, 38:23-39:9 ("We have not found any levels of heavy metal in any ingredients.").)

18.    CPF can reduce heavy metals in the Dog Food, such as using heavy metal free ingredients. (**ECF No. 104-35** (testing showing non-detectable levels of heavy metals in deboned chicken); **ECF No. 104-33, PageID13379:1-7** ("There

should be a COA attached to [every lot of every ingredient]…[showing] the food is actually tested for heavy metals [by the supplier].”); **ECF No. 104-33, PageID13380:1-2** (“[CPF] should buy ingredients that don't have heavy metals in it.”); **P.Ex.25**, 39:6-15 (CPF's expert would recommend that manufacturers source different ingredients to lower heavy metals levels in dog food); **P.Ex.43**, 86:5-12 (“Q: Okay. And [manufacturers] could [] choose, by testing, [] which ingredients should be added or not added to help address bringing the heavy metal levels down in that pet food[?] A: Yes. Q: [] Would that also be true for BPA?  A: Yes.”).)

19.    The FDA has not adopted usage of the National Research Council's (“NRC's”) maximum tolerance limits (“MTLs”) as a regulation or official guideline with respect to levels of heavy metals in dog food. (**P.Ex.25**, 28:4-20 (CPF's expert stated the NRC MTLs “are not regulatory limits,” “action levels,” or “tolerances.”); **P.Ex.26**, 3 (the FDA stated it “has not promulgated guidance, action levels, or tolerances for maximum content” for heavy metals.).)

20.    ███████████████████████████████████████████

███████████(**ECF No. 104-9**.) This goal aligns with current EPA standards. (**P.Ex.44**, 14 (“The EPA sets its 'maximum contaminant level goal' for arsenic in water at zero, which is the level at which 'there is no known or expected risk of health.'”).)

21.    The levels of heavy metals can bioaccumulate over time. (***Id.*** (“[a]ll

heavy metals … have their toxic effects on living organisms," and "[t]he bioaccumulation of toxic metals can occur in the body and food chains.").)

22.   BPA is an industrial chemical that has been linked to various health issues. (*See* **P.Ex.44**, 22-24.)

23.   CPF failed to test and screen for BPA. (**ECF No. 104-43, PageID13420, 13423-24**; **ECF No. 104-40** (CPF does not regularly test for BPA and viewed it as a "negligible risk."); **P.Ex.45**, -07 (testing would "provide[] Pet Lovers with peace-of-mind.").)

24.   CPF relies solely on its suppliers' guarantees that the packaging is BPA-free. (**ECF No. 104-41, PageID13416:11-19**; **P.Ex.46**, 158:14-159:3; **ECF No. 104-42**.) Manufacturers can reduce BPA levels in pet food by testing and then choosing which products to use. (**P.Ex.43**, 86:5-12.)

25.   BPA levels can bioaccumulate over time. (*See* **P.Ex.44**, 22-23 ("dietary exposure [to BPA] could lead to even greater overall concentrations of BPA than single oral dose exposure and that there was a potential for bioaccumulation over time with chronic dietary exposure."); ***id***., 28-29.)

26.   Little has been done to investigate the effects of BPA in dogs. (***Id***., 23 ("there has been little investigation whether [] dog foods contain BPA and potential health ramifications of BPA-dietary exposure in dogs."); **P.Ex.47,** 72:6-11 (neither the NRC MTLs nor any federal regulation or rule address BPA).)

27.     Pentobarbital is an unnatural, dangerous poison used to euthanize animals. (*See* **ECF No. 25**, PageID261-62, ¶¶182-183.) CPF exposed the Dog Food to pentobarbital by using beef tallow that was and/or had a material risk of pentobarbital based on the subpar manufacturing practices of CPF and its beef tallow suppliers, JBS USA Food Company ("JBS"). (*Id*., PageID254-61, ¶¶146-181.)

28.     CPF purchased beef tallow from JBS from August 2016 to May 2018. (**ECF No. 104-44, PageID13458:14-16**; **ECF No. 104-45, PageID13463,** ¶21). Since at least 2016, JBS handled condemned carcasses, which exposed its beef tallow to the risk of pentobarbital. (**ECF No. 104-46** (September 2, 2016 rendering procedure for CPF requiring that "Kill Floor personnel will hold morning condemned carcasses until lunch break...[and] hold afternoon condemned carcasses until end of production.").)

29.     CPF did not audit JBS in 2016 or 2017. (**ECF No. 104-47**, 15, 17.) When CPF finally audited JBS in 2018, it uncovered built-up excessive product on JBS's equipment, demonstrating the cross-contamination between CPF beef tallow and other products which have the potential of being contaminated with pentobarbital. (**ECF No. 104-48**.) CPF did not act on this troubling observation. (**ECF No. 104-49** (in discussing the audit, CPF's Director of Certification and Compliance admits "following up on [corrective action] after audits" is "a weak point" for him).)

30.     By failing to audit JBS in 2016 and 2017, CPF ignored JBS's subpar manufacturing practices, including its inability to segregate CPF's beef tallow from the condemned carcasses. (**ECF No. 104-47**.) The FDA later discovered that JBS manufactured beef tallow for CPF that was contaminated with pentobarbital. (**ECF No. 104-50** (samples of beef tallow manufactured in November 2017, December 2017, January 2018, and March 2018 *all tested positive* for pentobarbital).)

31.     These test results sufficiently demonstrate JBS's inability to prevent pentobarbital contamination and all Dog Food manufactured with JBS's tallow was exposed to the risk of pentobarbital because there is no evidence JBS ever segregated condemned carcasses from CPF's products nor that CPF ever audited JBS despite using this high-risk ingredient. (**ECF No. 25, PageID260-61**, ¶¶178-181.)

32.     CPF manufactured over 1.7 million pounds of Dog Food with this contaminated beef tallow. (**ECF No. 104-51, PageID13493:7-20**.) CPF admits it is illegal to use pentobarbital-contaminated ingredients. (*See **Id.**,* **PageID13492:7-11** ("So once you know an ingredient has a contaminant in it and it's detectable, you can't use it. So we by law cannot use it. We wouldn't use it if it had a potential risk with it.").) Over 100,000 pounds of kibble made with this pentobarbital-contaminated beef tallow remained in retail markets and CPF chose to not notify consumers because it wanted to avoid "panic in the marketplace." (**ECF No. 104-**

**51, PageID13494:6-20, 13495:11-18, 13490:10-21, 13491:12-17**.)

33.     Plaintiffs' testimony and expert opinions show a reasonable consumer would not expect the Dog Food contained and/or had the risk of containing pentobarbital. (*See* **P.Ex.19**, 98:1-5; **ECF No. 104-13, PageID13159-60**, ¶¶188-193 (a reasonable consumer would find the risk of pentobarbital as inconsistent with the Packaging Claims); **ECF No. 104-14, PageID13277-78, 13280-81**, Figs. 14-15, 20-21 (68-74% of respondents would not expect pentobarbital based on packaging promises).)

34.     CPF knew that consumers, including its employees, had difficulty understanding what "fresh" or "raw" meant. (**P.Exs. 48, 49,** -13 ("the label could read that all frozen ingredient[s] are freshly defrosted daily…it is a way for the competitors to plant the fresh word in the mind of consumers while it really means something else."), -14 ("[F]reezing…disqualifies a product from being fresh."); **P.Ex.50, -90** ("[CPF] cannot use 'delivered fresh' in some cases and 'fresh' in other cases and assume the consumer automatically knows you mean 'delivered fresh' but just left out the 'delivered' part.").)

35.     CPF's Vice President of Sales and Marketing, Peter Muhlenfeld, testified that something that has been frozen could not be fresh. (**ECF No. 110-25, PageID17145:13-16**; **P.Ex.46**, 289:16-23 ("we have raw ingredients which are frozen ingredients. Those are not fresh.").) CPF does not identify on the packaging which of

15

its ingredients are "fresh" or "raw," that certain ingredients may be either "fresh" or "raw" depending on the season, or that "raw" means frozen. (**P.Ex.48**.)

36.    CPF admits it uses non-fresh, non-regional ingredients as part of its standard practice. (**ECF No. 110-27, PageID17493-95**, ¶¶14, 18 ("The ratio of fresh to raw ingredients varied, depending on a number of factors, including the seasonality, the size of the catch or harvest, and when Champion manufactured the diet.").)

37.    CPF admits the "Fresh" claim is "misleading" because "[n]ot all ingredients [sic] are fresh and delivered daily." (**ECF No. 104-24**; **P.Ex.1** ███

███████████████████████████████████████████

█████████ **P.Ex.1** ███████████████████████

████████████████████

38.    CPF's packaging omits that its main supplier of fish ingredients delivers an unfrozen slurry of fish ingredients that was made from thawed frozen fish that was processed into a non-frozen state. (**ECF No. 104-15, PageID13288** ("The animal products will be arriving frozen[]….Our facility takes frozen blocks, grinds them in to a fresh slurry and ships the slurry in insulated food vats."); *see also* **P.Ex.41**, 264:3-8 ("Q: [W]hat ingredients [] are frozen? A: The list is long—is I mean, there's some parts of all of our ingredients that are frozen."); **P.Ex.51**,148:7-22 (most of all meat ingredients processed at a supplier were frozen and then are thawed and blended); **P.Ex.49**, -13 to -15 ("freezing…disqualifies a product from being fresh.").)

39.    CPF uses ███████████████████████████████████████

███████ (**ECF No. 104-64**; **P.Ex.52** (CPF's former CEO stated that less than half of the meat it received in 2013 arrived fresh, "counter to our marketing message.").)

40.    CPF defined "fresh" as meaning that its "fresh ingredients are never more than three weeks old from their date of production." (**P.Ex.53**, -26.)

41.    CPF's suppliers guarantee fresh ingredients up to 3 to 5 days, but CPF extends the shelf-life of fresh ingredients to 14 days. (**P.Ex.54**; **P.Ex.55**.)

42.    CPF routinely uses expired ingredients. (**P.Ex.56** (approving the use of expired fresh turkey meat); **P.Ex.57** (approved expired vegetables); **ECF No. 104-17**

███████████████████████████████████████

███████████████████; *see also* **P.Ex.58**, 104:22-105:24 (CPF uses expired ingredients in approximately 1 of every 20 production runs.).)

43.    CPF assesses expired ingredients by using a subjective ineffective sensory test. (**ECF No. 104-17** ███████████████████████

███████████████████████████████████████

███████████████████

44.    CPF permits use of expired ingredients based on its employees' sensory evaluations despite these expired ingredients failing laboratory tests used to gauge an ingredient's quality and freshness. (**ECF No. 104-18** (chicken meal failed peroxide value test but was "accepted based on sensory evaluation by upper management.").)

45.    CPF's own third party testing revealed that its Dog Food consisted of only 11.22% fresh ingredients. (**P.Ex.59**, -43.)

46.    CPF's use of non-fresh ingredients is deceptive and misleading. (**ECF No. 104-13, PageID13162, ¶¶**201-203; *see also* **P.Ex.21**, 100:25-101:4 (testifying expired ingredients or regrinds are not "fresh ingredients"); *id.*, 58:21-24, 102:2-7 (testifying all the Dog Food's ingredients were fresh or "fresh-frozen"); **P.Ex.20**, 102:22-24 (testifying expired ingredients are not fresh); **P.Ex.19**, 108:7-11 (same); **P.Ex.18**, 112:11-12 (same); **ECF No. 104-13, PageID13163**, ¶206 (Consumers "are likely to assume that ingredients sourced from a farm or ranch near Champion's manufacturing facility must be, as the oft-used advertising cliché goes, 'fresher than fresh!'"); **P.Ex.51**, 145:23-25 ("Q: Can an expired ingredient be fresh? A: No. Can an expired ingredient be fresh? Those don't even go together, but my answer would be no.").)

47.    The Dog Food often contains regrinds—previously manufactured dog or cat food rejected for quality assurance issues, ground up, recooked, and then introduced as an ingredient in a subsequent production run. (**ECF No. 25**, PageID245-46, ¶¶99-108.) Unlike other manufacturers who use out-of-specification finished products for lower quality foods, CPF reincorporates regrinds as ingredients in its ultra-premium Dog Food. (**P.Ex.50** ("Every industry I have ever worked in had a brand or product they could send their out of spec product to. In the cheese industry it

was process cheese, in the meat industry it was hot dogs or meatballs. In the seafood industry it was fish cakes and in the milk industry it was chocolate milk or milk shakes. You get the idea....I know we will never package this under our premium brand name but we do not even have to add our name to it or anyone to know that we produced it…."). )

48.     Regrinds are not disclosed on CPF's packaging because it knows that consumers would consider regrinds to be a low-quality ingredient. CPF's own employees acknowledged that its use of regrind ingredients resulted in a loss of nutritional value and quality. (**P.Ex.61**, -03 ("how good is the quality of our foods if we add regrinds (already cooked food) back into the mix—essentially double cooking the ingredients. Our story says that we try to use as much fresh as we can, reprocessed ingredients loose [sic] taste and nutritional value.").)

49.     CPF sometimes uses regrinds at a higher percentage than many other ingredients in the dog food. (**P.Ex.62**.) CPF claims it only permits dog food to contain between 3-5% regrind ingredients, but it regularly exceeds that amount. (**P.Ex.58**, 126:13-18; **ECF No. 104-19** ███████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ **P.Ex.63** (███████



██████████████████████ **P.Ex.64** ████████████████████████

████████████████████████ **P.Ex.65** (Orijen regrinds used in Acana);

*see also* **P.Ex.66** (discussing procedure for using regrinds).) ████████████

████████████████████████████ (**ECF No. 104-19**.)

CPF'S Kitchen Manager testified that CPF manufactured the Dog Food using regrinds more often than not. (**P.Ex.67**, 73:4-6.)

50.     CPF forbids its employees from mentioning the word "regrinds" at industry trade shows. (**P.Ex.68**, -14 (CPF lists "regrinds" in the "No" category under "Speak Our Language," and advised CPF representatives to not use the word regrinds); **P.Ex.69**, -83 (same); **P.Ex.70**, -87 (same).)

51.     CPF will use regrinds that test positive for salmonella, are nutritionally deficient, and are dangerous under AAFCO standards. (**P.Ex.71** ████████████

████████████████████████████████████████

████████████████████; **P.Ex.72**, 59 (calcium and phosphorus levels "above AAFCO [standards]–can cause health issues in dogs….I don't recommend that this lot [] be sent out for nutritional/animal health reasons…Would they be usable for regrinds at a low inclusion?...Yes, we could certainly utilize this product as a regrind, likely at [] inclusion of no more than 3%."); **P.Ex.73**, -36 ( "I don't believe we should release something that is this far below a minimum stated claim. It doesn't meet regulations or our internal specs so I would suggest it goes to regrinds.").)

52.     CPF did not have a shelf life for regrinds. (**P.Ex.67**, 71:15-18.)

53.     CPF uses undisclosed non-regional ingredients, and many are sourced internationally, including the ████████████████████████████ ████████████████ (**ECF No. 104-24**; **ECF No. 104-23.**) ██ ████████████████████ (**ECF No. 104-24**.)

54.     CPF failed to disclose that it uses other non-regional ingredients. (*See* **P.Ex.75** (pollock oil sourced from Washington, more than 2,000 miles away from DogStar); **P.Ex.41**, 279:24-280:5 (saltwater and freshwater fish sourced from a supplier located in Massachusetts, more than 1,000 miles from DogStar).)

55.     CPF considered changing its reference to "Regional" because it had outgrown its ability to source regionally. (*See* **ECF No. 104-26** ("We have recently considered changing this [regional] definition in our . . . name as we have outgrown our ability to source from our local region.").)

56.     CPF features misleading pictures of "exemplar ingredient suppliers" that depict small, local farmers and ranchers as their primary ingredient suppliers, when, CPF actually sources many of its featured ingredients from undisclosed large corporations. (*See* **ECF Nos. 110-3 to -7**; **P.Ex.74**, -83 ("In some cases, our feature farmers alone cannot supply all of our volume requirements…"); **P.Ex.76**, -80 (DogStar FAQ: "It's important to understand that our feature farmers by themselves cannot supply all of our fresh ingredients. For example, we have three botanical

growers, but feature our main supplier as he supplies the vast majority of what we use in our foods."); **ECF No. 104-25** ████████████████████████████████

████████████████████████████████████████████

**P.Ex.77**, -13 ████████████████████████████████

████ ; **P.Ex.78**, -2 ████████████████████████████

████████████████████████████ "Third Supplier" is "Marksbury Farm"; and "Feature Farm 1" is "Clark Family Farm"); **P.Ex.79**, -52 ("Chicken would be the feature for Kentucky that we have gotten very little from.... We need a new chicken feature!").)

57.    CPF intentionally masked farms owned by multinational conglomerates. (**ECF No. 104-27, PageID13313** ("Does Greg's farm in Robards Kentucky have a name? We know Tyson is the company that owns the farm."); ***Id.*, PageID13312** ("My take is that we shouldn't mention the name of the farm, since Tyson is a huge multinational conglomerate []. I'd just say, 'Like Greg in Robards, Kentucky...' I know we typically mention the name, but it seems problematic in this case."); ***Id.*** ("I'm going to suggest to move forward and use [the] suggestion to change it to 'Like Greg in Robards, Kentucky[.]'"); **ECF No. 104-28** (the feature farmer on the 2018 bags is actually from Tyson, Inc.); **P.Ex.80** ("Attached are sample photos that we would like from one of your farmers. If you would agree and you have a farmer that agrees we would not have to name Tyson."); **ECF No. 104-29** (CPF featured another

"exemplar supplier" for its local, fresh chicken, but omitted that it sourced a material amount of chicken from Pilgrim's Pride, a large corporation.).)

58.     CPF denied sourcing any of its ingredients from China. (**P.Ex.81**, 149:21-150:2, 150:19-152:8; (**P.Ex.82** ("We do not source ingredients from China for either our Canadian or US made foods and treats."); **P.Ex.83** ("[W]e are 100% China-free.").) But CPF sourced at least two ingredients from China. (**P.Ex.84**; **P.Ex.85**, ¶57.)

59.     Reasonable consumers are misled by CPF's routine use of undisclosed non-regional ingredients. (*See* **P.Ex.18**, 34:8-18, 56:22-57:2 ("Regional is that they got their food from somewhere close to where they were manufacturing[.]"), 59:19-22; **P.Ex.19**, 66:7-22 ("locally used products" from a "local farm" were important), 81:17-82:19 (believed the Kentucky supplier on the packaging was the sole supplier of beef and that the suppliers "were all regional and local"), 83:9-15 (an ingredient is not regional if it is not from local businesses); **P.Ex.20**, 14:4-10, 89:15-90:4; **P.Ex.21**, 67:2-13.) Plaintiffs' experts confirm reasonable consumers share this expectation. (*See* **ECF No. 104-13, PageID13098, 13123-31, 13166-67**, ¶¶32(i), 103-121, 213, 216 (Silverman opining a reasonable consumer would not expect use of non-regional ingredients in the Dog Food based on the "Regional" claims); **ECF No. 104-14, PageID13277, 13280**, Figs. 13, 19 (the vast majority of survey respondents (73.7% to 76.9%) would not expect imported ingredients in the Dog

Food and expected that each ingredient was sourced regionally (77.3% to 79.4%) based on "Regional" claims).)

60.    CPF has recently changed some of its Dog Food packaging, such as Acana Heritage Free Run Poultry, to no longer advertise itself as "Biologically Appropriate" and with little to no emphasis on its "Regional" ingredients, including the removal of its advertised Featured Farmer for chicken. (*See* **P.Ex.86**.) CPF's packaging also now discloses that its "raw" ingredients are in fact "frozen." (*Id.*)

61.    CPF's Retail Programs, including the Frequent Buyer and Professional Feeding Programs, provide financial rewards and incentives to customers for their purchases of the Dog Food. (**P.Ex.87**, -11 to -13; **P.Ex.88**, -78, -79.) Moreover, CPF managed and dictated how retailers sold the Dog Food to consumers, including how it was priced and promoted. (**P.Ex.87,** -16 ("Retailers should promote, price and advertise within Minimum Advertised Price (MAP) and Manufacturer's Suggested Retail Price (MSRP)."); **P.Ex.88**, -75 ("ORIJEN and ACANA pricing must be consistent with published price lists."); **P.Ex.87,** -17 ("All advertising or promotions must be produced in accordance with Champion's Branding Standards."); **P.Ex.88**, -88 (same)).)

62.    CPF received written pre-suit notice for the breach of express and implied warranty claims prior to Plaintiff Shaker filing any case. **P.Ex.89** (March 7, 2018, CLRA Notice that states "This notice also serves as a demand to cure breaches

of express and implied warranties, and to comply with all agreements and covenants of good faith and fair dealing created by Champion's warranties, advertisements, offers, and agreements or as established by law. The requested relief applies to all such claims to the extent required by California or other applicable law.")

## III.   LEGAL STANDARD

The Court's "function" is "not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).[5] "[R]easonable inferences are to be drawn in his [the nonmoving party's] favor." *Id*. at 660.

## IV.   ARGUMENT

CPF advertised the Dog Food with the Packaging Claims and failed to disclose the Omissions. Ex. A, Plaintiffs' Revised Response to Defendants' Revised Statement of Undisputed Material Facts ("SUMF") ¶¶26-30, 37, 45, 47; Plaintiffs' Revised Additional Statement of Undisputed Material Facts ("ASUMF") ¶¶1-6, 8. There are numerous issues of material fact related to whether the Packaging Claims and Omissions are misleading and deceptive.

### A.   A Reasonable Jury Could Find the Packaging Claims Are Misleading

#### 1.   Heavy Metals and a Risk of BPA Renders "Biologically Appropriate" Misleading

---

[5] Here, as throughout, all emphasis is deemed added and citations and footnotes are deemed omitted unless otherwise noted.

The record, including CPF's internal omissions and expert opinions, supports that a reasonable consumer would consider CPF's failure to disclose the presence of Heavy Metals and the risk of BPA on its packaging material. (ECF No. 25, PageID218.)[6]

Silverman opined that a reasonable consumer would find the presence of heavy metals and the risk of BPA and pentobarbital inconsistent with the Packaging Claims. SUMF ¶¶10, 14; ASUMF ¶¶9-10, 21-22, 25, 27, 45. Boedeker corroborated this with a consumer survey ("Expectations Survey") demonstrating that, based on the "Biologically Appropriate" promise, 71-84% of respondents did not expect the Dog Food to contain heavy metals or risk containing BPA. (ECF No. 109-2, PageID15773-76); ASUMF ¶7.[7] Considering these opinions and consumer input, the court in *Zarinebaf II,* denied summary judgment because: (1) Plaintiffs, unlike CPF, offered reports concluding that consumers viewing "Biologically

---

[6] CPF claims that heavy metals are not present "at a level that would pose a danger" based on MTLs and EU standards. (ECF No. 110, PageID16850, n. 7.) But not only is the level irrelevant here, but so are the MTLs. There is no evidence that the MTLs dictate consumer expectations regarding heavy metals (as demonstrated by Plaintiffs' expert opinions), MTLs are not official FDA regulations, and MTLs are non-binding on pet food manufacturers. SUMF ¶57-66; ASUMF ¶19.

[7] This matter is distinguished from the related case of *Weaver* where the absence of a consumer survey was central to the holding. *Weaver v. Champion Petfoods USA, Inc.*, 3 F.4th 927, 935-936, 939 (7th Cir. 2021); *see Zarinebaf II*, 2022 WL 980832, at *8; *see also Song v. Champion Petfoods USA, Inc.*, No. 18-cv-3205, 2020 WL 7624861, at *6 (D. Minn. Dec. 22, 2020) (decided at the motion to dismiss stage without the benefit of consumer surveys).

Appropriate" would not expect the presence of heavy metals or BPA; and (2) the issue is a question of fact for the jury. 2022 WL 980832, at *6.

CPF offers no evidence that: (1) supports that "a consumer acting reasonably" would not interpret "Biologically Appropriate" to mean the Dog Food is free of heavy metals and BPA;[8] or (2) rebuts the expert opinions of Silverman and Boedeker.[9] (ECF No. 110, PageID16849-50.) CPF's cited cases do not help its argument. The court in *Wysong* upheld a motion to dismiss because the plaintiff did not explain how the photographs (not a written statement) misled consumers in the context of the package. *See Wysong Corp. v. APN, Inc.,* 889 F.3d 267, 272 (6th Cir. 2018). Plaintiffs here have demonstrated that consumers were misled in the context of the whole package. *See also* ASUMF ¶¶6-10.[10]

Finally, CPF's position that Plaintiffs' BPA claims are "based on speculation," and they do not have standing, (ECF No. 110, PageID16851),

---

[8] Nor does CPF provide evidence that "Biologically Appropriate" in the context of the packaging only "pertain[s] to the design of the food and the rationale behind Champion's decision to make foods high in protein," but not to the inclusion of heavy metals or risk or inclusion of BPA. (ECF No. 110, PageID16850.)

[9] CPF's arguments as to the reliability of Boedeker's and Silverman's opinions have been fully briefed in the pending *Daubert* Motions. Plaintiffs will incorporate the arguments made in the oppositions throughout this brief to the extent the Court independently considers the admissibility of those opinions in ruling on CPF's motion for summary judgment. (*See generally* ECF Nos. 113, 114.)

[10] *See also Renfro v. Champion Petfoods USA, Inc.,* 25 F.4th 1293, 1301 (10th Cir. 2022) (analyzing Colorado state law claims and offering no cites to governing authorities for this Court).

conflicts with the opinion from CPF's own expert that, "[b]ecause of the ubiquitous presence of BPA in our environment, it is nearly certain that BPA is present in most food products." (ECF No. 110-36, PageID18258); SUMF ¶¶67-69; ASUMF ¶26.[11] Accordingly, Plaintiffs must have purchased CPF dog food that contained BPA, and there is no basis to grant CPF's motion as to this issue. *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805-06 (6th Cir. 2020) (facts must be viewed in the "light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor.").

The evidence establishes, at a minimum, that a genuine issue of material fact exists as to whether a reasonable consumer would understand from the statement of "Biologically Appropriate" on CPF's dog food packaging that the product contains any level of heavy metals or BPA.

### 2. Pentobarbital Makes "Biologically Appropriate" Misleading

The material risk of pentobarbital renders CPF's "Biologically Appropriate" claim false and misleading. Pentobarbital is a barbiturate used to euthanize animals and is biologically *inappropriate* in any amount. SUMF ¶93; ASUMF ¶27. Through

---

[11]Despite its argument now that they are "ubiquitous," (ECF No. 110, PageID16838), CPF internally proposed a goal of zero heavy metals in its products. ASUMF ¶20. And while it admits that not testing for heavy metal is "negligent," CPF never adequately or consistently tested the Dog Food or ingredients for heavy metals. ASUMF ¶15. Nor does it test for BPA, and instead relies on ineffective, partial guarantees from suppliers. ASUMF ¶¶23, 24.

their testimony and experts' opinions, Plaintiffs have shown that reasonable consumers would find CPF's "Biologically Appropriate" claim false and misleading based on the risk of pentobarbital and that the risk is material to their purchasing decision. SUMF ¶27; ASUMF ¶¶7, 33. CPF offers no contrary evidence. (ECF No. 110, PageID16852-53.)

Plaintiffs' pentobarbital allegations are not "conjecture." (*Id.*) From 2016 until May 2018, CPF purchased beef tallow (a high-risk ingredient) from JBS, a large rendered-ingredient supplier with a pattern of manufacturing beef tallow contaminated with pentobarbital. SUMF ¶¶83-85; ASUMF ¶¶27-33.[12] The FDA's test results showed that *all* beef tallow supplied by JBS from November 2017 to January 2018 (when Plaintiff Knierim was purchasing the Regional Red diet, which contains tallow) was positive for pentobarbital. SUMF ¶¶8, 81, 94-100; ASUMF ¶30; *see also* SUMF ¶98. These facts constitute sufficient *evidence* that a jury could

---

[12] JBS handled condemned carcasses of animals euthanized by pentobarbital the entire time it was CPF's supplier. SUMF ¶82; ASUMF ¶28. Since CPF did not audit JBS in 2016 and 2017, it never confirmed that JBS segregated these carcasses. SUMF ¶82; ASUMF ¶¶29-30, 86. When CPF finally audited JBS in early 2018, its auditor observed evidence of cross-contamination, yet CPF took no corrective action. *Id.* A few months later, CPF's reckless disregard for the pentobarbital risk resulted in its manufacturing 1.8 million pounds of the Red Meat diets using contaminated JBS beef tallow, including 100,000 pounds that CPF sold in retail markets because it did not want to create "panic in the marketplace." SUMF ¶¶88, 89, 91; ASUMF ¶32. There is no evidence in the record that JBS changed its manufacturing practices during the entire time it supplied beef tallow to CPF. That is sufficient evidence to establish the risk existed unabated the entire time.

conclude that all the JBS beef tallow purchased by CPF had the material risk of pentobarbital.

CPF also tenuously argues that Plaintiffs have no standing to bring claims premised upon the pentobarbital contamination because the dog food contained pentobarbital at too low of levels. (ECF No. 110, PageID16852.) However, the record here shows that a reasonable consumer would find *any* level of barbiturates unacceptable in pet food. Boedeker and Silverman have demonstrated that the inclusion of an ingredient that had a material risk of containing pentobarbital *is* material to consumers, even if the detection is below 2 ppb. ASUMF ¶¶7, 33.

The Ninth Circuit recently opined on the materiality of a risk, finding that even if a defect occurs an estimated 0.05% of the time, a reasonable juror could find that risk material. *Beaty v. Ford Motor Co.*, No. 20-35141, 854 Fed.Appx. 845, 849-50 (9th Cir. Apr. 2, 2021). Similarly, a reasonable juror here could find that the risk of pentobarbital was material to a consumer when deciding to pay an ultra-premium price and that the risk of pentobarbital failed to meet a reasonable consumer's expectations for "Biologically Appropriate." ASUMF ¶¶6, 7, 33.

### 3. A Jury Could Find that the "Fresh" Statement is Misleading

CPF's inclusion of decidedly non-fresh ingredients in its Dog Food renders the "Fresh" claims misleading. The record here shows that a reasonable consumer would not expect the Dog Food to contain, for example, expired ingredients or

regrinds (reground food that had previously been deemed unfit for sale) ASUMF ¶¶7, 11. Rather than offer any data of its own, CPF exclusively relies on the argument that because a "100% Fresh" guarantee is not on the packaging, the issue should not go to the jury. This argument fails.

CPF is entitled to present its defense that it does not advertise "100%" or "only" fresh ingredients to a jury. The jury will then balance that against the weight of Plaintiffs' evidence. For example, Plaintiffs contend—and CPF does not dispute—that every bag of Dog Food contains numerous non-fresh ingredients. SUMF ¶30; ASUMF ¶¶35-40. The Expectations Survey also demonstrates that the "Fresh" claim is misleading even in the absence of a "100% fresh" guarantee. SUMF ¶30; ASUMF ¶7. Indeed, 77-88% of survey respondents did not expect the Dog Food to contain expired ingredients or regrinds even though the bags did not state "100%" or "only" fresh ingredients. *Id*. This is consistent with Plaintiffs' testimony. SUMF ¶27; ASUMF ¶46. Further, Silverman opined that a reasonable consumer would be misled by the inclusion of frozen and expired ingredients and regrinds in the Dog Food. ASUMF ¶27. Thus, Plaintiffs have presented "exactly the type of extrinsic evidence ... necessary" to survive summary judgment. *Zarinebaf II*, 2022 WL 980832, at *8 (citing *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927 (7th Cir. 2021)). CPF offers no data refuting that reasonable consumers believed it used only fresh ingredients unless stated otherwise.

CPF also does not contest that its Dog Food contains frozen ingredients, such

as ███████████████████████████████████████████████████

███████ SUMF ¶30-31; ASUMF ¶39. CPF ignores that it was ██████████

████████████████████████████████████████████████████

████████████████████ SUMF ¶30; ASUMF ¶37. It further ignores its own documents

and testimony (including of its corporate designee) proving that CPF regularly uses

regrinds, as well as frozen and expired ingredients. ASUMF ¶¶36-52. In fact, while

CPF claims that a maximum 5% of ingredients in its Dog Food are regrinds, it

regularly exceeds that (undisclosed) guideline. ASUMF ¶49. █████████████

███████████████████████████████████ *See id.* ██████████████

████████████████████████████████████████████████████

████████████████ CPF also fails to disclose that it ███████████████

████████████████████████████████████████████ ASUMF ¶¶42-

44. When ingredients, like the chicken meal used in Acana Free-Run Poultry, are

deemed expired under scientific tests, CPF still permits use if an employee is not

bothered by the smell and approves it. *See id*. The packaging does not disclose any

of these practices to consumers. "Viewing [this] evidence in a light favorable to

[Plaintiffs], a reasonable juror could find that [the "Fresh" promise is] misleading."

*Innovation Ventures, LLC v. N2G Distrib., Inc.*, 779 F. Supp. 2d 671, 682 (E.D.

Mich. 2011).

CPF's examples of text that purportedly should have informed Plaintiffs that not all ingredients were fresh demonstrate genuine issues of material fact. CPF repeats the "Fresh" misrepresentation an average of *22 times* on its packaging. ASUMF ¶8. Yet, it argues that this repeated promise is not misleading because it mentions a single freeze-dried ingredient and because it discloses "raw" ingredients in the "meat math." (ECF No. 110, PageID16854.)  But whether CPF is correct is an issue for the jury to decide. *See Zarinebaf II*, 2022 WL 980832, at *8 (citing *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 479 (7th Cir. 2020)) ("While Champion disputes the relevance of these points, that is a dispute that a trier of fact should evaluate."). Ample evidence exists upon which a jury could find otherwise.  For example, the record evidences that reasonable consumers do not equate "raw" with frozen. ASUMF ¶¶12, 30-36. CPF also fails to point to any evidence showing reasonable consumers find these terms synonymous; in fact, CPF's current packaging spells out that its "raw" ingredients are also "frozen." ASUMF ¶60. As for the meat math, CPF admits to the inaccuracy of ingredient ratios, stating "[t]he ratio of fresh to raw ingredients varied, depending on a number of factors, including the seasonality, the size of the catch or harvest, and when Champion manufactured the diet." ECF No. 110-27, PageID17493.

This evidence of deception is precisely the type lacking in CPF's cases. In *Eff v. Slusher*, the court affirmed summary judgment because plaintiffs "could have

[ ] readily discovered" the facts forming the basis of the MCPA claim in public records. No. 214043, 2000 WL 33419371, at *3 (Mich. Ct. App. May 19, 2000). Here, myriad examples of CPF's deception and concealment were hidden from the public and Plaintiffs in its internal documents. In the end, **neither the lack of "100%" fresh guarantees nor the disclosure of freeze-dried and raw ingredients warrant summary judgment.** The record shows "a genuine issue of material fact regarding defendant[s'] liability under the MCPA, which is for the jury to decide." *Brownlow v. McCall Enters., Inc.*, 315 Mich. App. 103, 128 (2016). The same is true for all of Plaintiffs' claims based on the "Fresh" promises because "how [consumers] perceive advertising and how they make decisions ... are matters of fact, subject to proof that can be tested at trial[.]" *Bell*, 982 F.3d at 481.

### 4.     A Jury Could Find the "Regional" Statement is Misleading

CPF asks the Court to deconstruct the "Regional" statements in a way that reasonable consumers would not. CPF knows this promise is misleading on its face and has debated eliminating it because it is no longer able to purchase enough ingredients locally. SUMF ¶¶37, 42, 43; ASUMF ¶¶13, 55, 58. This admission sufficiently demonstrates a material factual dispute as to whether the "Regional" promise is misleading, and it is corroborated by expert opinion. ASUMF ¶¶7, 37-38. The majority of survey respondents did not expect the Dog Food to contain imported or non-regional ingredients. *Id.* Likewise, Plaintiffs interpreted

"Regional" to mean that its ingredients were purchased regionally and from the advertised regional farmers and similar regional farms. SUMF ¶¶37, 44; ASUMF ¶59. Yet every single bag of Dog Food contains non-regional ingredients.

CPF fails to disclose that its "regional" chicken was sourced from large, multinational corporations that CPF knew would make its Dog Food less appealing to its consumers. (ECF No 64, PageID4944.) In fact, in 2016, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ASUMF ¶56. CPF's internal records show that its employees actively hid its real chicken suppliers—Pilgrim's Pride and Tyson Inc.—from consumers to maintain the façade that small, family-operated regional farms supplied its chicken. SUMF ¶38; ASUMF ¶¶56-57; (ECF No. 104, PageID13003.) CPF purposely omits corporate identity or ownership of its exemplar suppliers because it knew its "Pet Lovers" relied on the packaging's representations. (ECF No. 104, PageID13003); SUMF ¶¶38-41. Finally, CPF's use of Indian turmeric, imported fish oils, and Chinese vitamin premixes do not conform to CPF's "Regional" promises. SUMF ¶37; ASUMF ¶¶13, 53-58.

Defendant incorrectly claims that its packaging provides context for the "Regional" statement. Consumers are not expected to examine the fine-print ingredient list located on the back of a label to correct a prominent front-label misrepresentation. *See, e.g., Bell*, 982 F.3d 468, 473-74 ("100% Grated Parmesan Cheese" could deceive a reasonable consumer despite fine-print, back-label

ingredient list indicating otherwise); *Dumont v. Reily Foods Co*., 934 F.3d 35, 40 (1st Cir. 2019) ("Hazelnut Crème" could deceive a reasonable consumer, despite fine-print back-label ingredient list disclosing that the package contained no hazelnut); *Mantikas v. Kellogg Co*., 910 F.3d 633, 637 (2d Cir. 2018) ("Whole Grain" or "Made With Whole Grain" could deceive a reasonable consumer, despite side-panel ingredient list that discloses "enriched white flour" as the first and thus predominant ingredient). And where, as here, the evidence suggests CPF has led reasonable consumers to believe the Dog Food contains primarily regional ingredients but the ingredients were not actually primarily regional, summary judgment would be improper. *See Campbell v. Whole Foods Mkt. Grp., Inc*., 516 F. Supp. 3d 370, 386 (S.D.N.Y. 2021) ("[T]he Court cannot conclude that a reasonable consumer is unlikely to be misled by the packaging[]... Th[e] representation is adequately pleaded to have been misleading because it falsely implies that honey is the primary sweetener in the product, when it is not."); *Colangelo*, 2022 WL 991518, at *24 (finding the reasoning of *Campbell* "compelling" but distinguishing facts before it where—unlike here—the plaintiff "failed to allege that the ingredients were not primarily regional and has pointed only to minor ingredients with allegedly non-regional origins"). *See* SUMF ¶¶42, 43; ASUMF ¶58.

The record here amply demonstrates there is a material factual dispute

regarding whether the "Regional" claim is misleading. Plaintiffs could prove that, because the Dog Food contains non-regional ingredients, advertising it as "Regional" "creates a 'capacity to mislead' the average consumer." *Loreto v. Procter & Gamble Co.,* 515 Fed.Appx. 576, 582 (6th Cir. 2013).

### 5.     A Jury Could Find the Natural Claims are Misleading

The unrefuted evidence shows that the Natural Claims misled Plaintiffs and reasonable consumers into believing the Dog Food does not contain heavy metals, BPA, and pentobarbital. (ECF No. 104, PageID13003-07); SUMF ¶¶45, 47. That is a sufficient basis for denying summary judgment on these claims.

Plaintiffs testified they understood the Dog Food did not contain heavy metals and they would not have purchased it had they known it contained heavy metals, BPA, and pentobarbital. SUMF ¶¶27, 46-51, 56, 70. Silverman likewise opined that: (1) reasonable consumers would perceive BPA and pentobarbital inconsistent with the Natural Claims (SUMF ¶¶45, 47); and (2) reasonable consumers would consider the presence of BPA, heavy metals, and pentobarbital to be material to their purchasing decisions and would be less likely to purchase the Dog Food if CPF disclosed the presence of heavy metals or BPA. SUMF ¶70; ASUMF ¶¶7, 9, 14.[13] A majority of the

---

[13] *See Hobbs v. Brother Int'l Corp.*, No. cv 15-1866, 2016 WL 7647674, at *4-5 (C.D. Cal. Aug. 31, 2016) (permitting Silverman to opine "on a reasonable consumer's perceptions," and finding that "the Silverman declaration [is] relevant to assess whether a significant portion of reasonable consumers would be misled").

Expectations Survey respondents, 71.9-84.7%, expect the Dog Food to not contain heavy metals, BPA, or pentobarbital based on the Natural Claims. SUMF ¶47; ASUMF ¶7.

CPF speculates that consumers "could not have been misled" because it did not explicitly state that "all or 100% of its ingredients are natural, or heavy-metal or BPA-free." (ECF No. 110, PageID16859.) The court in *Zarinebaf II* rejected this exact argument at summary judgment, finding "Boedeker's consumer survey and Silverman's testimony sufficiently reliable and relevant to pass muster under *Daubert*." *Zarinebaf II*, 2022 WL 980832, at \*10 (a court "cannot discount Plaintiffs' expert opinions and insert its own evaluation of factual evidence to find summary judgment is appropriate"). The same argument was also rejected at summary judgment in *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 682-683 (N.D. Cal. 2021). When considering similar opinions of Silverman on "natural" statements for premium-priced dog food, Judge Orrick reasoned that the issue is "whether the [natural] statements are misleading, not explicitly contrary" and "[h]ow a reasonable consumer would understand them is a quintessential matter for a jury." *Id*. These holdings apply with equal force here.

CPF also makes the non-sensical argument that its Natural Claims are not misleading because Plaintiffs did not present evidence that their pets did not receive nourishment or that they "were nourished through unnatural means." (ECF No. 110,

PageID.16859.) In support, CPF simply states the obvious facts that Plaintiffs' dogs ate and digested the kibble "through natural means" and their bodies "naturally absorbed" it. (ECF No. 110, PageID.16859.)[14] These contentions entirely avoid the question for the jury: whether consumers were likely to be misled into purchasing CPF's premium-priced Dog Food.  The harm was done at the point of purchase, not when the consumer's pet later ate the food "through natural means" or "naturally absorbed" it.

Finally, the record shows Plaintiffs' reasonable understanding that the Dog Food ingredients were superior to others based on its Natural Claims. SUMF ¶47. Considered independently, *or within the context of CPF's additional packaging claims*, a genuine dispute of material fact exists with regard to whether the Natural Claims are misleading.

## B.    Plaintiffs' Expert Opinions Create Issues of Material Fact

Plaintiffs' expert opinions are widely recognized as the exact type of

---

[14] During the September 22, 2021, *Daubert* hearing, Silverman addressed what CPF's use of the terms "nutrients" and "natural" actually communicates in the context of this case: "Consumers use the word 'nutrients' or interpret the word 'nutrients' as a health claim, and they also interpret 'natural' as a health claim. They believe that – many consumers believe that natural foods are better than what one would consider ordinary processed food. So in my expert opinion, a reasonable consumer would see this as a health claim and that this is a very special dog food, and that would be material." SUMF ¶45; *see also, Bell*, 982 F.3d at 476 ("We agree with the district court that the context of the entire packaging is relevant…What matters most is how real consumers understand and react to the advertising.").

evidence properly used in consumer protection class actions and nothing in CPF's motions alters this well-established law.

It cannot be disputed that consumer surveys are repeatedly accepted as proof of consumer perception where the challenged statements are not objectively false. *See, e.g., Zarinebaf II*, 2022 WL 980832, at *6 (plaintiffs' survey evidence "sufficient to put a question of fact before a jury"); *Abbott Labs. v. Gerber Prods. Co., Inc.*, 979 F. Supp. 569, 575 n.5 (W.D. Mich. 1997) (declining to consider that advertising claim was implicitly false where plaintiff "provided no evidence of consumers' reactions to the advertisements, leaving the Court to interpret the advertisements on its own, which is an unacceptable replacement for proof of consumers' reaction).[15]   Indeed, the Seventh Circuit in *Weaver* affirmed dismissal of essentially the same claims against CPF precisely because plaintiffs failed to present a consumer survey. *Weaver,* 3 F.4th at 939.

CPF knows the marketing claims at issue in this case are subjective and not

---

[15] *See also L & F Prods., a Div. of Sterling Winthrop Inc. v. Procter & Gamble, Co.*, 45 F.3d 709, 711 (2d Cir. 1995) ("Where the plaintiff's theory is that the challenged commercial is impliedly false, extrinsic evidence must confirm that the commercial is likely to mislead or confuse."); *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 304 (4th Cir. 2017) ("…it is incumbent on the plaintiff to present 'extrinsic evidence of consumer confusion,' generally in the form of consumer survey evidence."); *Ruth v. Triumph P'ships*, 577 F.3d 790, 800 (7th Cir. 2009) (where "cases involve[] statements that are not plainly misleading or deceptive but might possibly mislead or deceive[]. . . we have held that plaintiffs may prevail only by producing extrinsic evidence, such as consumer surveys").

objectively verifiable. *See, e.g., Zarinebaf II*, 2022 WL 980832, at *6 ("Champion neatly sums up Plaintiffs' condition to defeat summary judgment: '[s]ince there is nothing inherently misleading about "Biologically Appropriate" on its face, Plaintiffs must demonstrate with evidence that a reasonable consumer would interpret the phrase "Biologically Appropriate" to mean that Champion's dog food was free of heavy metals and BPA.'"). The record shows that CPF is collecting subjective pieces of context that it believes refutes Plaintiffs' claims—it is not pointing to any objective evidence, like a dictionary definition. (*See, e.g.,* ECF. No. 110 at PageID.16849 ("Biologically Appropriate" cannot possibly "signify to a consumer acting reasonably that [CPF's] dog food is free of naturally occurring heavy metals" because of "dogs evolved as carnivores" statement).)

To support its argument, CPF can only refer to non-binding decisions that are factually inapposite. In *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886 (7th Cir. 2000), the problem with the survey was that the plaintiff attempted to use it to show that the word "first" meant something other than its objectively verifiable dictionary meaning. But with no ambiguity in the definition of "first," no factual issue required survey evidence and using a flawed survey to show that "first" really means "majority" was improper. *Id.* at 884 (the Court stated: "In English, 'first' is ordinal. It denotes rank in a series."). *Mead Johnson* is entirely inapposite from this

41

case.[16] *See also McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 254 (S.D.N.Y. 2005) (declining to follow *Mead Johnson* where the relevant "surveys were used in the manner in which surveys are traditionally used in false advertisement cases").

The Eight Circuit's decision in *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387 (8th Cir. 2004) is also irrelevant. The Court found that the phrase "America's Favorite Pasta," both standing alone and in the context of the relevant advertising, was puffery and that a consumer survey could not "transform" the phrase "into a specific, measurable claim." *Id.* at 391–93. Here, CPF erroneously asserts that "Nourish as Nature Intended" is puffery but does not make the same argument as to any of the other challenged statements nor does it assert the application of their plain meanings because there is none. The *Am. Italian Pasta* decision thus does not support CPF's motion. *See Retractable Techs., Inc. v. Becton*, No. 2:08-cv-16, 2013 U.S. Dist. LEXIS 26996, at *15 (E.D. Tex. Feb. 27, 2013) (declining to follow *Mead Johnson* and *Am. Italian Pasta Co.* where no party argued the "claims at issue . . . are mere puffery or that the plain and ordinary meaning of

---

[16] In the amended language of the decision issued on Petition For Rehearing in *Mead Johnson* (which CPF ignores), the Court made clear it did not intend to bar surveys when the meaning of particular language or messages is at issue: "None of this calls into question the understanding, expressed by many decisions, that whether a claim is either 'false' or 'misleading' is an issue of fact rather than law. []." *Mead Johnson,* 209 F.3d 1032, 1035 (7th Cir. 2000).

the claims should apply").[17]

CPF's arguments as to the why the merits opinion in *Colangelo* governs here are also misplaced. (ECF No. 110 at PageID16864-66.) First, that case only involved two Acana diets. *Colangelo,* 2022 WL 991518, at \*1. Second, the court improperly made factual calls on how a reasonable consumer would understand a claim that should go to the jury. *See*, *e.g.*, *id.* at \*22-23 (finding no misleading label after the court interpreted "fresh or raw" on its own and after excluding portions of relevant expert opinions).

### C.    Triable Issues Exist as to CPF's Material Omissions

The omission or concealment of material information is actionable under the MCPA. Mich. Comp. Law ("MCL") §§445.903(1)(s) and (1)(cc). Omissions-based claims turn on materiality. *Id.*; (ECF No. 110, PageID16866-67). CPF wrongly asserts that a duty to disclose arises only upon consumer inquiry, or that Plaintiffs must establish a legal duty to disclose at all. (ECF No. 110, PageID16867.) [18]

Whether Plaintiffs made inquiries to CPF is irrelevant and not dispositive here. Sections 445.903(1)(s) and (1)(cc) contain "plain, unambiguous language"

---

[17] Plaintiffs incorporate the arguments made in the oppositions to the extent the Court independently considers the admissibility of those opinions in ruling on CPF's motion for summary judgment. (*See generally* ECF Nos. 113, 114.)

[18] CPF's reliance on *Weaver* is misplaced as Wisconsin law bars omission-based claims and thus no stand-alone statutory omissions claims were at issue there. *See State v. McGuire,* 2007 WI App 139, ¶21, 302 Wis.2d 688, 735 N.W.2d 555.

and do not require Plaintiffs to "prove all elements of fraud[.]" *Brownlow*, 315 Mich. App. at 125-26. "[T]here are no published cases from this Court or our Supreme Court that state this proposition." *Id.* at 125. Applying the tort of silent fraud's legal duty or consumer inquiry requirement to these sections "writes elements of fraud into the provisions of the MCPA that do not, and should not, exist, thereby ignoring the longstanding principles of statutory interpretation." *Id.* at 122.[19] The MCPA jury instructions do not mention any duty to inquire. M Civ JI 113.09.Any inquiry to CPF would have been futile since it never returned Plaintiff Knierim's call when she left a message after becoming concerned about heavy metals. SUMF ¶53.

Sufficient evidence—CPF's documents and testimony, Plaintiffs' Expectations Survey, expert opinions, and testimony—demonstrates consumers do not expect the Dog Food to contain heavy metals, non-fresh and non-regional ingredients, or to have a risk of containing pentobarbital and BPA. This evidence "reveal[s] [] material fact[s] [that] tend[] to mislead or deceive the consumer, and [] could not reasonably be known by the consumer," MCL §445.903(1)(s), or shows that CPF failed to "reveal facts that are material to the transaction in light of

---

[19] The cases CPF relies on apply the legal duty requirement to the tort of silent fraud, which is not at issue here. *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 660-66 (6th Cir. 2013) (separately analyzing plaintiffs' MCPA claim); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 794 (E.D. Mich. 2019).

representations of fact made in a positive manner." MCL §445.903(1)(cc).

CPF's argument that it did not omit this information is neither plausible nor appropriate to decide at this stage. First, CPF fails to point to a single example of where it disclosed heavy metals, frozen or expired ingredients, or regrinds. It offers *its* interpretation of what it communicates, but does not support its argument with any evidence suggesting that *Plaintiffs and reasonable consumers* interpret the communications in the same way as CPF.[20] To the contrary, the record shows consumers do *not* interpret CPF's packaging the same way as CPF. ASUMF ¶7.

Whether all foods contain heavy metals is a disputed material fact. First, even CPF's employees testified that they thought the Dog Food contained no heavy metals. ASUMF ¶17. Second, both parties' experts agree that CPF and other manufacturers can control and reduce the presence of heavy metals in dog food. SUMF ¶¶55-66; ASUMF ¶¶18, 21. This conclusion is corroborated by CPF's limited heavy metal testing, which showed that CPF's "great asset" ("Fresh" ingredients) had non-detectable amounts of heavy metals, while other non-fresh ingredients contained detectable amounts of heavy metals. SUMF ¶54; ASUMF ¶¶4, 16, 18. This is consistent with the FDA's Total Diet study where the majority of poultry products, such as chicken and turkey breasts, do not contain detectable

---

[20] CPF's argument that the presence of heavy metals cannot form an omissions claim because it is not material information fails for the same for the reasons stated above. *See* Section IV.A.1,3,5.

amounts of heavy metals. SUMF ¶54. The FDA tested 32 lots of oven-roasted chicken and turkey breast for arsenic, cadmium, and lead, and tested 15 lots of each for mercury. *Id.* Test results showed 71.85% of the chicken breast tested non-detect for arsenic; 93.75% non-detect for cadmium; and 100% non-detect for lead and mercury. *Id*. Similarly, 75% of the turkey breast tested non-detect for arsenic; 96.875% non-detect for cadmium; 100% non-detect for lead; and 86.66% non-detect for mercury. *Id*. In comparison, the Dog Food tested positive for heavy metals at much higher levels: arsenic levels up to 3.256 mg/kg; cadmium levels up to 0.200 mg/kg; lead levels up to 0.489 mg/kg; and mercury levels up to 0.0549 mg/kg. *Id*. CPF's own expert's testing confirmed the consistent presence of heavy metals. *Id*.

As to the omission of non-regional and frozen ingredients, CPF cannot point to any meaningful disclosure. Instead, CPF claims the meat math panel, a general disclosure of *specific* "freeze-dried" ingredients, and the disclosure of a single non-regional ingredient obviates the need to disclose the other numerous frozen and non-regional ingredients (including frozen forms of key ingredients and ingredients internationally sourced). (ECF No. 110, PageID16868-69.) CPF again fails to show that *its* interpretation of the packaging mirrors that of reasonable consumers. On the other hand, 84% of survey respondents believed that the Dog Food contained *only* fresh ingredients unless stated otherwise on the packaging. ASUMF ¶7. Likewise, 77-79% believed the ingredients were from the region where the food was made

unless specifically stated otherwise on the packaging. ASUMF ¶7. The survey demonstrates that CPF's partial disclosures (relevant to an ingredient here or there) do nothing to inform consumers of its *numerous* other omissions. "The jury [will be] left to decide the [] factual question: 'What would [Plaintiffs] have done if [CPF] had disclosed [the Omissions]?' This disputed fact [is to be] resolved by the jury[.]" *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 429 (6th Cir. 2004).[21] Summary judgment should be denied as to Plaintiffs' MCL §§445.903(1)(s) & (1)(cc) claims. *See, Zarinebaf II,* 2022 WL 980832 at *10-11 (finding omissions claims are triable issues of fact).

### D.     Summary Judgment Is Improper on the MCPA Claims

CPF argues that summary judgment on Plaintiffs' MCPA claims is warranted because the "sale and purchase of dog food" is exempt under the licensing and regulatory regimes of the Michigan Commercial Feed Law ("MCFL"), MCL §287.521, *et seq.* (ECF No. 110 at PageID16872.) This defense fails.[22]

CPF improperly construes Plaintiffs' MCPA claim as one based on the provisions of the MCFL. The Packaging Claims and Omissions are not general transactions authorized under the MCFL. Regardless, a genuine dispute of material

---

[21] CPF's arguments that Plaintiffs' omissions claims cannot be premised on the risk of presence of BPA and pentobarbital are addressed in Sections IV.1-2,5.

[22] Plaintiffs reserve their argument that CPF waived its MCPA affirmative defense for appeal.

fact exists as to whether CPF submitted the labels at issue in this matter to a Michigan regulatory body.

### 1.   CPF's Marketing Conduct is Not Exempt from the MCPA.

The MCPA exempts "[any] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MCL §445.904(1)(a). While the Michigan Supreme Court has given the MCPA exemption a "broad reading," *Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 465, 597 N.W.2d 28 (1999), courts have not found a total revocation of the MCPA. *See Wong* v. *T-Mobile USA, Inc*., No. 05-73922, 2006 WL 2042512, at *7 (E.D. Mich. July 20, 2006) (MCPA's exemption for regulated transactions does "not abrogate the statute entirely[.]); *Woodger v. Taylor Chevrolet, Inc.*, No. 14-CV-11810, 2015 WL 5026176, at *7 (E.D. Mich. Aug. 25, 2015) (acknowledging defendant's far reaching interpretation of the MCPA exemption could "eviscerate the protections the statute was designed to provide[.]").

CPF bases its MCPA exemption defense on the MCFL, claiming that Plaintiffs acknowledge the MCFL governs the labeling, manufacture, and distribution of dog food in Michigan. (ECF No. 110, PageID16862 (citing MCL §287.521 *et seq*.; ECF No. 25, ¶¶304-306, PageID294).) But Plaintiffs made no such acknowledgment, nor did they allege the MCFL applied to the alleged MCPA violations. (ECF No. 25 at

¶¶233-44, PageID278-80.) [23]

Regardless, the Packaging Claims and Omissions are not general transactions specifically authorized by the MCFL, and are thereby not subject to exemption. Under the MCPA, activity is "specifically authorized" when it is "explicitly sanctioned" by law. *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 212-13, 732 N.W.2d 514 (2007). The MCPA exemption *does not* apply to regulated entities where the wrongdoing extends beyond the regulated activity. *See*, *e.g.*, *Att'y Gen. v. Diamond Mortg. Co.*, 414 Mich. 603, 617, 327 N.W.2d 805 (1982) (broker's license authorized defendant "to engage in the activities of a real estate broker," but did not "specifically authorize the conduct that plaintiff alleges is violative of the [MCPA], nor transactions that result from that conduct."); *Wong*, 2006 WL 2042512, at *7-9 (exemption did not apply to defendant's billing practices); *Baker v. Arbor Drugs, Inc.*, 215 Mich.App. 198, 208, 544 N.W.2d 727 (1996) (exemption did not apply to defendant's deceptive advertisement because "advertising is not within the purview of the [] Board's regulatory power" even though the pharmacy itself was regulated); *Am. Auto. Ass'n, Inc. v. Advanced Am. Auto Warranty Servs., Inc.*, No. 09-CV-12351, 2009 WL 3837234, at *6 (E.D. Mich. Nov. 16, 2009) (exemption did not

---

[23] Plaintiffs only reference to the MCFL was in their negligence per se claim concerning CPF's manufacturing and distributing commercial feed that is adulterated or misbranded. (ECF No. 25 PageID293-94, ¶¶303-304, 310.) Notably, by the time CPF raised its affirmative defense, the parties had stipulated to dismiss Plaintiffs' negligence claim. (*See* ECF No. 29.)

apply because it was not a transaction or conduct).[24]

In applying the MCPA exemption, manufacturing and distribution activities are distinguished from marketing activities. *See*, *e.g.*, *In re Nat'l Prescription Opiate Litig.,* 458 F.Supp.3d 665, 690 (N.D. Ohio 2020) (differentiating between sale and distribution activities and marketing activities in considering exemption to the MCPA). CPF's deceptive marketing activity is fundamentally different from and unrelated to the manufacturing and distribution activity regulated by the MCFL. *See* Act 120 of 1975 (Feed Law); MCL §287.533 (the MCFL applies to the "manufacture or distribution" of pet food); MCL §287.524 10(a)-(b). The MCFL does not require that the Michigan Department of Agriculture and Rural Development ("MDARD") collect copies of product labels when applying for a Michigan Commercial Feed Manufacturer's/Distributor's License ("License"). *See* MCL §287.524(9) ("To determine compliance with this act and rules promulgated under this act, the director *may* require a current licensee or an applicant for a new license to submit labels or labeling...") (emphasis added). CPF's License applications demonstrate the optional label submission. SUMF ¶18. The License itself also only indicates it is a license for

---

[24] *See also Brownlow*, 315 Mich. App. at 108 ("the general transaction of cleaning a house was not specifically authorized by defendant's contractor license and therefore not exempt from the [MCPA]"); *Price v. Long Realty, Inc.*, 199 Mich. App. 461, 471, 502 N.W.2d 337 (1993) (MCPA exemption did not apply because "the defendant's license 'does not specifically authorize the conduct that plaintiff alleges is violative…'"); *Comer v. Roosen Varchetti & Olivier, PLLC*, No. 17-13218, 2018 WL 5719793, at *5 (E.D. Mich. Nov. 1, 2018).

the facility establishment with no reference to packaging or labels. SUMF ¶¶16, 20. Moreover, the MCFL does not require product "registration." SUMF ¶19. Therefore, the challenged marketing claims here are beyond the scope of MCFL license and regulations. *See Wong*, 2006 WL 2042512, at *7 ("Even if a defendant is licensed or regulated, it may remain liable under the MCPA for conduct outside the scope of its license or the pertinent regulations. []To conclude otherwise would be to create a gap in enforcement in those areas not covered by government regulation."); *Diamond Mortg. Co.*, 414 Mich. at 617.

CPF's cited case, *Liss,* is factual inapposite. There the conduct at issue involved residential home building by a residential homebuilder specifically authorized to contract to build homes. 478 Mich. at 213-14. Whereas here, CPF's conduct at issue is their misleading and deceptive packaging - not the specifically authorized conduct of the manufacturing and distributing of a product. *See* MCL §287.533 (MCFL applies to the "manufacture or distribution" of commercial feed).

*Rosenbaum v. Toyota Motor Sales, USA, Inc.* is likewise distinguishable. There the court found MCPA claims based on false advertising were exempt because automobile *advertising* was an activity specifically regulated in Michigan and federally. No. 16-CV-12645, 2016 WL 9775018, at *3 (E.D. Mich. Oct. 21, 2016), *aff'd sub nom.* 708 Fed.Appx. 242 (6th Cir. 2017) (citing 16 C.F.R. §259.2 ("Guide Concerning Fuel Economy Advertising for New Automobiles"), MCL §257.248d

(Michigan Vehicle Code), and MCL §445.315 (Shopping Reform and Modernization Act)). In this case, the MCFL provides no such specific regulations as to pet food marketing.

Notably, CPF can only rely on cases in which the exemption applied to activities unrelated to the MCFL. *See Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100, at *2 (Mich. Ct. App. Dec. 26, 2019), *appeal denied*, 950 N.W.2d 51 (Mich. 2020) *petition for cert. filed*, No. 160927 (Mich. Feb. 6, 2020) (manufacture, sale, and lease of automobiles); *Matanky*, 370 F. Supp. 3d at 800 (same); *Alexander v. Del Monte Corp.,* No. 09–12303, 2011 WL 87286, at *2 (E.D. Mich. Jan. 11, 2011) (the processing, packaging, and holding of food products); *Kyles v. Keefe Commissary Network, LLC*, No. 14-CV-11907, 2015 WL 1637466, at *7-8 (E.D. Mich. Apr. 13, 2015) (the manufacturing and selling and producing and packaging of hot cocoa). CPF's Packaging Claims and Omissions do not fall within the MCPA exemption.

### 2. The MCFL is Concerned with Ingredients and Guaranteed Analysis

Insofar as the MCFL is concerned with packaging or labels, it is focused on the product's ingredients and guaranteed analysis. *See* MCL §287.525(1)(a)(i)-(iv).[25] CPF cannot dispute this. *See* SUMF ¶21. Ignoring this, CPF now claims the

---

[25] At one point, Michigan regulated the specifics of pet food labels beyond the guaranteed analysis and ingredients claims, but the regulation was rescinded. *See*

regulatory reach of the MCFL extends to the approval of marketing claims, and at the same time, acted outside the bounds of any regulatory obligations and oversight when it used the deceptive Packaging Claims and Omissions. (*See* ECF No. 110, PageID16871.)

Information on the CPF's packaging regarding the presence or risk of heavy metals, BPA, or pentobarbital, or marketing claims such as Biologically Appropriate were not approved by Michigan because they do not relate to the ingredient panel, any major changes to the ingredient panel, or the guaranteed analysis. SUMF ¶21. Similarly, CPF would also not disclose regrinds claims or omissions to Michigan because they do not consider them ingredients. *Id.* In fact, CPF asserts that there is "absolutely no path" to make these disclosures to Michigan. *Id.*

### 3. CPF has not Met its Burden to Establish that the MCFL Specifically Authorizes Pet Food Marketing Activities.

"The party claiming the exemption bears the burden of proving its applicability." *Liss*, 478 Mich. at 208. Since CPF has alleged no evidence that the MCFL specifically authorizes its Packaging Claims and Omissions (or that CPF was required to take any steps to satisfy any regulatory requirements), it has not met its burden. *See Golden Star Wholesale, Inc. v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231,

---

Mich. Admin. Code R 285.635.151979, Rescinded by 2015 P.A. No. 83, eff. October 1, 2015 (providing specific regulatory guidance regarding pet food label information, including, inter alia, unqualified representations or claims).

1253 (E.D. Mich. 2021) (court refused to decide of the MCPA exemption where, inter alia, plaintiffs claimed that defendant had alleged "with no evidence that it is regulated under almost every regulatory scheme...").

CPF's argument is strongest in what it omits, i.e., any evidence that the labels *at issue here* were submitted to Michigan. In fact, the evidence shows the opposite – no labels were submitted. SUMF ¶¶18-19, 21-23.  CPF can only point to a *single* internal tracking document for a *single* product at issue, Orijen Regional Red Dog Food that indicates approval from Michigan in 2016. SUMF ¶19. But even this tracking document had no other documentation or proof that the labels were actually submitted.  CPF's significant lack of evidence demonstrates it has not met its burden to establish its marketing activities were regulated by the MFCL.

### 4.    The Actual Submission of any Label Here Raises a Question of Fact for the Jury.

There is a genuine dispute of fact as to whether CPF actually submitted the packaging and labels to a Michigan regulatory agency.  CPF has provided no proof of delivery, no copies of USB drives, and no copies of CDs or other disks, or copies of any labels at issue that may have been submitted to Michigan. SUMF ¶¶19, 21, 22, 24, 25. Nor did CPF make any effort to confirm with Michigan it had submitted labels to Michigan, or to request copies of any labels CPF had submitted. *Id.*

CPF relies on undocumented verbal communications and "intentions" that its product labels were approved by Michigan- neither of which can indisputably prove

that it submitted and Michigan approved labels for the Dog Food at issue here.

SUMF ¶19. Despite this clear lack of evidence, CPF maintains that it provided

product labels to Michigan, and that Michigan approved those labels. (ECF No. 110,

PageID16871.)  Consequently, the record demonstrates that genuine questions of

material fact exist surround CPF's submission of relevant labels to Michigan.

### E.    Privity Does Not Preclude the Express Warranty Claim

Privity does not justify dismissal of Plaintiffs' express warranty claims.

Privity exists where, as here, the party is an intended beneficiary of the contract

between the manufacturer and retailer.  The Michigan third party beneficiary statute

provides such status to a consumer:

> Any person for whose benefit a promise is made by way of contract, as
> hereinafter defined, has the same right to enforce said promise that he would
> have had if the said promise had been made directly to him as the promisee.
>
> (1)    A promise shall be construed to have been made for the benefit of a
> person whenever the promisor of said promise had undertaken to give
> or to do or refrain from doing something directly to or for said person.

See MCL § 600.1405; see also Schechner v. Whirlpool Corp., 237 F.Supp.3d 601,

608 (E.D. Mich. 2017) ("Privity of contract exists between contracting parties and

intended beneficiaries."); River Rouge Sch. Dist. v. Mestek, Inc., No. 226919, 2002

WL 1921466, at *1–2 (Mich. Ct. App. Aug. 20, 2002).

The express warranties at issue were for the benefit of consumers, including

Plaintiffs. CPF's Retail Programs create a Frequent Buyer Program and a

Professional Feeding Program, both of which provide financial rewards to consumers, and CPF managed and dictated how retailers sold the Dog Food to consumers, including its pricing and promotion. ASUMF ¶61.

CPF marketed the Dog Food as "Biologically Appropriate," made with "Fresh Regional Ingredients," to "Nourish as Nature Intended," and "Delivering Nutrients Naturally" and failed to disclose that the Dog Food contained heavy metals, and non-fresh and non-regional ingredients and had the risk of including BPA and pentobarbital. Plaintiffs relied on the Packaging Claims and Omissions. ASUMF ¶9. To ask the obvious, for whose benefit, other than pet owners, would CPF have made these promises. *MEA-NEA Loc. I v. Mount Clemens Cmty. Sch.*, No. 248794, 2004 WL 2387650, at *6 (Mich. Ct. App. Oct. 26, 2004) ("The provisions of [] establish that plaintiff was 'directly and intentionally provided for' in the agreement and that the agreement provided for the 'direct protection of plaintiff' and therefore plaintiff is entitled to maintain his cause of action under the third-party beneficiary statute."). As such, privity is not required.

## F. CPF Had Sufficient Notice of the Warranty Claims

CPF received actual notice of its breaches of warranties when it received a written CLRA notice dated March 7, 2018. ASUMF ¶62. After that notice was given, on April 19, 2018, *Reitman v. Champion Petfoods*, No. 18-cv-01736-DOC-JPR (C.D. Cal.) was amended to add Ramy Shaker as a named plaintiff. *Id.*, at ECF

No. 39. *Six months later*, on October 19, 2018, Plaintiff filed this case in Michigan Circuit Court on October 19, 2018, after which CPF removed the case to this Court on November 19, 2018. ECF Nos. 1, 1-2. CPF was plainly aware of the warranty claims at issue here well before filing of the action. ASUMF ¶62; *City of Wyoming v. Procter & Gamble Co*., 210 F. Supp. 3d 1137, 1158 (D. Minn. 2016) ("Defendants have been locked in litigation ... in courts all across the country; it could hardly be said that Plaintiffs' complaint was the first time Defendants received notice..."); *In re FCA US LLC Monostable Elec. Gearshift Litig*., 280 F. Supp. 3d 975, 1012 (E.D. Mich. 2017).

CPF relies heavily upon this Court's decision in *Johnston v. PhD Fitness, LLC* to argue lack of notice where the plaintiffs served a notice letter four months *after* filing their lawsuit. No. 16-cv-14152, 2018 WL 646683, at *4 (E.D. Mich. Jan. 31, 2018) (finding that "[m]ailing a letter four months after filing suit does not serve the notice requirement's purposes"). Here, the notice was mailed *one* month prior to Plaintiff Shaker bringing any claims in any case. ASUMF ¶62.

The record shows CPF knew of the warranty claims at least six months *before* the filing of *this* case. *Id*. Plaintiffs do not contend the mere filing of this case alone constituted notice. *Cf. Johnston*, 2018 WL 646683, at *4. Notably, CPF does not, because it cannot, "pointed to any pleaded fact that shows that it has been deprived of a commercially reasonable opportunity to resolve the plaintiffs' claims of breach

57

by any delay in the filing of this case..." *In re FCA,* 280 F. Supp. 3d at 1013.

Finally, and contrary to the above, CPF argues that Plaintiffs are relying solely on allegations in the operative complaint as a basis for sufficient notice. (ECF No. 110, PageID16877-78.) While this is demonstrably wrong, these allegations indeed supply a substantial and independent basis for sufficient notice. (*See* ECF No. 25, PageID282-83, ¶¶251-54; PageID286, ¶¶266-69 (CPF's knowledge through its known ingredients and contaminants, its product testing, CPF's known use of non-regional ingredients and non-fresh ingredients).) CPF had ample notice and an opportunity to cure.

### G.    The Economic Loss Doctrine Does Not Apply

The purpose of the economic loss rule is to encourage parties to a commercial sale of goods to avail themselves of the "opportunity to negotiate the terms and specifications" of their transaction, "including warranties, disclaimers, and limitation of remedies." *Neibarger v. Universal Coops., Inc.*, 439 Mich. 512, 523, 486 N.W.2d 612 (1992). The rule generally "does not apply where [] the parties have never been in a position to negotiate the economic risks themselves." *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 372, 532 N.W.2d 541 (1995). It is critical that the risk of harm must have been "within the contemplation of the parties to the agreement" such that the harm "could have been the subject of negotiations between the parties." *Neibarger*, 439 Mich. at 532;

*see also Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 Fed. Appx. 775, 780 (6th Cir. 2019).

Applying the economic loss rule here would defy this purpose. Plaintiffs are not sophisticated commercial entities and did *not* negotiate their purchase. The material facts misrepresented and omitted by CPF are *not* the kind that Plaintiffs would have contemplated at the time of purchase.[26] CPF misrepresented and omitted material information regarding the presence or potential presence of contaminants. (*See* ECF No. 25 at ¶¶55–83, PageID236-42 (heavy metals); *id*. at ¶¶84–96, PageID242-44 (BPA); *id*. at ¶¶146–183, PageID254-62 (pentobarbital).) Plaintiffs were unaware that they were feeding their dogs food that was or may have been adulterated with these toxins. As such, they could never have negotiated for a different allocation of risk. *Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich. App. 694, 705, 493 N.W.2d 513 (1992) (declining to bar tort claim for economic losses stemming from purchase of asbestos-containing materials because "the risk involved here is not the type that is allocated to a party through negotiation");

---

[26] *Murphy v. The Proctor & Gamble Co.* is distinguishable on this basis. 695 F. Supp. 2d 600 (E.D. Mich. 2010). There plaintiffs alleged that the marketing deceptively led consumers to believe a razor blade handle was only compatible with certain cartridges. *Id*. at 601–02. These allegations implicate no safety concerns unlike here where CPF has raised safety as a critical part of its defense. (*See* ECF No. 110 at PageID16839-43.)

*Roseville Plaza Ltd. P'ship v. United States Gypsum Co.*, 811 F. Supp. 1200, 1205 (E.D. Mich. 1992) (same).

Michigan law also recognizes an exception where fraud pervades the transaction. *Huron Tool*, 209 Mich. App. at 372-73. As argued above, Plaintiffs were duped by CPF and denied the opportunity to make informed decisions regarding their purchases. CPF incorrectly argues that *Huron* exception does not apply to intentional frauds concerning the "quality or character of the goods sold," such as Plaintiffs' fraudulent misrepresentation and concealment claims. *Murphy*, 695 F. Supp 2d at 602. But the dangerous nature of the undisclosed heavy metals, BPA, and pentobarbital invokes policy concerns traditionally resolved through tort law, taking Plaintiffs' claims outside this exception to the exception. *Crossing at Eagle Pond, LLC v. Lubrizol Corp.*, 346 F. Supp. 3d 1048, 1058 (E.D. Mich. 2018) ("Application of the economic loss doctrine should not pivot on the type of damage suffered by the plaintiff (e.g., personal injury v. property damage), but rather should turn on considerations such as [1] the use of the product (e.g. commercial v. residential), [2] characteristics of plaintiff (e.g. manufacturer v. private consumer) and [3] policies implicated in the case (e.g. contract law v. tort law).") (quoting *Republic Ins. Co. v. Broan Mfg. Co.*, 960 F. Supp. 1247, 1252 (E.D. Mich. 1997)).

## V.   CONCLUSION

For the foregoing reasons, the Court should deny CPF's motion in its entirety.

Dated: May 10, 2022                    THE MILLER LAW FIRM, P.C.

*/s/ E. Powell Miller*
E. POWELL MILLER (P39487)
SHARON S. ALMONRODE (P33938)
DENNIS A. LIENHARDT (P81118)
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
E-mail: epm@millerlawpc.com
        ssa@millerlawpc.com
        dal@millerlawpc.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
ROBERT K. SHELQUIST
REBECCA A. PETERSON (241858)
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
        rapeterson@locklaw.com
        capeterson@locklaw.com

ROBBINS LLP
KEVIN A. SEELY (199982)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
E-mail: kseely@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON
KARLA M. GLUEK
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
E-mail: dgustafson@gustafsongluek.com
      kgluek@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA
4725 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: charles@cuneolaw.com

LITE DEPALMA GREENBERG &
AFANADOR, LLC
JOSEPH DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
      scruzhodge@litedepalma.com

WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
55 West Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2022, I electronically filed the foregoing with

the Clerk of the Court using the ECF system which will notify all counsel of record

authorized to receive such filings.

/s/ *E. Powell Miller*
E. POWELL MILLER (P39487)
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com